# 26-0253

## United States Court of Appeals
*for the*
## Second Circuit

CHERYL JAMES, PKA SALT-N-PEPA, SANDRA DENTON, PKA SALT-N-PEPA,

*Plaintiffs–Appellants,*

- v. -

UMG RECORDINGS, INC., DBA UNIVERSAL MUSIC GROUP, A DELAWARE corporation,

*Defendant–Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS – APPELLANTS CHERYL JAMES, PKA SALT-N-PEPA, SANDRA DENTON, PKA SALT-N-PEPA

RICHARD S. BUSCH
ANDREW H. "DREW" DAVIS
*Attorneys for Plaintiffs–Appellants*
KING & BALLOW LAW OFFICES
26 Century Boulevard, Suite NT 700
Nashville, Tennessee 37214
Phone: (615) 259-3456
*rbusch@kingballow.com*
*ddavis@kingballow.com*

TABLE OF CONTENTS

Table of Authorities .................................................................................. iv

Jurisdictional Statement ..............................................................................1

Statement of the Issues................................................................................2

Statement of the Case..................................................................................4

I.  Introduction and Factual Background. ............................................5

A.  Preliminary Statement ...............................................................5

B.  The Contracts at Issue and the Termination Notices. ................7

II.  The District Court's Decision.........................................................12

III.  The Congressional Intent of Section 203's Termination Provisions.............13

Summary of the Argument.........................................................................14

Argument...................................................................................................18

I.  The Standard of Review for All Issues in this Appeal is *De Novo*. ..............18

II.  The Plain Language of the Relevant Agreements Demonstrates that Appellants Effected a Terminable Grant under Section 203.........................18

A.  Section 203 Applies to Any "grant of transfer or license of copyright or of any right under a copyright." ...............................18

1.  Copyrights Do Not Vest, and Cannot Be Conveyed Prior to Affixation in a Tangible Medium.................................................................19

2.  Section 204, which Governs Transfers of Copyright, Requires Merely a Writing Signed by the Conveying Party.......................................22

a)  Congress provided an express definition of "transfer of copyright." .22

b) Congress also provided express requirements for a transfer of copyright.................................................................................22

c) Federal Law Requires a Writing Signed by the Grantor, and State Law Determines Whether There is an Intent to Grant Copyright......................24

B. The Plain Language of the Agreements Shows Present Intent to "transfer or license of copyright or of any right under a copyright." ..............................27

1. The District Court Erred by Searching for an Assertion of Copyright Ownership in the 1986 Agreements. ............................................................27

2. The NITA Agreement Contains a Terminable Grant. ...........................30

a) The NITA Agreement presently conveys the copyrights to the sound recordings at issue. ..............................................................................30

b) At the very least, the NITA Agreement presently grants exclusive exploitation rights which are "rights under copyright."............................36

3. The District Court Erred in Finding that "It was only Azor and NITA that granted a transfer of rights in 1986 to Next Plateau Records" as the NPR Agreement and Inducement Letter Confirm Salt-N-Pepa's Assignment Found in the NITA Agreement.....................................................................37

a) Grants Are Binding on Successors-In-Interest...................................37

b) The District Court Erred by Not Considering that the NITA Agreement Came First. ............................................................................38

c) The District Court's Analysis of the NPR Agreement and attached Inducement Letter are in Error................................................................41

d) Nonetheless, the Inducement Letter Expressly Independently Effects a Grant of Copyright. ...............................................................................45

C. Alternatively, The Language of the 1986 Agreements is Ambiguous, Precluding Judgment as a Matter of Law under Rule 12.................................46

III. The Recordings Are Not Made-for-Hire. ......................................................48

ii

A. The Statutory Definition and Legislative History Show that Congress Did Not Intend for Sound Recordings to be Works Made for Hire Unless Made by an Employee in the Scope of Her Employment. ...............................................49

    1. Employees within the Scope of their Employment. ..............................50

    2. Specially Commissioned Works. ...........................................................50

B. The District Court Clearly Made an Implicit Finding that the Sound Recordings were Made for Hire. ........................................................................52

C. The Sound Recordings are Not Works Made For Hire. .............................54

    1. Making a Determination of Whether the Works are Made for Hire is Inappropriate at Pleadings Stage. ................................................................54

    2. Salt-N-Pepa have Adequately Pleaded that the Works are Not Made for Hire. ...........................................................................................................55

IV. Determination of Whether the Remixes are Derivative Works is Improper on a Motion to Dismiss. .......................................................................................56

Conclusion ........................................................................................................59

## TABLE OF AUTHORITIES

### The Constitution of the United States

U.S. Const. art. I, § 8, cl. 8...................................................................................19

### The Supreme Court of the United States

*Cmty. for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989) ............................................................ 20, 27, 50, 51

*Encino Motorcars, LLC v. Navarro*,
584 U.S. 79 (2018) ...........................................................................37

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) .........................................................................57

*Fogerty v. Fantasy, Inc.*,
510 U.S. 517 (1994) .........................................................................18

*Fred Fisher Music Co. v. M. Witmark & Sons*,
318 U.S. 643 (1943) .........................................................................20

*Harper & Row, Publrs. v. Nation Enters.*,
471 U.S. 539 (1985) .........................................................................19

*Miller Music Corp. v. Charles N. Daniels, Inc.*,
362 U.S. 373 (1960) .........................................................................20

*Russello v. United States*,
464 U.S. 16 (1983) ...........................................................................52

*Stone v. INS*,
514 U.S. 386 (1995) .........................................................................52

### Cases

*Acuti v. Authentic Brands Grp. LLC*,
33 F.4th 131 (2d Cir. 2022).......................................................... 23, 28

*Advance Trading Corp. v. Nydegger & Co.*,
127 N.Y.S.2d 800 (Sup. Ct. 1953) ...................................................28

iv

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015)....................................................................20

*Aymes v. Bonelli*,
  980 F.2d 857 (2d Cir. 1992) ...................................................................55

*Bernstein v. Glavin*,
  725 N.E.2d 455 (Ind. Ct. App. 2000) ....................................................26

*Close-Up Int'l, Inc. v. Berov*,
  382 F. App'x 113 (2d Cir. 2010) ............................................................24

*Effects Assocs. v. Cohen*,
  908 F.2d 555 (9th Cir. 1990) ..................................................................25

*Eight Mile Style, LLC v. Spotify USA Inc.*, No. 3:19-cv-0736,
  2022 U.S. Dist. LEXIS 161220 (M.D. Tenn. Sep. 7, 2022) .................48

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*,
  375 F.3d 168 (2d Cir. 2004) ..................................................................47

*Horror Inc. v. Miller*,
  15 F.4th 232  (2d Cir. 2021) ..................................................................50

*Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*,
  52 N.Y.2d 105 (N.Y. 1981)....................................................................39

*L.K. Station Grp., LLC v. Quantek Media, LLC*,
  2009 NY Slip Op 3828, 879 N.Y.S.2d 112 (App. Div. 1st Dept.).......42

*Lazar v. Amazon Studios, LLC*, No. 2:24-cv-09748-SVW-KS,
  2026 LX 140625 (C.D. Cal. Feb. 13, 2026).........................................55

*Match Grp., LLC v. Beazley Underwriting Ltd.*, No. 23-1058-cv,
  2024 U.S. App. LEXIS 20317 (2d Cir. Aug. 13, 2024)........................47

*Miller v. Wells Fargo Bank Int'l Corp.*,
  540 F.2d 548 (2d Cir. 1976) ..................................................................28

*Neurological Surgery Prac. of Long Island, PLLC v. United States HHS*,
  145 F.4th 212 (2d Cir. 2025)..................................................................18

v

*Olin Corp. v. Ins. Co. of N. Am.*, No. 84-cv-1968,
   2016 U.S. Dist. LEXIS 32079 (S.D.N.Y. Mar. 11, 2016)....................................31

*Playboy Enters. v. Dumas*,
   53 F.3d 549 (2d Cir. 1995) ....................................................................... 23, 24

*Pohl v. Commercial Ins. Co.*,
   36 Misc. 2d 173 (Sup. Ct. Rensselaer County 1962) ............................................33

*Pujals v. Standard Chtd. Bank*,
   533 F. App'x 7 (2d Cir. 2013) ......................................................................47

*R.G. Grp., Inc. v. Horn & Hardart Co.*,
   751 F.2d 69 (2d Cir. 1984) ..........................................................................39

*Radio TV Espanola S.A. v. New World Entm't Ltd.*,
   183 F.3d 922 (9th Cir. 1999)........................................................................26

*Regency Gardens Co. v. Yoshevayev*,
   2021 NY Slip Op 21091, 71 Misc. 3d 1046 (Civ. Ct. Queens County 2021)......33

*Rescuecom Corp. v. Google, Inc.*,
   562 F.3d 123 (2d Cir. 2009) ..................................................................... 41, 59

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*,
   2009 NY Slip Op 8675,13 N.Y.3d 398 (N.Y. 2009)...........................................42

*Schiller & Schmidt, Inc. v. Nordisco Corp.*,
   969 F.2d 410 (7th Cir. 1992) ........................................................................23

*SCO Grp., Inc. v. Novell, Inc.*,
   578 F.3d 1201 (10th Cir. 2009) .....................................................................29

*Shell v. Burlington N. Santa Fe Ry. Co.*,
   941 F.3d 331 (7th Cir. 2019) ........................................................................33

*Silvester v. Time Warner, Inc.*,
   1 Misc. 3d 250 (Sup. Ct. N.Y. County 2003)......................................... 25, 30, 44

*Steiner v. Lewmar, Inc.*,
   816 F.3d 26 (2d Cir. 2016) ..........................................................................47

vi

*Stephan v. State Veterinary Med. Bd.*,
 113 Ohio App. 538 (1960)............................................................................30

*TeeVee Toons, Inc. v. DM Records, Inc*,
 2007 U.S. Dist. LEXIS 74822 (S.D.N.Y. Sep. 27, 2007) ....................................59

*Underwood v. Lastrada Entm't Co.*, No. 16cv9058 (DLC),
 2020 U.S. Dist. LEXIS 118013 (S.D.N.Y. July 6, 2020)......................................9

*United States v. Am. Soc'y of Composers (In re Cellco P'ship)*,
 663 F. Supp. 2d 363 (S.D.N.Y. 2009) ................................................................34

*Vetter v. Resnik*,
 163 F.4th 951 (5th Cir. 2026) ............................................................................11

*Waite v. UMG Recordings, Inc.*, No. 19-cv-01091 (LAK),
 2023 U.S. Dist. LEXIS 14465 (S.D.N.Y. Jan. 27, 2023)......................................54

*Westchester Gen. Hosp., Inc. v. Evanston Ins. Co.*,
 48 F.4th 1298 (11th Cir. 2022)............................................................................33

*Woods v. Bourne Co.*,
 60 F.3d 978 (2d Cir. 1995) ..................................................................................58

## Statutes

17 U.S.C. § 101................................................................................. passim

17 U.S.C. § 102................................................................................................15

17 U.S.C. § 103(b) ...........................................................................................57

17 U.S.C. § 106.......................................................................................... 19, 32

17 U.S.C. § 201.................................................................................... 15, 17, 54

17 U.S.C. § 201(a) ................................................................................... 20, 27

17 U.S.C. § 201(b) ................................................................................... 35, 49

17 U.S.C. § 203................................................................................. passim

vii

17 U.S.C. § 203(a)(4) ................................................................................37

17 U.S.C. § 203(b)(1) ................................................................................57

17 U.S.C. § 204 ........................................................................................15

17 U.S.C. § 204(a) ...................................................................................23

17 U.S.C. § 23 (1909) ...............................................................................20

28 U.S.C. § 1291 ........................................................................................1

28 U.S.C. § 1331 ........................................................................................1

28 U.S.C. § 1338(a) ...................................................................................1

28 U.S.C. § 1367(a) ...................................................................................1

## Regulations

37 C.F.R. § 201.10 ............................................................................ 21, 38

## Rules

FED. R. APP. P. 4(a)(1)(A) .........................................................................1

## Treatises and Other Authorities

1 Nimmer on Copyright § 2.10[A][2][b] (2026) ....................................34

1 Nimmer on Copyright § 3.01 (2026) ...................................................57

1 Nimmer on Copyright § 5.03 (2026) ....................................... 51, 52, 55

2 Nimmer on Copyright § 7.16 (2026) ...................................................15

3 Nimmer on Copyright § 10.03 (2026) ........................................... 23, 25

Black's Law Dictionary (9th Ed. 2009) ..................................................22

H.R. Rep. No. 92-487 ...............................................................................35

H.R. Rep. No. 94-1476 ................................................................................... passim

UNITED STATES COPYRIGHT OFFICE, *Analysis Of Gap Grants Under The Termination Provisions of Title 17, Gap in Termination Provisions*, 76 Fed. Reg. 32,316 (June 6, 2011) ............................................................................21

UNITED STATES COPYRIGHT OFFICE, *Circular 56A: Musical Compositions and Sound Recordings* ............................................................................34

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1338(a) because the Plaintiffs-Appellants seek a declaration of rights and injunctive relief under the Copyright Act of 1976, 17 U.S.C. § 101, *et seq.*, and it had supplemental jurisdiction over Plaintiffs-Appellants' remaining claim under 28 U.S.C. § 1367(a) as it arises directly from the common nucleus of operative facts as those arising in federal question jurisdiction.

This Court has jurisdiction under 28 U.S.C. § 1291. The District Court granted Defendant-Appellee, UMG Recordings, Inc.'s ("UMG") Motion to Dismiss on January 8, 2026, with judgment entered for UMG on January 9, 2026. A-223. Pursuant to FED. R. APP. P. 4(a)(1)(A), Plaintiffs-Appellants timely filed their Notice of Appeal on February 4, 2026. A-225.

1

**STATEMENT OF THE ISSUES**

Plaintiffs-Appellants Cheryl James ("James") and Sandra Denton ("Denton"), collectively p/k/a Salt-N-Pepa ("Salt-N-Pepa"), raise a solitary issue on appeal: whether the District Court erred in granting Defendant-Appellee UMG Recording, Inc.'s ("UMG") motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), finding that "[T]he 1986 agreements do not indicate that Plaintiffs ever owned the copyrights to the sound recordings or that they granted a transfer of those rights to anyone else" such that Plaintiffs, Cheryl James and Sandra Denton, collectively, p/k/a/ Salt-N-Pepa, had not made a grant of copyrights terminable pursuant to 17 U.S.C. § 203. A-218. Subsidiary to this issue are:

(a) Do the operative agreements between Salt-N-Pepa, their producer's company, Noise in the Attic Productions, Inc. ("NITA"), and between NITA and UMG's predecessor-in-interest, Next Plateau Records, Inc. ("NPR") (collectively, the "1986 Agreements") constitute a "exclusive or nonexclusive grant of a transfer or license of a copyright or of any right under a copyright" which is terminable under 17 U.S.C. § 203;

(b) Did the District Court apply the correct standard under 17 U.S.C. § 204 and applicable state contract law in finding that the 1986 Agreements did not constitute a transfer of copyright from Salt-N-Pepa to UMG's predecessor(s)-in-interest?

2

(c) Did the District Court err by implicitly making a finding that the works were made for hire despite claiming not to "reach the issue of whether the [subject] recordings were, in fact, works made for hire" (A-219); and

(d) In deciding these issues, did the District Court apply the proper standard for evaluating the evidence under Rule 12? Specifically, did it accept as true, all the factual allegations contained in the operative First Amended Complaint, drawing all reasonable inferences in the light most favorable to the non-moving party?

## STATEMENT OF THE CASE

Salt-N-Pepa initiated this action against UMG after failed negotiations regarding their Notices of Termination pursuant to 17 U.S.C. § 203. They brought two causes of action: First for Declaratory Relief seeking a declaration that their Notices of Termination are valid and effective such that the copyrights to the sound recordings listed therein should revert to Salt-N-Pepa as the statutory authors on the dates listed therein; and Second for Conversion seeking damages from UMG's wrongful dominion over the master tapes that contain the subject sound recordings.

UMG filed a motion to dismiss arguing, as relevant to this appeal, that: (1) the relevant agreements do not contain a grant terminable under Section 203; (2) the sound recordings were works made for hire and thus excluded by Section 203's termination provisions; and (3) the first two notwithstanding, that many of the sound recordings listed on the termination notices are remixes and thus derivative works which are also not subject to Section 203's termination provisions. *See generally,* A-206-A-223. The District Court, presided over by Judge Denise Cote, granted UMG's motion agreeing with UMG on the first issue and declining to expressly reach the second two issues.[1] This appeal followed.

---

[1] Although, as discussed *infra*, the District Court errantly implicitly reached the work for hire issue.

4

## I.    Introduction and Factual Background.

### A. Preliminary Statement

Salt-N-Pepa are worldwide music icons hailing from Queens, New York. A-37. They are pioneers in Hip-Hop becoming: the first females certified platinum by the Recording Industry Association of America, the first female rap group to win a Grammy Award, and the first female rap group to be awarded a Grammy Lifetime Achievement Award. *Id*. They have been inducted into the Rock & Roll Hall of Fame and have their own star on the Hollywood walk of fame. *Id.* They average over five million monthly streams on Spotify; have garnered over one billion streams worldwide; and sold over fifteen million physical albums in the United States alone. *Id*. Their catalog includes such ever-green hits as "Push It" and "Whatta Man" that still enjoy global appeal, the former recently charting *again* (nearly forty years after initial release) in the United Kingdom. A-38.

The lasting success of Salt-N-Pepa's catalog has been a windfall for UMG and its predecessors-in-interest – indeed, the catalog generated approximately one million dollars in royalties in the five months preceding this lawsuit, alone. Under the relevant agreements, UMG has enjoyed the lion's share of these royalties.

Congress gave artists like Salt-N-Pepa an opportunity to escape unremunerative contracts like those at issue by giving statutory authors a right to terminate grants of copyrights while balancing that interest by giving the grantees a

5

two-year period as a quasi-right of first refusal to renegotiate. Unfortunately, the negotiations between Salt-N-Pepa and UMG did not achieve an agreement, and despite receipt of valid, regulation-compliant notices UMG has refused to honor them. Hence, the instant action.

Before detailing the factual predicate giving rise to this action, it is important to clarify what is and is *not* at issue on this appeal.

***What is not at issue.*** UMG's motion to dismiss does not raise any issues regarding compliance with the requirements set forth in Section 203 or the regulations promulgated thereunder, and UMG's motion likewise does not dispute that the notices were timely served on the correct parties.

***What is at issue.*** Accordingly, this appeal is relatively narrow, focusing predominantly on just one issue: did Salt-N-Pepa effectuate a "transfer or license of copyright or of any right under a copyright" (as those terms are defined in the Copyright Act of 1976) that is terminable under Section 203? Here, the relevant 1986 Agreements *do* effect a transfer of copyright by Salt-N-Pepa, or, at the very least, constitute their grant of an exclusive license to exploit the sound recordings to UMG's predecessor-in-interest. This is all that is necessary to fall within the purview of Section 203's termination provisions.

This issue has two related issues: (1) are the sound recordings works made for hire and thus excluded from Section 203's termination provisions; and (2) are certain

of the sound recordings, the "remixes," actually derivative works which are excluded from Section 203's termination provisions? However, both inquiries are too fact-intensive to be disposed of on a motion to dismiss.

**B. The Contracts at Issue and the Termination Notices.**

Salt-N-Pepa began their careers as recording artists in 1985, first enjoying success with their track "The Showstopper" which was a response to Doug E. Fresh's hit, "The Show." A-45. "The Showstopper" was the genesis of their professional moniker, inspired by the lyric: "right now I'm gonna show you how it's supposed to be 'cause we, the salt and pepper MCs." A-45.

On May 15, 1986, Salt-N-Pepa entered into a recording agreement with NITA, which was owned by James' then-boyfriend and later-producer, Herb Azor. A-45. In the NITA Agreement, Salt-N-Pepa agreed to provide "exclusive personal services to [NITA] as a recording artist." A-72. The NITA Agreement likewise constitutes a grant of copyrights, or at least an exclusive license to exploit Salt-N-Pepa's sound recordings by way of language in the preamble: "as well as **granting** [NITA] certain exclusive rights with respect to Artist pertaining to audio-visual exploitation." *Id.* (emphasis added). This grant of copyrights in the preamble is confirmed in Paragraph H of the NITA Agreement where, in relevant part, Salt-N-Pepa agreed that: "As between [NITA] and [Salt-N-Pepa], [NITA] shall be the sole and exclusive owner of any and all rights, title and/or interest in and to master

7

recordings recorded hereunder, including but not limited to the worldwide sound copyrights therein and the renewal rights thereto." A-75.

Also on May 15, 1986, as contemplated by the NITA Agreement, NITA entered into a Distribution Agreement with NPR. Under the terms of the NPR Agreement, NITA granted the rights it acquired under the NITA Agreement to Salt-N-Pepa's recording services *and* the copyrights to sound recordings created thereunder to NPR. A-72, A-85. Further, also on the same day, Salt-N-Pepa executed the Inducement Letter appended to the NPR Agreement (the "Inducement Letter") wherein Salt-N-Pepa agreed to be bound by the NPR Agreement as if a party thereto, agreed to provide their recording services to NPR, ***and*** expressly "grant[ed] [NPR] all the rights and remedies therein granted to [NPR]" (including, at issue here, "exclusive rights with respect to Artist pertaining to audio-visual exploitation" of the copyrights to the sound recordings). A-107-109.

In 1992, after enjoying tremendous success exploiting Salt-N-Pepa's material, NPR assigned its rights to London Records ("London"), and Salt-N-Pepa and NITA entered into an agreement with London ratifying that assignment and agreeing to provide further recording services thereunder (the "London Agreement"). A-114-141. The same day, July 1, 1992, Salt-N-Pepa entered into a subsequent agreement with NITA (the "1992 NITA Agreement") acknowledging, *inter alia*, that two albums remained to be recorded under the 1986 NITA Agreement. A-142-151.

8

Importantly, neither of the 1986 Agreements nor those from 1992 contain any of the statutorily-required language that would render the sound recordings works made for hire nor language that would create a traditional employment relationship. *First*, in neither of the agreements do the parties "expressly agree" that the work shall be considered a "work made for hire." *See* 17 U.S.C. § 101 (A work is specially ordered or commissioned as a work made for hire only "if the parties **expressly** agree in a written instrument signed by them that the work shall be considered a work made for hire") (emphasis added). <u>Indeed, neither of the agreements even use the phrase "made for hire"</u>! *Second*, noticeably absent from either agreement are the conventional hallmarks of traditional employment, *e.g.* the tax treatment of the hired party and provision of employee benefits to Salt-N-Pepa.[2]

As such, reading all of the Agreements together, the only conclusion that can be drawn is that Salt-N-Pepa, the recording artists and authors of the sound recordings (as that term is defined in the Copyright Act), agreed to grant their

---

[2] Recording agreements which, in fact, render sound recordings "works made for hire" of the record company contain express language to that effect. For example, "<u>Each Master Recording</u> made under this agreement, from the Inception of Recording, <u>will be considered a 'work made for hire'</u> for Company, and will be deemed transferred to Company by this agreement, together with all rights in it, if it is determined not to be such a work . . . . All such Master Recordings and all Matrices and Phonograph Records manufactured therefrom, together with the performances embodied thereon, <u>shall be sole property of Company</u>, free from any claims whatsoever by you or any other Person…" *Underwood v. Lastrada Entm't Co.*, No. 16cv9058 (DLC), 2020 U.S. Dist. LEXIS 118013, at *2 (S.D.N.Y. July 6, 2020) (Cote, J.) (emphasis kept).

copyrights in the sound recordings to NITA, who in turn granted them to NPR, who in turn granted them to London, with those copyrights ultimately being assigned to UMG. A-46-52.

After UMG and its predecessors-in-interest enjoyed the fruits of Salt-N-Pepa's artistic endeavors for over three decades, on March 22, 2022, Salt-N-Pepa exercised their statutory rights under Section 203 serving termination notices on UMG for the sound recordings, and submitted these notices with the Copyright Office for recordation that same day as prescribed in the statute. A-55. On May 10, 2022, the Copyright Office requested that the notice of termination be amended to specify the effective dates of termination for each sound recording based on the date of grant or date of publication. A-55-56. That amended notice of termination was served on UMG and submitted for recordation with the Copyright Office on May 13, 2022. *Id.*; A-152-170.

While Congress intended that the notice period in the termination procedure serve to provide time to negotiate a "first refusal,"[3] UMG responded on June 27, 2022 alleging that the notices of termination were "invalid and ineffective" arguing the same points raised on its Motion to Dismiss: that Salt-N-Pepa had not made a terminable grant; the works were made for hire; and that the remixes were not subject to termination as derivative works. A-171-77. On May 15, 2024, the date upon which

---

[3] H.R. Rep. 94-1476 at [127].

10

the first of the terminations were to become effective, UMG ceased exploitation of the sound recordings, removing them from streaming platforms and distribution channels. A-56-57. Salt-N-Pepa allege that this decision was not a magnanimous gesture respecting Salt-N-Pepa's rights, but rather to gain financial leverage over them by stemming the flow of their royalties. *Id.* Indeed, this allegation makes sense given UMG's refusal to acknowledge the validity of the termination notices.

The Parties then endeavored to resolve the dispute regarding the termination notices, entering into a Section 203 Exploitation Agreement which would allow the exploitation of the sound recordings while negotiations continued. A-57; A-179-181. The Parties were unable to resolve the dispute, and on April 1, 2025, Plaintiffs were compelled to terminate the Section 203 Exploitation Agreement. A-199-200. On April 10, 2025, UMG responded in writing continuing to claim ownership of the sound recordings and informing Salt-N-Pepa that they would "ceas[e] all U.S. exploitation of the Sound Recordings at this time."[4] Because of the irreconcilable dispute regarding the validity of the termination notices, Salt-N-Pepa brought the instant action to acquire a declaration as to the validity of the termination notices and that they are the owners of the copyrights in the subject sound recordings.

---

[4] *But see, Vetter v. Resnik*, 163 F.4th 951 (5th Cir. 2026) (holding that where the grant of copyright does not contain a geographical limitation, then the termination of that grant should likewise not be limited solely to the United States)

11

## II.  The District Court's Decision

The District Court granted UMG's motion to dismiss, finding, "the 1986 agreements do not indicate that Plaintiffs ever owned the copyrights to the sound recordings or that they granted a transfer of those rights to anyone else." A-218. The District Court did not reach the issue of whether the remixes are derivative works. *See generally* A-206-223. And, while claiming that the Opinion "does not reach the issue of whether the recordings were, in fact, works made for hire," (A-219), clearly the District Court made that conclusion, at least implicitly, when it determined that Salt-N-Pepa did not assert copyright ownership or effect a grant of copyright in the 1986 Agreements.

The District Court is clearly in error. The plain language of these agreements can lead to no other conclusion. Salt-N-Pepa are the statutory authors of the sound recordings, the copyrights therein vested in them by law upon affixation in a tangible medium. They granted their rights to NITA in the NITA Agreement, the first in a chain of grants ultimately leading to UMG. Given that the first-in-time grant was made by the statutory authors, it is terminable under Section 203.

The District Court also dismissed Salt-N-Pepa's claim for conversion finding that none of the contracts indicated that Salt-N-Pepa ever owned the physical master tapes. A-222.

12

Salt-N-Pepa timely filed their notice of appeal (A-225), and this appeal followed.

### III.     The Congressional Intent of Section 203's Termination Provisions

Before turning to the merits, it is important to highlight the clear Congressional purpose behind the termination rights codified in Section 203. Congress gave a clear mandate that the termination rights codified in Section 203 were meant to rectify the imbalance of bargaining power that all artists face when negotiating with entities to exploit their works. H.R. Rep. No. 94-1476 at [124]. Congress was intentional with the design of Section 203 in response to judge-made law that perverted the purpose of the termination provisions under the 1909 Act. In 1961, the Register of Copyrights provided a Report on the General Revision of U.S. Copyright Law addressed to the then-chairman of the House Judiciary Committee.[5] In this Recommendation, the Register noted that:

> In practice, this reversionary feature of the present renewal system has largely failed to accomplish its primary purpose. It has also been the source of more confusion and litigation than any other provision in the copyright law.
>
> … It has become common practice for publishers and others to take advance assignments of future renewal rights. Thus, the reversionary

---

[5] Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law, 87th Cong., 1st Sess., Copyright Law Revision (H. Judiciary Comm. Print 1961). Full text available at https://www.copyright.gov/history/1961_registers_report.pdf

13

> purpose of the renewal provision has been thwarted to a considerable extent. …
>
> Instead of the present reversion of the renewal right, we believe that some other provision should be made to permit authors and their heirs to renegotiate their assignments in certain situations.[6]

The Register continued:

> The present statute has sought to protect authors against transfers of their rights for inadequate remuneration, by providing for the reversion of the renewal copyright to the author or his heirs. …
>
> Since authors are often in a relatively poor bargaining position, however, we believe that some other provision should be made to permit them to renegotiate their transfers that do not give them a reasonable share of the economic returns from their works.[7]

Congress meant to remedy these issues when it codified Section 203. Allowing the District Court's decision to stand is tantamount to continuing the cycle of allowing judicial decisions to contravene Congress's stated intent to provide safeguards to artists to promote the progress of useful arts – as mandated by the Constitution.

## SUMMARY OF THE ARGUMENT

Section 203 provides that within the earlier of thirty-five years to forty years from the execution of the grant or thirty-five to forty years from the date of publication of the work an author of copyright may terminate "the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978." 17 U.S.C. § 203.

---

[6] *Id.* at 53-55.
[7] *Id.* at 92.

14

The District Court granted UMG's motion to dismiss finding that Salt-N-Pepa had not made a grant of copyright terminable under Section 203. A-206-223. This decision is riddled with error.

The District Court misapplied the statutory definition of "transfer of copyright" under 17 U.S.C. § 101, and as governed by 17 U.S.C. § 204, by creating an entirely new requirement that finds no basis in the statute, legislative history, binding judicial opinions, or any copyright jurisprudence. To wit, the District Court held that the "key inquiry" was "whether Plaintiffs, in any of the 1986 agreements, asserted their ownership of the copyrights and transferred that ownership to a predecessor of UMG." A-216.

Rather than focusing on whether the 1986 Agreements effected a transfer of copyright or any rights thereunder by Salt-N-Pepa, the District Court created a new requirement out of whole cloth: "whether Plaintiffs, in any of the 1986 agreements, ***asserted their ownership of the copyrights***…" *Id.* (emphasis added). Salt-N-Pepa have no such requirement under the law to "assert their ownership" of the copyrights. Copyrights vest automatically in the author at affixation. 17 U.S.C. §§ 102, 201.[8] This error pervades the District Court's decision. Characterizing it as the "key

---

[8] The 1976 Act removed the publication and registration requirement from the 1909 Act, *i.e.* "registration is not a condition to obtaining copyright." 2 Nimmer on Copyright § 7.16 (2026)

inquiry," the District Court repeated this ersatz requirement twice more in the eight pages of relevant discussion in the Opinion. A-221-22.

Along with creating an extra element from thin air, the District Court clearly misinterpreted the 1986 Agreements, ignoring relevant grant language and taking an overall myopic view of the transfers at issue. By ignoring the grant of copyrights and exclusive exploitation rights thereof in the NITA Agreement (despite its use of the word "granting"), the District Court erred by finding that Salt-N-Pepa made no such grant. The District Court nullified the following language from the preamble of the NITA Agreement: "as well as [Salt-N-Pepa] granting [NITA] certain exclusive rights with respect to Artist pertaining to audio-visual exploitation," confirmed as part of the parties' contract by Paragraph H.  A-75.

Likewise, the District Court erred in its interpretation of the Inducement Letter which itself contains a direct grant from Salt-N-Pepa to NPR. A-107-109 ("I [Salt-N-Pepa] hereby make all of the warranties and representations made to you in said [NPR Agreement], ***grant you all of the rights and remedies therein***…") (emphasis added). Clearly these agreements constitute a terminable transfer – at the very least of "exclusive rights … pertaining to audio-visual exploitation." However, to the extent one could find the transfer ambiguous, which it is not, determination at the pleadings stage would be inappropriate.

16

Further, the District Court erred in its implicit finding that the sound recordings are works made for hire. While the District Court noted that its opinion did not reach the issue, clearly it did. By requiring an assertion of copyright ownership, in effect, the District Court made a determination of authorship. Salt-N-Pepa, as the recording artists, are the statutory authors of the work as that term is defined and clarified by the legislative history behind copyright protection of sound recordings. The only way that the copyrights in the sound recordings would not vest initially in them as authors would be if the works were made for hire. *See* 17 U.S.C. § 201(a)-(b). Making such a determination, though, finds no basis in the agreements. And, and under binding Supreme Court precedent, making the determination of whether a work is made for hire is a fact-intensive inquiry which courts have held is inappropriate for resolution at the pleadings stage (especially where, as here, there is no express "work for hire" language in any of the agreements).

Finally, while the District Court did not reach the issue, Salt-N-Pepa provide brief analysis addressing UMG's arguments before the District Court that certain of the sound recordings are "remixes" and thus "derivative works" ineligible for termination under Section 203. Put simply, the terms "remix" and "derivative work" are not synonyms, and not every "remix" contains sufficient independently copyrightable elements to be deemed a derivative work. This too is a fact-intensive inquiry that likely would involve expert, musicological testimony regarding the

17

additional elements contained in the remix and whether that is sufficiently original and copyrightable on a song-by-song basis. Thus, it is not appropriate for resolution at the pleadings stage.

<strong><u>ARGUMENT</u></strong>

**I. The Standard of Review for All Issues in this Appeal is _De Novo_.**

This Court reviews a district court's decision to grant a motion to dismiss _de novo_ "'accepting the allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff.'" _Neurological Surgery Prac. of Long Island, PLLC v. United States HHS_, 145 F.4th 212, 222 (2d Cir. 2025).

**II. The Plain Language of the Relevant Agreements Demonstrates that Appellants Effected a Terminable Grant under Section 203.**

**A. Section 203 Applies to Any "grant of transfer or license of copyright or of any right under a copyright."**

Analyzing the Copyright Act, the Supreme Court has made clear, "'Our task is to apply the text, not to improve upon it. '[] When the text of the statute is clear, our interpretive inquiry ends." _Fogerty v. Fantasy, Inc._, 510 U.S. 517, 538 (1994) (internal citations omitted). Here, Section 203 of the Copyright Act is clear:

> In the case of any work other than a work made for hire, the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, otherwise than by will, is subject to termination under the following conditions:…

17 U.S.C. § 203.

18

The Copyright Act provides the definitive list of "rights under copyright" in Section 106. At issue for sound recordings are the rights to:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;… and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.[9]

17 U.S.C. § 106.

### 1. Copyrights Do Not Vest, and Cannot Be Conveyed Prior to Affixation in a Tangible Medium.

Copyright law is rooted in the Constitutional mandate to Congress "to Promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. The Supreme Court noted that "[This] limited grant is a means by which an important public purpose may be achieved. It is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired." *Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 546 (1985). "The monopoly created by copyright thus

---

[9] This last one added by the Digital Performance Right in Sound Recordings Act of 1995, Pub. L. 104-39.

19

rewards the individual author in order to benefit the public." *Id.* As this Court noted, "copyright is a commercial right, intended to protect the ability of authors to profit from the exclusive right to merchandise their own work." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015).

"The Copyright Act of 1976 provides that copyright ownership 'vests initially in the author or authors of the work.'" *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989) (citing 17 U.S.C. § 201(a)).

Thus, copyrights, or any rights thereunder, cannot be transferred *until* they vest. However, that is not to say that an author cannot presently intend to convey copyrights in the future. For example, the Supreme Court has confirmed that under the 1909 Act, an author could assign his contingent rights to the renewal term of copyright.[10] *See Fred Fisher Music Co. v. M. Witmark & Sons*, 318 U.S. 643, 656-57 (1943); *Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373, 375 (1960).

The Copyright Office has declined to rule that an agreement to transfer copyright that predates the creation thereof is invalid solely for that reason. Rather, it issued a rule in response to a Notice of Inquiry regarding so-called "gap grants" where a copyrighted work was created after January 1, 1978 but where the agreement

---

[10] Under the Copyright Act of 1909, the term of Copyright was two, separate, twenty-eight-year periods. The Second Term being contingent upon the author's survival (said rights passing to her heirs if the author pre-deceased the expiration of the initial term) and that the application for renewal was made in the last year of the first term. 17 U.S.C. § 23 (1909).

20

effecting that transfer pre-dated that date. [11] *See* UNITED STATES COPYRIGHT OFFICE, *Analysis Of Gap Grants Under The Termination Provisions of Title 17, Gap in Termination Provisions*, 76 Fed. Reg. 32,316 (June 6, 2011).[12] The Copyright Office ruled these grants of future copyrights by way of "Gap Grants are terminable under Section 203, as currently codified, because as a matter of copyright law, a transfer that predates the existence of the copyrighted work cannot be effective (and therefore cannot be 'executed') until the work of authorship (and the copyright) come into existence." *Id.* That is, even though the *agreement* conveying the copyrights pre-dated the existence of the copyrights and January 1, 1978, they were nonetheless terminable under Section 203 which governs grants made after that date. This rule was codified at 37 C.F.R. § 201.10(f)(1)(ii)(C).

In summary, the copyrights to works *to be created* can be transferred upon the affixation of the work in a tangible medium. The fact that an agreement to effect such a transfer might call for such transfer to occur in the future does not mean, as a matter of law, that there is not a present intent to transfer the copyrights by way of said agreement.

---

[11] Section 203 applies to terminations of grants made after this date, whereas Section 304 applies to terminations of grants made before this date. Hence the need for clarification.

[12] Available at http://www.copyright.gov/reports/gap-grant-analysis.pdf

**2. Section 204, which Governs Transfers of Copyright, Requires Merely a Writing Signed by the Conveying Party.**

**a) Congress provided an express definition of "transfer of copyright."**

The Copyright Act defines a "transfer of copyright" in the broadest of terms:

> A "transfer of copyright ownership" is an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license.

17 U.S.C. § 101. Congress made it very clear that a "transfer of copyright" does not necessarily mandate a transfer of title thereto. By including "hypothecation," Congress made it clear that it considers "any [] conveyance, alienation, or hypothecation" to be sufficient to constitute a transfer of copyright even if there is not a formal transfer of title. To wit, hypothecation does not even involve a transfer of title. As Black's Law Dictionary provides, hypothecation is "[t]he pledging of something as security ***without delivery of title or possession***. *Hypothecation*, Black's Law Dictionary (9th Ed. 2009) (emphasis added).

**b) Congress also provided express requirements for a transfer of copyright.**

Section 204 provides the requirements for a transfer of copyrights:

> A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

22

17 U.S.C. § 204(a).

The Copyright Act only requires *two* things for a valid transfer of copyright: (1) a writing; and (2) said writing be signed by the owner, or the owner's authorized agent, of the rights conveyed. *Id.* This Court clarified: "We hold, therefore, that based on the plain reading of the statute, a grant 'executed by the author' is a grant that is documented in writing, that is signed by the author, and that conveys rights owned by the author." *Acuti v. Authentic Brands Grp. LLC*, 33 F.4th 131, 138 (2d Cir. 2022).

A writing need not even say the words "copyright" to effect a transfer of copyright. *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 413 (7th Cir. 1992)[13] ("Although the agreement does not mention the word 'copyright,' its wording leaves little doubt that Bertel sold all the assets of Spotline Studios, tangible and intangible alike.")[14]

The 1986 Agreements meet this standard effecting a "transfer of copyright".

---

[13] Cited approvingly in *Playboy Enters. v. Dumas*, 53 F.3d 549, 564 (2d Cir. 1995).
[14] The same is true in reverse—a note or memorandum of transfer that satisfies Section 204 made *after* an oral transfer can validate the grant *ab initio* to the date of the oral transfer. 3 Nimmer on Copyright § 10.03 (2026).

23

**c) Federal Law Requires a Writing Signed by the Grantor, and State Law Determines Whether There is an Intent to Grant Copyright.**

While Section 204 governs the requirements for a transfer of copyright, this Court has previously noted that "An alleged transfer of copyright is subject to requirements for a valid transfer under copyright law but is also governed by state contract law." *Close-Up Int'l, Inc. v. Berov*, 382 F. App'x 113, 115 (2d Cir. 2010).[15] That is, a district court *must* confirm compliance with Section 204, but will then ensure that the contract evidences mutual assent, essential terms, etc. under state contract law principles. *Id.*

For example, in *Playboy Enters.*, this Court affirmed the district court's decision that on the record, it was not possible to determine the intent of the parties within the four-corners of a writing, and found that the only writings which *could* satisfy Section 204 were too ambiguous to find that a transfer of copyright had occurred. 53 F.3d at 564.

Professor Nimmer, however, advises against a rigorous application of state law principles to copyright assignments, noting that while state law principles are

---

[15] *But see*, H.R. Rep. No. 94-1476 at [129] (In explaining the import of Section 301's federal preemption clause of the Copyright Act of 1976, "One of the fundamental purposes behind the copyright clause of the Constitution, as shown in Madison's comments in The Federalist, was to promote national uniformity and to avoid the practical difficulties of determining and enforcing an author's rights under the differing laws and in the separate courts of the various States.").

used to ascertain mutual intent and key terms, "contract rules established under state law cannot invalidate any aspect of federal copyright law." 3 Nimmer on Copyright § 10.03 (2026). He provides this by way of example: where state law requires bilateral execution of a contract, an assignment of copyright signed only by the owner thereof would be effective under Section 204 despite the fact that a contract claim founded on state law would fail for lack of bilateral execution. *Id.*

"Likewise, it is not necessary that the written instrument include phrases of present intent (along the lines of 'I hereby transfer'). … [O]ther decisions validate transfers even though they lack such language of present intent." *Id.* (citing *Silvester v. Time Warner, Inc.*, 1 Misc. 3d 250, 255-56 (Sup. Ct. N.Y. County 2003), *aff'd* 14 A.D.3d 430 (1st Dep't 2005) (finding that the language, "All recordings, phonograph record masters and reproductions made therefrom, together with the performance embodied therein, shall be entirely [the record company's] property" constituted a present conveyance of "full ownership rights to the master recordings" to the record company.))

Many courts are in accord. *See Effects Assocs. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) ("Section 204's writing requirement is not unduly burdensome; it necessitates neither protracted negotiations nor substantial expense. The rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It

doesn't have to be the Magna Charta; a one-line pro forma statement will do."); *Radio TV Espanola S.A. v. New World Entm't Ltd.*, 183 F.3d 922, 927 (9th Cir. 1999) ("No magic words must be included in a document to satisfy § 204(a). Rather, the parties' intent as evidenced by the writing must demonstrate a transfer of the copyright."); *Bernstein v. Glavin*, 725 N.E.2d 455, 460 (Ind. Ct. App. 2000) (quoting *id.*, rejecting the argument that the words "even though your lyrics will become the property of Warren publishing" did not connote a present intent to transfer, holding "we determine the parties' intentions by considering the contract as a whole and not by reading particular words and phrases in isolation [] We agree with appellees that 'considering the intangible nature of lyrics, there can be no confusion between ownership of the copyright in the lyrics and ownership of a material object'; thus, the term 'property' in this instance can only refer to copyright") (internal citations omitted).

That is, the question for this Court is whether the 1986 Agreements constitute a transfer of copyright by Salt-N-Pepa that satisfies Section 204 and whether the writings at issue are clear on their face that they meant to convey copyrights or any rights thereunder. The answer is unquestionably yes.

**B. The Plain Language of the Agreements Shows Present Intent to "transfer or license of copyright or of any right under a copyright."**

**1. The District Court Erred by Searching for an Assertion of Copyright Ownership in the 1986 Agreements.**

Before turning to the language of the 1986 Agreements, it must be noted that the District Court viewed the agreements through the wrong lens. In its Order, the District Court held,

> Because only an author who executed a grant may terminate it, 17 U.S.C. § 203(a), the key inquiry here is whether Plaintiffs, in any of the 1986 agreements, asserted their ownership of the copyrights and transferred that ownership to a predecessor of UMG.

A-216; *see also id.* at A-218 ("None of the agreements characterize Plaintiffs as the owner of the copyrights, let alone effect a transfer by Plaintiffs of copyrights); *id.* at A-219 ("But this argument fails for the reasons described above – the document does not represent that Plaintiffs owned the copyrights at the time of contract and were transferring those rights to Azor.").[16]  However, this is manifestly erroneous. Salt-N-Pepa are not required to "assert[] their ownership of the copyrights" in the 1986 Agreements. Copyright vests automatically in the author of a creative work as soon as it is affixed in a tangible medium. *Reid*, 490 U.S. at 737; 17 U.S.C. § 201(a).

---

[16] In addition to characterizing assertion of ownership as the "key inquiry," that the District Court repeated this errant view of Section 204's requirements twice more in its discussion shows just how important it was to the District Court's analysis. The misapplication of the requirements of Section 204 thus pervades the entire decision and warrants reversal.

27

Though this Court has held that in order to comply with Section 204, the grantor must actually have the rights being granted (*Acuti*, 33 F.4th at 138) that is not to say that the same writing must also expressly assert ownership of the copyrights prior to the contemplated conveyance in order to be effective. All that is required is: (1) a writing and (2) the signature of the copyright owner that actually possesses the rights being granted. *Id.*

The District Court's newly-invented requirement (express assertion of ownership) finds no basis in the statute, this Court's decisions, in the persuasive authorities from its Sister Circuits, nor Supreme Court precedence. Tellingly, the District Court provides no authority to support this statement of the law. A-216.

The District Court's decision creates a requirement that, to effectuate a transfer under Section 204 (and thus be terminable under Section 203), one must include a preamble or contractual provision expressly asserting copyright ownership. Section 204 simply provides no such requirement. Neither does New York Law. *Cf. Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548, 557 (2d Cir. 1976) (quoting *Advance Trading Corp. v. Nydegger & Co.*, 127 N.Y.S.2d 800, 801 (Sup. Ct. 1953) ("The New York cases make clear that an assignment need not utilize any particular phraseology or form; any act or words are sufficient which 'show an intention of transferring the chose in action to the assignee, when the assignor is divested of all control and right to cause of action and the assignee is entitled to control it and

28

receive its fruits.'"); *SCO Grp., Inc. v. Novell, Inc.*, 578 F.3d 1201, 1212 (10th Cir. 2009) ("[Section 204(a)] does not on its face impose any heightened burden of clarity or particularity.").

A requirement to expressly "assert" ownership by the assignor turns the Congressional intent behind the termination rights on its head. Congress expressly included Section 203 in the 1976 Act to "safeguard[] authors against unremunerative transfers" that result from the "unequal bargaining position of authors," because authors were facing "take-it-or-leave-it" contracts, without any bargaining power. H.R. Rep. No. 94-1476 at [124]. Taken to its logical conclusion, to preserve the artists' termination rights, it would require authors, despite disparity of bargaining power, to demand that assignees (like multi-billion-dollar record companies[17]) include language asserting the artists' copyrights, notwithstanding that including such language would be against the assignee's interests should they (as UMG has done here) try to argue later that the works were made-for-hire.

This new-made rule proffered by the District Court must be reversed as it has no basis in the statute and contravenes express Congressional intent.

---

[17] According to publicly available sources, UMG as a whole posted $14.4 billion in global revenue for 2025.

### 2. The NITA Agreement Contains a Terminable Grant.

#### a) The NITA Agreement presently conveys the copyrights to the sound recordings at issue.

The District Court ignored clear grant language in the NITA Agreement. Instead, it latches on to one sentence from the NITA Agreement and finds, citing no authority, that it does not constitute a transfer. A-218. That language provides that NITA "shall be the sole and exclusive owner of any and all rights, title and/or interest in and to master recordings . . . , including but not limited to the worldwide sound copyrights therein." A-75 ¶H.

The Parties agree that New York law governs the 1986 Agreements. A-216-17. Similar language to that found in the 1986 Agreements has been found sufficient to connote a conveyance of copyright under New York Law. *Silvester*, 1 Misc. 3d at 255-56 ("All recordings, phonograph record masters and reproductions made therefrom, together with the performance embodied therein, shall be entirely [the record company's] property"). [18]

Further, while later dismissing Salt-N-Pepa's arguments for not reading provisions "in full," (A-219-20), the District Court omitted the leading prepositional

---

[18] *Accord Stephan v. State Veterinary Med. Bd.*, 113 Ohio App. 538, 541 (1960) (analyzing "shall" in a statutory sense to create a present obligation, "Webster, in discussing its use as an auxiliary verb, says that 'shall' means 'am obliged' or 'must.' And since the past tense is 'should,' it ["shall"] can be readily seen that the idea of obligation is present.")

phrase to the sentence in Paragraph H upon which it relies: "***As between Company [NITA] and Artist [Salt-N-Pepa]***, Company shall be the sole and exclusive owner of any and all rights, title and/or interest in and to master recordings recorded hereunder, including but not limited to the worldwide sound copyrights therein and the renewal thereto." A-218 (emphasis added).

While perhaps seemingly inconsequential at first, the inclusion of the prepositional phrase "as between Company and Artist" is important to the overall context and directly relevant in determining whether Salt-N-Pepa had made a conveyance. It demonstrates that there could be some question as to ownership that warranted a written clarification of the rights between Salt-N-Pepa, on the one hand, and NITA on the other hand. Such clarification would not have been needed if Salt-N-Pepa had no claim to the copyrights.

Further, and most convincingly, one need look no further than the ***preamble*** to the NITA Agreement to find present intent to transfer copyrights.[19] It provides:

> The following when signed by you, … and by Noise in the Attic Productions, Inc. … will constitute the agreement between Artist and Company with respect to Company providing Artist production services as well as [sic] with respect to Artist rendering Artist's exclusive personal services to Company as a recording artist, **as well as**

---

[19] Preambles serve as a valid portion of the contract subject to aiding in contractual analysis. *See, e.g.*, *Olin Corp. v. Ins. Co. of N. Am.*, No. 84-cv-1968, 2016 U.S. Dist. LEXIS 32079, at *18-21 (S.D.N.Y. Mar. 11, 2016) (using the preamble to determine the actual parties to a contract); *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992) ("[T]he entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency.").

31

> **granting Company certain exclusive rights with respect to Artist pertaining to audio-visual exploitation.**"

A-72. (emphasis added).

"Audio-visual exploitation" encompasses all four of the applicable Section 106 rights: (1) reproducing and creating of phonorecords; (2) preparing derivative works; (3) distributing copies or phonorecords by sale, transfer of ownership, etc.; and (6) performing the copyrighted work publicly by means of digital audio transmission. 17 U.S.C. § 106.

This is the magic present tense grant that the District Court was looking for, but avoided finding. The NITA Agreement provides that "when signed by you… will constitute the agreement" wherein the Artist [Salt-N-Pepa] agreed to provide exclusive recording services and "granting" NITA the exclusive rights to exploit the sound recordings made during the term of that agreement. A-72.

The use of future tense "will constitute" is expressly modified by the language "when signed by you" meaning a present obligation upon execution to provide recording services **_and_** present intent to convey copyrights. This present obligation and intent to convey copyrights is made all the more manifest by the fact that the preamble, thereafter, makes use of present participles in the remainder of the sentence: "Company **_providing_** Artist with production services," "Artist **_rendering_** Artist's exclusive personal services to Company as a recording artist," and "**_granting_**

32

Company certain exclusive rights … to audio-visual exploitation." A-72. (emphasis added).

Use of present participles in contract signal a present, ongoing, and continuous action or obligation. *See Westchester Gen. Hosp., Inc. v. Evanston Ins. Co.*, 48 F.4th 1298, 1307 (11th Cir. 2022) ("A present participle is used to signal present and continuing action."); *Shell v. Burlington N. Santa Fe Ry. Co.*, 941 F.3d 331, 336 (7th Cir. 2019) (explaining that a present participle, such as the word "having," means "presently and continuously," and "does not include something in the past that has ended or something yet to come").

New York courts agree that use of a present participle connotes present, ongoing action. *See Pohl v. Commercial Ins. Co.*, 36 Misc. 2d 173, 176 (Sup. Ct. Rensselaer County 1962) (finding that "falling" is a present participle and its use in an insurance contract "expresses a state of action in progress or a present descending"); *Regency Gardens Co. v. Yoshevayev*, 2021 NY Slip Op 21091, 2, 71 Misc. 3d 1046, 1049 (Civ. Ct. Queens County 2021) (noting that use of present participle in statute "plainly connotes ongoing activity").

Considering the preamble, the circumstances that necessitated the prepositional phrase "as between Artist and Company" in Paragraph H of the NITA Agreement are clear. Salt-N-Pepa, upon execution of the NITA Agreement, presently agreed to provide exclusive personal services as recording artists. The

33

result of these personal recording services would be creative expressions: the master recordings. As soon as Salt-N-Pepa's creative expressions were affixed in a tangible medium, the copyrights therein vested in the author(s).

Salt-N-Pepa must be the authors of the sound recordings. The Copyright Act does not provide a definition of "author," but the Supreme Court has given guidance: "As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Reid*, 490 U.S. at 737 (1989).

As the Copyright Office notes, "The author of a sound recording is the performer(s) featured in the recording and/or the producer(s) who captured and/or manipulated or edited the sounds that appear in the final recording." UNITED STATES COPYRIGHT OFFICE, *Circular 56A: Musical Compositions and Sound Recordings*, available at https://www.copyright.gov/circs/circ56a.pdf).[20] The Copyright Office's use of "and/or" provides further context to the language selected by the parties to the NITA Agreement. Either or both could be considered the author provided that the producer made an independently copyrightable contribution. *See* 1 Nimmer on Copyright § 2.10[A][2][b] (2026) (noting that the producer must contribute more than setting up the recording session, but rather must, "capture and electronically

---

[20] Quoted in a previous iteration for the same principle in *United States v. Am. Soc'y of Composers (In re Cellco P'ship)*, 663 F. Supp. 2d 363, 369 (S.D.N.Y. 2009).

34

process[] the sounds, and compil[e] and edit[] them to make the final sound recording.") (citing H.R. Rep. No. 92-487).

Because Salt-N-Pepa are the authors, even if deemed co-authors with Azor/NITA, [21] *the only* way that NITA could have assigned Salt-N-Pepa's rights to NPR by way of the NPR Agreement would be: (1) blatant infringement or misrepresentation; (2) the recordings were works made for hire and thus authorship vested in NITA *ab initio* (17 U.S.C. § 201(b)); or (3) there was an assignment of those rights by way of the NITA Agreement.

We know that the first is not correct because Salt-N-Pepa confirmed in the Inducement Letter signed the same day that Azor's representations were accurate, and as belt-and-suspenders, Salt-N-Pepa granted NPR "all the rights and remedies therein granted." A-107 ¶1.

The second issue is discussed *infra*, but, briefly, the sound recordings were not works made for hire – and such a conclusion would require a fact-intensive calculus improper for disposition at the pleadings stage. *See* discussion *infra*.

There can only be one conclusion: the NITA Agreement serves as a grant of the copyrights to the sound recordings to NITA.

---

[21] At the pleadings stage, like here, it would be inappropriate to make a finding of fact with regard to the relative contributions of Azor and Salt-N-Pepa. As pleaded, "Salt-N-Pepa created Master Tapes for their sound recordings." *See, e.g.*, A-49 ¶ 62, A-52 ¶ 71). That is sufficient to plead authorship at this stage.

35

**b) At the very least, the NITA Agreement presently grants exclusive exploitation rights which are "rights under copyright."**

In no uncertain terms, there is at least a grant of "exclusive rights with respect to Artist Pertaining to audio-visual exploitation" to NITA, which is terminable under Section 203.

Again, the 1986 Agreements, when read in their entire context, convey all of the copyrights to the subject recordings, however, *at the very least*, the NITA Agreement expressly constitutes an exclusive conveyance by Salt-N-Pepa of rights under copyright. As discussed above, audio-visual exploitation covers all four Section 106 rights for sound recordings. And, exclusive licenses are terminable under Section 203. 17 U.S.C. § 203.

However, noticeably absent from the District Court's analysis of the 1986 Agreements is whether Salt-N-Pepa conveyed "any right under a copyright"[22] in the 1986 Agreements. A-206-223. This alone is grounds for reversal given that the District Court's conclusion was limited to wholesale transfer of copyrights rather than whether Salt-N-Pepa conveyed "any rights under copyright," which would also be terminable under Section 203.

---

[22] 17 U.S.C. § 203

36

**3. The District Court Erred in Finding that "It was only Azor and NITA that granted a transfer of rights in 1986 to Next Plateau Records" as the NPR Agreement and Inducement Letter Confirm Salt-N-Pepa's Assignment Found in the NITA Agreement.**

### a) Grants Are Binding on Successors-In-Interest.

The plain language of Section 203 indicates that it expressly applies to successors in interest to the original grant.

For example, subsection (a)(4) provides: "The termination shall be effected by serving an advance notice in writing, signed by the number and proportion of owners of termination interests required under clauses (1) and (2) of this subsection, or by their duly authorized agents, **upon the grantee or the grantee's successor in title**." 17 U.S.C. § 203(a)(4) (emphasis added). Congress, thus, expressly anticipated that the original grantee might further transfer rights, and provided that the author may terminate the grant by serving notice on the original grantee _**or**_ the grantee's successor-in-interest. *See Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87 (2018) ("'or' is 'almost always disjunctive'" meaning its use in a statutory scheme to connect nouns and gerunds means those before and after "or" are equally applicable).

The regulations promulgated under Section 203 provide further context supporting this conclusion. First, the purpose of the written notice and two-year requirement are to provide the grantee or their successor in interest adequate notice and an opportunity to negotiate a right of "first refusal" during that time. H.R. Rep.

37

No. 94-1476 at [127-28]. As such, the regulations require that a notice of termination must include the name of the grantee "or the grantee's successor in title" as well as the date and identification of the original grant. 37 C.F.R. § 201.10(b)(2). The regulations also expressly contemplate service on the grantee's successor-in-title. 37 C.F.R. § 201.10(d).

As such, the inquiry is not whether NITA made a grant to NPR, but rather whether Salt-N-Pepa made an original grant to NITA who subsequently made the grant to NPR as UMG's successor-in-interest. As discussed above, the NITA Agreement clearly constitutes a transfer of copyrights from Salt-N-Pepa. Thus, when correctly interpreted, the 1986 Agreements together should be read to mean that the copyrights originated with Salt-N-Pepa, and then were transferred to NITA, then NPR, next to London, and eventually to UMG.

Because Section 203 expressly contemplates that terminations would be binding and effective against successors in interest, and because the seminal grant of rights came *from* the authors (Salt-N-Pepa), their termination notices are effective to terminate UMG's rights reverting them to Salt-N-Pepa.

### b) The District Court Erred by Not Considering that the NITA Agreement Came First.

The District Court held that the NPR Agreement "confirmed NITA's ownership of all preexisting and future recordings before effectuating a transfer of 'all aforesaid right, title and interest in and to such Sides including without limitation

38

the sound recording copyright.'" A-218. It then found that there is an "absence of a contract evidencing a transfer of rights by Plaintiffs" based, in large part of quoted language from the NPR Agreement. *Id.*

Not so. This error is rooted in the issues discussed above: the District Court completely ignored the grant language in the preamble of the NITA Agreement which was executed preceding the NPR Agreement. A-206-223; *see* A-46, ¶¶ 45-49. The NITA Agreement must have been executed first because it expressly contemplates the entry of a subsequent distribution agreement. A-72. From the preamble: "'Distribution Company', for the purposes of this agreement shall mean Next Plateau Records, Inc., with whom Company [NITA] is entering into an agreement [] for the distribution of audio and/or audio-visual recordings recording by Artist simultaneously herewith…" *Id.*

The use of the terms "is entering into an agreement" is important. While the use of the present participles in the NITA Agreement created present rights and obligations (including here a present intent to convey copyrights), the same is not true with regard to whether there is valid execution of a contract. An "agreement to agree" is unenforceable until a binding contract is entered. *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (N.Y. 1981) (agreement to agree unenforceable); *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984) ("Under New York law, if parties do not intend to be bound by an

39

agreement until it is in writing and signed, then there is no contract until that event occurs.").

Here, the NITA Agreement provides that NITA was "simultaneously" "entering into" the NPR Agreement, the draft of which was appended thereto. A-72. However, when read together, it is clear that in order to be operative, the NITA Agreement must be deemed to have been executed first. The NPR Agreement is quite clear that it was not binding until execution. For example, there is an integration clause showing intent not to be bound until execution. A-100 ¶ 26. The NPR Agreement provides that delivery of the pre-existing recordings was not due until "upon execution of this agreement." A-87 ¶ 3(c). And, the term of the agreement did not start to run until the "date hereof". A-86 ¶ 2.

Therefore, when the two 1986 Agreements are read together, it is quite clear that while executed on the same day, the NITA Agreement must have been intended to have been executed first. At the very least, at the pleadings stage, Salt-N-Pepa is entitled to a viewing of the factual allegations in a light most favorable to them, and this reasonable inference which finds ample support in the four corners of the documents should have been drawn by the District Court. "When reviewing a motion to dismiss, a court must 'accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally.'" *Rescuecom Corp. v.*

*Google, Inc.*, 562 F.3d 123, 127 (2d Cir. 2009). The District Court gave no such favorable treatment to Salt-N-Pepa when analyzing the 1986 Agreements, ignoring operative language and wrongfully dismissing valid arguments regarding Salt-N-Pepa's reasonable interpretation.

### c) The District Court's Analysis of the NPR Agreement and attached Inducement Letter are in Error.

When viewed through this lens – *i.e.* that the NITA Agreement was executed first – the flaw in the District Court's analysis of Salt-N-Pepa's arguments regarding the grant language and the representations and warranties is readily apparent.

The District Court found that under the language of the Inducement Letter, Salt-N-Pepa agreed to the representations and warranties made by NITA that it was the "'sole and exclusive owner' of the copyrights, which it confirmed before transferring those copyrights to Next Plateau Records. Thus, the only copyright transfer effectuated by these agreements was the one from NITA to Next Plateau Records." A-22-21. The District Court's analysis in this regard is in error because it: (1) ignores the previous grants made by Salt-N-Pepa in the NITA Agreement; (2) fails to delineate between the pre-existing recordings and recordings to be made under the 1986 Agreements; (3) cites language regarding the pre-existing recordings to justify its reading of *all* the sound recordings; and (4) omits operative limiting language in the language it quoted.

41

Salt-N-Pepa will not further belabor the District Court's oversight of the NITA Agreement grants. Thus, with respect to the representations and warranties in the NPR Agreement that the District Court uses to dismiss Salt-N-Pepa's arguments, the District Court omits important language from its quotation of the NPR Agreement, Paragraph 3(c), which reads fully, in relevant part:

> Upon execution of this agreement, Producer shall deliver to Company the Sides embodying Artist's performances of the Compositions listed on Schedule 'A' annexed hereto and made a part hereof. Producer warrants and represents that Producer is the sole and exclusive owner of **such Sides** and all right, title and interest therein, and has all rights necessary to manufacture, advertise and sell phonograph records made from such Sides throughout the world …

A-87. (emphasis added).

The District Court's analysis omitted the limiting language "such Sides", and therefore it cannot be an effective analysis of the paragraph as a whole.[23] "Such Sides" is a reference back to the antecedent in the first sentence of that paragraph regarding the pre-existing recordings at the time of execution: "Producer [NITA]

---

[23] *Cf. Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 2009 NY Slip Op 8675, 5, 13 N.Y.3d 398, 404 (N.Y. 2009) (The entire contract must be reviewed and "[p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.); *L.K. Station Grp., LLC v. Quantek Media, LLC*, 2009 NY Slip Op 3828, 4, 879 N.Y.S.2d 112, 117 (App. Div. 1st Dept.) (interpreting and applying limiting language in a liquidated damages clause precluding a claim for specific performance).

shall deliver to Company [NPR] the Sides embodying Artist's performances of the Compositions listed on Schedule 'A' annexed hereto." A-87 ¶3(c).

These preexisting recordings are those Salt-N-Pepa recorded *prior* to the 1986 Agreements and include, *e.g.*, "The Showstopper," which, as discussed above, was released prior to the 1986 Agreements. A-45 ¶¶ 42-44. Salt-N-Pepa granted these preexisting recordings to NITA in the NITA Agreement. A-72-75. For these preexisting recordings, the copyrights had vested in Salt-N-Pepa as authors at their affixation and were ripe to be conveyed.[24] *And*, because the NITA Agreement must be deemed to have been executed first, the representation and warranty made by NITA in this paragraph is true. Thus, Salt-N-Pepa's agreement to that representation and warranty in the Inducement Letter regarding these "such Sides" is true at the time of the NPR Agreement (even if the ink were still drying on the NITA Agreement). NITA, as assignee of the copyrights per the NITA Agreement, did own these preexisting Sides.

The District Court dismissed Salt-N-Pepa's arguments that they made a grant of copyrights ignoring this dichotomy between the preexisting Sides and those to be recorded, and ignoring that the rights to these preexisting recordings vested automatically in Salt-N-Pepa. Instead, it ruled that the NPR Agreement "confirmed

---

[24] The fact that these rights automatically initially vested in Salt-N-Pepa explains why, in the Inducement Letter, discussed *infra*, NPR requested an express grant of these rights directly from Salt-N-Pepa.

NITA's ownership of all preexisting and future recordings." A-218. While this statement is true, it ignores that NITA's ownership of all preexisting and future recordings comes only by way of the grants made by Salt-N-Pepa in the NITA Agreement!

For those Sides not yet in existence, there is a separate conveyance in the NPR Agreement. Paragraph 5 provides that:

> All Sides recorded during the Term shall be recorded by Producer on Company's behalf and all records made therefrom, together with the performances therein, shall, from the inception of their creation, be entirely the property of Company in perpetuity, throughout the Territory, free from any claim whatsoever by Producer, Artist or by any persons deriving any rights or interest from Producer or Artist; and Company shall have the right to secure the sound recording (P) copyright in and to the Sides in Company's name as the owner and author thereof and to secure any and all renewals of such copyright. …

A-88.

This language tracks that in the NITA agreement that the recordings "shall" belong to Company. As discussed above, such language can be read, along with the entirety of the rest of the writing, to constitute a transfer of copyright. *Silvester*, 1 Misc. 3d at 255-56 (finding the language "All recordings … shall be entirely [the record company's] property" constituted a present transfer to the record company.) Further, the inclusion of the language "from the inception of their creation" also tracks with the discussion, *supra*, regarding present transfers of future copyrights. It is an acknowledgment that those copyrights to as-yet-recorded Sides had not vested

44

and could not be presently transferred. Nonetheless, this paragraph constitutes a present grant by NITA to NPR – and the District Court Agrees NITA transferred copyrights to NPR by this language (A-218-21).

To put a finer point on the issue: the District Court ruled that "All Sides…shall…be entirely the property of Company [NPR]" effected a transfer, but "As between Company and Artist, Company shall be the sole and exclusive owner of all rights, title and/or interest" did not constitute a transfer. A-218. Disparately treating such similar language in contracts executed on the same day is clear error.[25]

### d) Nonetheless, the Inducement Letter Expressly Independently Effects a Grant of Copyright.

The foregoing notwithstanding, Salt-N-Pepa signed an Inducement Letter appended to the NPR Agreement. In Paragraph 1 of the Inducement Letter, Salt-N-Pepa expressly "make all of the warranties and representations made to you in said agreement [the NPR Agreement], *__grant you all of the rights and remedies therein granted to you__* and agree to perform all of the obligations therein undertaken to be

---

[25] Further, arguably stemming from the same error discussed above regarding the creation of a new requirement to assert copyright ownership in the writing used to effect a transfer thereof, the District Court held that NITA made a representation that it was "'the sole and exclusive owner; of the copyrights, **which it confirmed before transferring those copyrights to Next Plateau Records.**" A-220 (emphasis added). This supposed "confirmation" "before transferring" finds no basis in the record. There is no separate writing "confirming" NITA's rights *other than* the NITA Agreement wherein Salt-N-Pepa transferred copyrights to NITA.

45

performed for you and undertake to be bound thereby as though I was a party to said agreement." A-107. (emphasis added).

The District Court dismissed this clear and express grant, finding it incompatible with the acknowledgement to be bound to NITA's representations and warranties. A-220-221. However, as discussed above, the District Court omitted the operative limiting language "such Sides" in that analysis. The representations and warranties comport with the fact that Salt-N-Pepa had already assigned the rights to their preexisting recordings to NITA. As such, the District Court was in error to ignore the express grant of rights directly from Salt-N-Pepa to NPR.

When the NITA Agreement, NPR Agreement, and Inducement Letter are read together as a whole, there can be only one conclusion based on well-settled copyright and contract principles: Salt-N-Pepa, as the statutory authors of the sound recordings entered into agreements with their producer and record label conveying the copyrights to the label (though first to their producer) for their exploitation as countless recording artists have done since the invention of the phonograph. This grant comports with Section 204, and as such is terminable under Section 203.

## C. Alternatively, The Language of the 1986 Agreements is Ambiguous, Precluding Judgment as a Matter of Law under Rule 12.

For the foregoing reasons, Salt-N-Pepa assert that the 1986 Agreements contain unambiguous present grants to NITA of their copyrights in both their preexisting recordings and to the as-yet-recorded Sides to be created pursuant to the

46

1986 Agreements. However, to the extent that this Court is inclined to disagree, Salt-N-Pepa would argue in the alternative that the 1986 Agreements are ambiguous as to whether they evidence a present intent to transfer copyrights or any rights thereunder.

Whether a contract is ambiguous is an issue of law. *Match Grp., LLC v. Beazley Underwriting Ltd.*, No. 23-1058-cv, 2024 U.S. App. LEXIS 20317, at *2 (2d Cir. Aug. 13, 2024). "A contract is ambiguous if it is 'reasonably susceptible of more than one interpretation,' and unambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Steiner v. Lewmar, Inc.*, 816 F.3d 26, 32 (2d Cir. 2016). If there is found to be an ambiguity, such ambiguity cannot be resolved on a motion to dismiss. *Pujals v. Standard Chtd. Bank*, 533 F. App'x 7, 10 (2d Cir. 2013); *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004) ("[I]f a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim.").

Salt-N-Pepa, at the very least, have shown for purposes of Rule 12, that their interpretation of 1986 Agreements is reasonable, especially given the aforementioned, express grant language therein. UMG proposed an alternative interpretation. Even if the District Court found UMG's interpretation (more)

reasonable, it was error to outright reject Salt-N-Pepa's reasonable interpretation. Rather, the District Court should have reserved the issue to allow a record to be built to resolve this apparent ambiguity. [26]

Accordingly, even if this Court is not inclined to find that the 1986 Agreements unambiguously constitute transfers of copyright from Salt-N-Pepa, it should still reverse the District Court's decision to afford Salt-N-Pepa the opportunity to adduce parol evidence and custom and practice testimony to assist the District Court's analysis.

## III. The Recordings Are Not Made-for-Hire.

UMG argued before the District Court that the sound recordings are works made for hire, and thus not subject to termination under Section 203. A-216.

While the District Court expressly noted that its "Opinion does not reach the issue of whether the recordings were, in fact, works made for hire" (A-219), it implicitly does make such a finding. The Opinion even openly credits that outcome: "such a classification is consistent with the copyright registrations for each of the

---

[26] The contracts at issue arise out of the unique backdrop of the music industry. As one district court has noted, the music industry, has its own "preexisting norms, customs, and terminology, which can be opaque to outsiders unversed in industry practice." *Eight Mile Style, LLC v. Spotify USA Inc.*, No. 3:19-cv-0736, 2022 U.S. Dist. LEXIS 161220, at *7 (M.D. Tenn. Sep. 7, 2022) (denying motion for early summary judgment motion finding the need for expert testimony finding it inappropriate to interpret music publishing contracts without the aid of expert testimony to provide "industry-specific understanding").

sound recordings listed in Plaintiffs' Notice of Termination." Moreover, the District Court's "key inquiry" of looking for an assertion of copyright ownership by Salt-N-Pepa is actually a *de facto* work for hire analysis rather than that of whether there is a termination because the copyrights in works made for hire vest initially in the employer. 17 U.S.C. § 201(b).

Despite the District Court's caveat that it did not reach the issue, because it clearly did (at least implicitly), Salt-N-Pepa must address the issue on appeal.

### A. The Statutory Definition and Legislative History Show that Congress Did Not Intend for Sound Recordings to be Works Made for Hire Unless Made by an Employee in the Scope of Her Employment.

The Copyright Act provides a bifurcated definition of works made for hire.

A "work made for hire" is—

(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with the purpose of use in systematic instructional activities.

49

17 U.S.C. § 101.

### 1. Employees within the Scope of their Employment.

As for the first half of the definition, the Supreme Court noted, "The Act does not define these terms" *i.e.* employee and employment. *Reid*, 490 U.S. at 738. The Supreme Court, thus reviewed the legislative history behind the 1976 Act's overhaul, comparing the language in the current Act to the 1909 Act, and ultimately concluding that "To determine whether a work is for hire under the Act, a court first should ascertain, using principles of general common law of agency, whether the work was prepared by an employee or an independent contractor." *Id.* at 751. The *Reid* Court then provided factors used to determine whether such an agency relationship exists. *See Horror Inc. v. Miller*, 15 F.4th 232, 243-44 (2d Cir. 2021) (enumerating the <u>thirteen</u> *Reid* factors and noting that "other relevant factors may also be considered, so long as they are drawn from the common law of agency that *Reid* seeks to synthesize.").

### 2. Specially Commissioned Works

The second half of the definition requires that the work be specially ordered or commissioned, fall under one of the nine enumerated categories, *and* there must be a written instrument signed by the parties expressing that the work shall be a work made for hire. 17 U.S.C. § 101. A work is specially ordered or commissioned as a work made for hire only "if the parties **expressly** agree in a written instrument signed

50

by them that the work shall be considered a work made for hire." *Id.* (emphasis added). In neither of the agreements do the parties "expressly agree" that the work shall be considered a "work for hire." <u>Indeed, neither of the agreements even use the phrase "made for hire"</u>!

Further, "If a work does not fall within one of the qualifying categories, then even if it has been prepared by one person upon the special order or commission of another, it will not qualify as a 'work made for hire,' with the special legal consequences that flow from this designation." 1 Nimmer on Copyright § 5.03 (2026).[27] There is an obvious omission from the enumerated categories – sound recordings. "Whether through inadvertence or deliberately, the 1976 Act did not offer the possibility for commissioned status of a sound recording *per se*." *Id.* Then came the "millennial flip-flop". In 1999, Congress passed the Satellite Home Viewer Improvement Act of 1999, wherein, even though unrelated to the general purpose of that bill, it amended the definition of "works made for hire" in Title 17 to include sound recordings as category for specially commissioned works for hire. *Id.*

Moving rather quickly for Congress, the House Subcommittee on Courts and Intellectual Property convened a hearing just six months later. *Id.* These hearings centered on whether the insertion of sound recordings was merely a "technical and

---

[27] *See also Reid*, 490 U.S. at 738 (noting that sculpture does not fit into any of the nine categories).

51

conforming change" or a substantive, purposeful amendment. *Id.* What resulted from the debate was the Work Made for Hire and Copyright Corrections Act of 2000. *Id.*[28] This Act deleted sound recordings from the categories of commissioned works eligible to be works made for hire. *Id.*

This is manifest Congressional intent – especially considering the speed in which Congress remedied the error. One cannot find a more direct application of *inclusio unius est exclusion alterius* than Congress amending a statute to include an item into an enumerated list, and then intentionally re-amending the statute to remove that same item from the enumerated list in the span of one year. *Cf. Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[Where] Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

**B. The District Court Clearly Made an Implicit Finding that the Sound Recordings were Made for Hire.**

As foreshadowed above, the District Court's errant reading of the 1986 Agreements leads to only one conclusion: that despite claiming not to reach the issue

---

[28] Citing Pub. L. No. 106-379, Sec. 1, 114 Stat. 1444 (Oct. 27, 2000)

52

of whether the sound recordings were made for hire (A-219), clearly the District Court made such a finding, at least implicitly.

The District Court directly lent credence to the sound recordings being made for hire stating, "the 1986 NITA Recording Agreement indicates that the sound recordings are likely works made for hire, which are excluded from § 203's termination mechanism." A-218-219. The District Court also noted that "such a classification is consistent with the copyright registrations for each of the sound recordings listed in Plaintiffs' Notice of Termination." A-219. The District Court went an extra step in justifying the consideration of these copyright registrations noting that they are subject to judicial notice. *Id.* n.2. Why should the District Court have even needed to consider that the copyright registrations list "Next Plateau Records, Inc., employer for hire," "London Records, employer for hire," or "UMG Recordings Inc., employer for hire" if not to justify its implicit finding that the works were made for hire?

The *only* way to square the District Court's reading of the 1986 Agreements with their actual language is to presuppose (improperly) that the sound recordings were works made for hire. The District Court played its hand when it asserted (errantly) that the "key inquiry" before it was whether there was an assertion of copyright ownership within the four corners of the 1986 Agreements.

53

Again, copyrights vest in the author upon affixation as a matter of law. There does not need to be any affirmative assertion of ownership by the author. *Rather*, what the District Court was actually doing was making a determination of authorship – and in this case that inquiry revolves around whether the works are made for hire. *See* 17 U.S.C. § 201(a)-(b) (noting that copyright vests in the author of the work, and that in the case of a work made for hire, the employer is the author).

By requiring that Salt-N-Pepa expressly assert copyright ownership in the 1986 Agreements, and ruling against them for failure to do so is error for all the reasons discussed above, *and* because it puts the cart before the horse on the work for hire issue. This *alone* warrants reversal. As discussed in the next section, the determination of whether a work is made for hire is highly factual and entirely inappropriate for the pleadings stage.

**C. The Sound Recordings are Not Works Made For Hire.**

    **1. Making a Determination of Whether the Works are Made for Hire is Inappropriate at Pleadings Stage.**

Under *either* definition of works made for hire, determination of whether the sound recordings at issue are made for hire would be a fact-intensive inquiry, wholly inappropriate for the pleadings stage. *See generally*, *Waite v. UMG Recordings, Inc.*, No. 19-cv-01091 (LAK), 2023 U.S. Dist. LEXIS 14465 (S.D.N.Y. Jan. 27, 2023) (declining to class certification in a case involving copyright terminations and UMG's work for hire defense finding, "the individualized evidence and case-by-

case evaluations necessary to resolve those claims");[29] *see also* 1 Nimmer on Copyright § 5.03 (2026) (noting that under *Reid*, determination of employment "is explicated through reliance on a myriad of factors); *cf. Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992) (noting that the *Reid* factors can be "easily misapplied, since it consists merely of a list of possible considerations that may or may not be relevant in a given case" and that no one factor is "dispositive".); *accord Lazar v. Amazon Studios, LLC*, No. 2:24-cv-09748-SVW-KS, 2026 LX 140625, at *14 (C.D. Cal. Feb. 13, 2026) (finding that the work for hire "analysis in this case would be fact-intensive and improper at the summary judgment stage.").

Accordingly, the District Court was clearly in error to make these implicit findings, *and* resolution of the work for hire issue on appeal would be inappropriate.

### 2. Salt-N-Pepa have Adequately Pleaded that the Works are Not Made for Hire.

While an inquiry as to whether the works were made for hire is inappropriate on a motion to dismiss, there are ample factual allegations showing that these works are not made for hire. Neither of the 1986 Agreements define or even intimate that the relationship between Salt-N-Pepa and UMG's predecessors was that of an employment relationship. A-72-109. Neither use the word "employ," "employee," etc. *Id.* The NITA Agreement provides that NITA would provide Salt-N-Pepa with

---

[29] Not only was UMG party to *Waite*, UMG also heavily relied on it below. *See, e.g.* A-172-173.

"production services" and that Salt-N-Pepa would provide "exclusive personal services [] as a recording artist". A-72. The NPR Agreement does not provide any indicia that it was creating an employment relationship, and indeed even the Inducement Letter signed directly by Salt-N-Pepa only pledges that they "agree to perform all of the obligations therein under taken to be performed by you and undertake to be bound thereby as though I was a party to said agreement." A-107.

Again, application of the <u>thirteen</u> *Reid* factors at this stage, without benefit of a factual evidentiary record, would be inappropriate, but noticeably absent from either agreement are the conventional hallmarks of traditional employment, *e.g.* the tax treatment of the hired party and provision of employee benefits to Salt-N-Pepa. <u>Again, neither of the agreements even use the phrase "made for hire"</u>!

In sum, nothing within the four corners of the 1986 Agreements and the London Agreement rebuts the First Amended Complaint's allegations that the works were not made for hire. A-37-71 ¶¶ 48, 53, 65, 113. Salt-N-Pepa are entitled to deference on these factual allegations at the pleadings stage given there is no countervailing language in the 1986 Agreements and no judicially noticeable fact to the contrary.

## IV. <u>Determination of Whether the Remixes are Derivative Works is Improper on a Motion to Dismiss.</u>

Before the District Court, UMG argued that certain of the sound recordings subject to the termination notices were "remixes" and thus fall under Section 203's

exception for derivative works. A-216; *see* 17 U.S.C. § 203(b)(1). The District Court declined to reach this issue. A-216. As such Salt-N-Pepa will not belabor the point, but two issues are relevant and important to discuss on appeal.

First, *even if*, *arguendo*, the remixes constitute derivative works (a point Salt-N-Pepa do not concede), the plain language of Section 203 provides that a grant of the right to prepare derivative works is terminable. *Id*. The 1986 Agreements plainly involved these rights. A-72-109. As such that grant is terminable.

Second, whether a remix constitutes a derivative work is a fact-intensive inquiry inappropriate for disposition at the pleadings stage. The Copyright Act defines derivative works as:

> A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

17 U.S.C. § 101. The Copyright Act also provides that the copyrights to a derivative work only extend to the material contributed by the author of the derivative work, and said material also must contain sufficient originality to independently qualify for copyright protection. 17 U.S.C. § 103(b); 1 Nimmer on Copyright § 3.01 (2026); *see Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348 (1991) ("Originality

57

remains the *sine qua non* of copyright; accordingly, copyright protection may extend only to those components of a work that are original to the author.").

Thus, determining whether each remix constitutes a derivative work by the addition of some other independently copyrightable contribution to the original sound recordings created by Salt-N-Pepa would require analyzing *each* such remix, comparing it to the original and making a factual determination as to whether or not those additional elements rise to the level of independently copyrightable contributions such as to render the remix a derivative work. As this Court noted,

> [There must be] something of substance added making the piece to some extent a new work with the old song embedded in it but from which the new has developed. It is not merely a stylized version of the original song where a major artist may take liberties with the lyrics or the tempo, the listener hearing basically the original tune. It is, in short, the addition of such new material as would entitle the creator to a copyright on the new material.

*Woods v. Bourne Co.*, 60 F.3d 978, 991 (2d Cir. 1995).

The FAC provides, *e.g.*, that:

> Upon information and belief, re-releasing sound recordings characterized as "remixes" in order to drive additional sales was a standard marketing practice for recording labels during the relevant time period. Critically, upon information and belief, the "remixes" of Plaintiffs' sound recordings and, in particular, of "Push It" are not original, independently copyrightable works and the "remixes" do not contain substantive copyrightable variations—i.e., there is no original, substantial variation between the versions of these sound recordings that Plaintiffs originally authored, released and/or performed and the versions that were re-released characterized as "remixes."

58

A-48 ¶ 58; *see also* A-49 ¶ 62, n.3. This allegation must be taken as true and viewed in a light most favorable, thus precluding resolution of whether the remixes are derivative works subject to Section 203's exception upon a motion made under Rule 12. *Rescuecom Corp.*, 562 F.3d at 127.[30]

## CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's grant of UMG's motion to dismiss Salt-N-Pepa's claims and remand for further proceedings.

March 31, 2026                    Respectfully submitted,

                                  /s/Richard S. Busch
                                  Richard S. Busch
                                  Andrew H. "Drew" Davis
                                  rbusch@kingballow.com
                                  ddavis@kingballow.com
                                  KING & BALLOW
                                  26 Century Boulevard, Suite NT 700
                                  Nashville, Tennessee 37214(615) 726-5434

                                  *Counsel for Plaintiffs-Appellants*

---

[30] One district court determined that such a factual inquiry is inappropriate even at summary judgment. *See TeeVee Toons, Inc. v. DM Records, Inc*, 2007 U.S. Dist. LEXIS 74822, at *28 (S.D.N.Y. Sep. 27, 2007).

**Certificate of Compliance**
**With Type-Volume Limitation, Typeface Requirements, and**
**Type Style Requirements**

1.      This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) and L.R. 32.1 because this brief contains 13,968 words.

2.      This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14 point Times New Roman font.

/s/Richard S. Busch
Richard S. Busch

60

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2026, I electronically filed the foregoing with the Clerk of the court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/Richard S. Busch
Richard S. Busch