# 26-0253-cv

# United States Court of Appeals

*for the*

## Second Circuit

CHERYL JAMES, PKA Salt-N-Pepa, SANDRA DENTON, PKA Salt-N-Pepa,

*Plaintiffs-Appellants,*

– v. –

UMG RECORDINGS, INC.,
DBA Universal Music Group, a Delaware corporation,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF ON BEHALF OF *AMICI CURIAE* AUTHORS ALLIANCE, MUSIC ARTISTS COALITION AND PUBLIC KNOWLEDGE IN SUPPORT OF PLAINTIFFS-APPELLANTS

JASON M. SCHULTZ
NYU TECHNOLOGY LAW & POLICY CLINIC
*Counsel for Amici Curiae*
*Authors Alliance, Music Artists*
*Coalition and Public Knowledge*
245 Sullivan Street, 5th Floor
New York. New York 10012
(212) 998-6430

CP COUNSEL PRESS    (800) 4-APPEAL • (392000)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *Amici Curiae* do not have parent corporations and no publicly held corporation owns 10% or more of their stock.

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS.................................................................................. ii

TABLE OF AUTHORITIES ........................................................................... iii

STATEMENT OF INTEREST.......................................................................... 1

SUMMARY OF ARGUMENT .........................................................................3

ARGUMENT ................................................................................................4

I.  Section 203(a) Requires Courts to Set Aside Any Agreement that Contravenes an Author's Termination Right, Even If Such an Agreement Is Otherwise Valid.............................................................................................6

II.  Section 101 Requires Courts to Apply the Common Law of Agency and Engage in Fact-Specific Investigation When Determining Whether a Work Qualifies as a "Work Made for Hire" Exempt from Termination; Copyright Registrations Are Not Dispositive on "Work Made for Hire" Questions.....11

III.  Legislative History Makes It Amply Clear that Section 203 Was Enacted to "Safeguard[] Authors Against Unremunerative Transfers;" the Same Concern Remains Today. ........................................................................................16

IV.  As an Indispensable Safeguard to Preserving Authors' Statutory Termination Rights, Section 203 Allows Termination Against Grantee's Successors in Title.............................................................................................................22

CONCLUSION ............................................................................................26

CERTIFICATE OF COMPLIANCE ................................................................27

# TABLE OF AUTHORITIES

**Cases**

*Classic Media, Inc. v. Mewborn*,
532 F.3d 978 (9th Cir. 2008)................................................................7

*Cmty. for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989) ....................................... 5, 10, 11, 12

*Eisenberg v. Advance Relocation & Storage, Inc.*,
237 F.3d 111 (2d Cir. 2000)...............................................12

*Fred Fisher Music Co. v. M. Witmark & Sons*,
318 U.S. 643 (1943) ...................................................21

*Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*,
716 F.3d 302 (2d Cir. 2013)................................................8

*Horror v. Miller*,
15 F.4th 232 (2d Cir. 2021)................................. 4, 9, 13

*Langman Fabrics v. Graff Californiawear, Inc.*,
160 F.3d 106 (2d Cir. 1998), *amended*, 169 F.3d 782 (2d Cir. 1998).............13

*Marvel Characters, Inc. v. Simon*,
310 F.3d 280 (2d Cir. 2002)................................. 8, 10

*Merchant v. Lymon*,
828 F.Supp. 1048 (S.D.N.Y. 1993)...............................................14

*Merchant v. Lymon*,
828 F.Supp. 1048 (S.D.N.Y. 1993), *rev'd on other grounds*, 92 F.3d 51 (2d Cir. 1996) ...............................................14

*Noise In The Attic Prods., Inc. v. London Recs.*,
10 A.D.3d 303 (2004) ...............................................24

*Pierpont v. Fowle*,
19 F. Cas. 652 (C.C.D. Mass. 1846) ...............................................20

*Steinbeck v. McIntosh & Otis, Inc.*,
433 F. Supp. 2d 395 (S.D.N.Y. 2006), *rev'd*, 537 F.3d 193 (2d Cir. 2008)......9

*Stewart v. Abend*,
495 U.S. 207 (1990)........................................................................................20

*Wilson v. Dynatone Publishing Co.*,
892 F.3d 112 (2d Cir. 2018)............................................................................15

**Statutes**

17 U.S.C. § 101 .............................................................................. 5, 6, 8, 11

17 U.S.C. § 201(a) ...........................................................................................11

17 U.S.C. § 203 .................................................................................... *passim*

17 U.S.C. § 24 (1909 Copyright Act (superseded 1976)) ....................................20

17 U.S.C. § 304................................................................................................23

17 U.S.C. § 410(a) ...........................................................................................14

17 U.S.C. § 410(c) ...........................................................................................13

Act of May 31, 1790, ch. 15, § 1, 1 Stat. 124........................................................20

**Other Authorities**

3 Nimmer on Copyright § 11.02[A][2]...................................................................8

Ann Bartow, *Using the Lessons of Copyright's Excess to Analyze the Political Economy of Section 203 Termination Rights*, 6 Tex. A&M J. Prop. L. 23 (2020) ............................................................................................................19

App. of Pls.-Appellants.................................................................... *passim*

Barbara Ringer, *Study No. 31: Renewal of Copyright*, *reprinted in* Library of Congress Copyright Office, *Copyright Law Revision: Studies Prepared for the Subcommittee on Patents, Trademarks, and Copyrights of the Committee on the Judiciary, United States Senate, Eighty-sixth Congress, First [-Second] Session* (1961) ............................................................................................20

Ben Sisario, *Bob Dylan Sells His Songwriting Catalog in Blockbuster Deal*, N.Y. Times (Dec. 7, 2020), https://www.nytimes.com/2020/12/07/arts/music/bob-dylan-universal-music.html..........................................................................17

iv

*Copyright: Assignment of Author's Renewal Interest*, 18 Ind. L.J. 318 (1943) ......21

Debra Filcman, *How Bruce Springsteen Settled A Lawsuit With His Original Manager*, Townsquare Media Inc. (May 29, 2017), https://ultimateclassicrock.com/bruce-springsteen-mike-appel-settle-lawsuit 17

Eriq Gardner, *Cheetah Girls Creator Latest Alleged Victim of Hollywood Accounting*, The Hollywood Reporter (Feb. 15, 2008, at 1:02 ET), https://www.hollywoodreporter.com/business/business-news/cheetah-girls-creator-latest-alleged-62309 ...........................................................................17

*From Trad-Pub to Self-Pub—Tips and Observations*, Elizabeth Spann Craig (June 10, 2016), https://elizabethspanncraig.com/uncategorized/from-trad-pub-to-self-pub-observations ....................................................................................18

H. Comm. of the Judiciary, 89th Cong., Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law (Comm. Print 1965)......................................................................................... 10, 16

H.R. Rep. No. 2222 (1961) ...........................................................................22

H.R. Rep. No. 94-1476 (1976)................................................... 6, 7, 16, 23

Jane Pauley, *Stephen King Used Paperback Advance From First Novel to Make Sure his Mother Never Had to Work Again*, CBS News (June 14, 2021, at 7:04 ET), https://www.cbsnews.com/news/stephen-king-carrie-paperback-advance-mother-work ...........................................................................18

Kristelia García, *The Emperor's New Copyright*, 103 B.U. L. Rev. 837 (2023) ....15

Mary LaFrance, *Authorship and Termination Rights in Sound Recordings*, 75 S. Cal. L. Rev. 375 (2002)..................................................................................11

Paul J. Heald, *Copyright Reversion to Authors (and the Rosetta Effect): An Empirical Study of Reappearing Books* (December 8, 2017)..........................19

Richard Arnold & Jane C. Ginsburg, *Foreign Contracts & U.S. Copyright Termination Rights*, 43 Colum. J.L. & Arts 437 (2020)..................................21

*Robert Darnton and Authors Alliance: A Rights Reversion Success Story*, Authors Alliance (Sept. 11, 2015), http://www.authorsalliance.org/2015/09/11/robert-darnton-and-authors-alliancea-rights-reversion-success-story ........................18

Ryan A. Rafoth, *Limitations of the 1999 Work-For-Hire Amendment: Courts Should Not Consider Sound Recordings to Be Works-For-Hire When Artists' Termination Rights Begin Vesting in Year 2013*, 53 Vand. L. Rev. 1021 (2000) ......................................................................................................15

S. Rep. No. 94-473 (1975) ..............................................................................16

U.S. Copyright Office, Analysis of Gap Grants under the Termination Provisions of Title 17 (2010) .................................................................. 14, 25

U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 506.2 (3d ed. 2021) ..............................................................................................14

U.S. Copyright Office, General Guide to the Copyright Act of 1976 (1977) .........21

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 8..............................................................................18

## STATEMENT OF INTEREST[1]

Authors Alliance is a 501(c)(3) nonprofit that seeks to advance the interests of authors who want to serve the public good by sharing their creations broadly. Authors Alliance has over 3,000 members, including Nobel laureates, MacArthur Fellows, novelists, historians, fan fiction writers, journalists, and others. Our members, like authors of all types, rely on their biggest asset—their copyrights and their creations—to make a living and to make an impact in the world. The right to terminate copyright transfers is uniquely important to authors because it protects authors from being permanently bound by unremunerative deals, and ensures authors eventually regain the ability to control their works, whether to provide public access to the works or to create new works based on those existing works. Allowing authors to share in the eventual benefits of their works and to fully leverage their earlier creations encourages continued creation. By preserving authors' statutory termination rights, copyright law fulfills its fundamental purpose of promoting the progress of knowledge and culture, ultimately benefiting society at large.

---

[1] All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund the preparation or submission of this brief; and no person—other than the *Amicus Curiae* Authors Alliance, its members, or its counsel—contributed money that was intended to fund the preparation or submission of this brief.

The Music Artists Coalition is a 501(c)(6) organization that exists to champion the rights, compensation, and well-being of the people who create music. Both music industry executives and music creators founded MAC to ensure that musicians have a seat at the table, driving the strategy and conversation about the legal issues that shape their lives and livelihoods. MAC's membership includes recording artists, songwriters, and music creators whose work has shaped musical history and drives the music business today. Members of MAC include chart-topping songwriters, Grammy-winning artists, Rock and Roll Hall of Fame inductees, as well as music creators at all points of career development. MAC's Board consists of Ali Harnell, Anderson .Paak, Coran Capshaw, Dave Matthews, Don Henley, Elliot Groffman, Irving Azoff, Jim Cicconi, John Silva, Jordan Bromley, Kristen Foster, Maren Morris, Meghan Trainor, Shane McAnally, Susan Genco, and Verdine White, all of whom are beloved musicians and leaders in the music industry. MAC advocates on behalf of its constituents for appropriate compensation and for better terms regarding creative control of their works.

Public Knowledge is a nonprofit organization that promotes the public interest in communications and technology policy, including copyright law. Public Knowledge has long advocated for balanced copyright policies that serve creators and the public alike, and has participated in proceedings before Congress, federal agencies, and courts on issues affecting authors' rights and public access to creative

works. Public Knowledge has a direct interest in this case because Section 203's termination right sits at the intersection of two goals central to its mission: protecting individual creators from exploitative transfers and promoting broad public access to creative works. When authors can reclaim their copyrights, they gain the ability to make their works available on new terms and through new channels, expanding the public's access to knowledge and culture.

## SUMMARY OF ARGUMENT

Congress adopted Section 203 to protect authors from "unremunerative transfers" and to empower them to regain control over their copyrights "notwithstanding any agreement to the contrary," including agreements such as the ones in this case. The district court's decision renders these protections illusory by permitting distributors to evade Section 203 simply by forcing authors, who occupy an inherently unfair bargaining position, to sign agreements that allegedly disavow ownership and then by executing subsequent grants that do not involve the authors. The district court's decision cannot be reconciled with the statute. This Court should reverse that decision and interpret the rest of the statute in light of Section 203(a)(5)'s command that termination must be effectuated "notwithstanding any agreement to the contrary," and Section 203(a)(4)'s notice requirement that notice be served on "the grantee's successor in title." Section 203's "executed by the author" language must be construed in favor of authors, not against them: it prevents

3

later assignments between third parties from delaying termination indefinitely, ensuring that the 35-year clock always runs from the original *authorial* grant.

## ARGUMENT

First, termination must be effectuated "notwithstanding any agreement to the contrary." 17 U.S.C. § 203(a)(5). For a court to deprive any works' initial creators of their Section 203 termination rights, it must find either that ownership was transferred by will or that the works were originally created as "works made for hire." Neither were found here by the district court. Private agreements purporting in any way to abrogate termination rights must be set aside when evaluating whether the initial creators of a work have termination rights, except when the agreements are analyzed as evidence to establish the existence of a valid will or valid "work made for hire" relationship. Instead, the district court went against the plain statutory language of Section 203 and allowed private agreements to control the termination inquiry without finding that either of the relevant statutory exceptions applied.

Second, this Court held in *Horror v. Miller* that contracts and copyright registrations alone cannot transform a work into a "work made for hire." 15 F.4th 232, 258 (2d Cir. 2021). To qualify as a "work made for hire," a work must either have been created by an author acting within the scope of employment, or, if created by an independent contractor, fall within one of the statutorily enumerated categories and be subject to a written agreement expressly designating the work as "made for

4

hire." 17 U.S.C. § 101. When parties do not provide any contract specifying the sound recordings are "work made for hire," as is the case here, courts must undertake a fact-intensive inquiry into the actual relationship between the work's creators and those claiming authorship, as required by the Supreme Court in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 750-51 (1989), before depriving the initial creators of their statutory termination rights. The district court erred by wholly bypassing this necessary authorship analysis. A complaint that plausibly established plaintiffs as the initial creators of the works at issue should survive a motion to dismiss, allowing the parties to develop the factual record regarding authorship through discovery. It is critical that this Court uphold its approach in *Miller* to protect all authors, both those in this case and every future case that involves attempts to circumvent Section 203's protections via private contracts.

Third, Section 203 termination must be valid against grantees and their successors in title. The district court erred by holding Section 203 to permit termination only as against the original grantees—a construction plainly contradictory to the statute's text and legislative history. This invention is extraordinary, as it would allow distributors to evade termination merely by executing a subsequent grant in which the author is not a party so—according to the district court—the underlying work can be treated as exempt from termination. Such a rule renders termination rights entirely illusory.

5

For each of the foregoing reasons, this Court should reverse the district court's decision and remand for a ruling consistent with the correct application of Sections 101, 201, and 203 of the 1976 Copyright Act.

## I. Section 203(a) Requires Courts to Set Aside Any Agreement that Contravenes an Author's Termination Right, Even If Such an Agreement Is Otherwise Valid.

The plain text of Section 203, its legislative history, and the case law all make clear that termination must be effectuated "notwithstanding any agreement to the contrary." 17 U.S.C. § 203(a)(5); *see also* H.R. Rep. No. 94-1476, at 125 (1976) ("The scope of the [termination] right would extend . . . to any 'transfer of copyright ownership,' as defined in section 101 . . . ."). The district court erred by rewriting that law into the opposite rule, holding that contrary private agreements designed to negate termination rights effectively superseded Section 203. App. of Pls.-Appellants A-221 [hereinafter App.]. The district court's opposite rule cannot be reconciled with the statute, its legislative history, nor established case law.

Section 203(a)(5) unambiguously states that "[t]ermination of the grant may be effected notwithstanding any agreement to the contrary, including an agreement . . . to make any future grant." 17 U.S.C. § 203(a)(5). Under the 1976 Copyright Act, the term "including" is illustrative, not limitative. 17 U.S.C. § 101. The correct interpretation of "any agreement to the contrary" is inclusive of all instances except for the two explicitly stated in the statute—transfers "by will" and transfers of a

"work made for hire." 17 U.S.C. § 203(a); *see, e.g., Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 983 (9th Cir. 2008) ("[W]e must interpret the term 'agreement[s] to the contrary' under § 304(c)(5) as inclusive of agreements other than the two examples Congress explicitly mentioned").

There is no room for uncertainty when legislative history corroborates this clear categorical rule. The House Report accompanying the 1976 Act states that "the right to [terminate] cannot be waived in advance or contracted away" except for "the author's own bequests" (i.e., will) or "works made for hire." H.R. Rep. No. 94-1476, at 125. It is therefore clear that courts may examine agreements in termination disputes only as evidence bearing on whether one of these two statutory exceptions applies; an agreement alone can *never* extinguish termination right.

Further, Congress began Section 203 with "[i]n the case of any work other than a work made for hire" to signal the dispositive and limited nature of this singular exception to the termination right. 17 U.S.C. § 203(a). Congress's plain language thus instructs courts to presume that any contract concerning copyright transfers from an author to a subsequent rightsholder falls within the scope of termination unless the rightsholder can successfully rebut this presumption with proof that the work at issue was, in fact, a "work for hire."

What qualifies as "works for hire" is governed by Section 101 and is limited to (1) works prepared by an employee within the scope of employment, and (2)

certain specially commissioned works in nine statutorily enumerated categories where the parties expressly agree in a signed writing that the work will be treated as a work made for hire. 17 U.S.C. § 101. Despite the Copyright Act's express requirements, the district court neither analyzed nor found that the plaintiffs' recordings qualified as works made for hire: It conducted virtually no analysis on whether the sound recordings were created within an employment relationship, nor whether sound recordings fall within one of the nine commissioned-work categories and there was any signed writing in which the parties *expressly* agreed that the works will be treated as "works for hire." App. at A-219. The court, in fact, could not do these things, because these are disputed factual questions.

The district court focused exclusively on third-party agreements, which cannot in fact transform a work into a "work made for hire." As Nimmer explains, "[t]he parties to a grant may not agree that a work shall be deemed one made 'for hire' in order to avoid the termination provisions if a 'for hire' relationship (within the meaning of Section 101) does not, in fact, exist between them." 3 Nimmer on Copyright § 11.02[A][2]. This Circuit has followed the same rule. *See, e.g.*, *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 292 (2d Cir. 2002) (finding a contract referring to a book as a "work for hire" was an "agreement to the contrary," and could not make the work for hire for purposes of termination); *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 315-16 (2d Cir. 2013)

(finding that, despite an agreement treating a work as "made for hire," copyright law determines authorship by examining parties' relationship at the time of a work's creation and cannot be resolved by contract language alone); *Horror*, 15 F.4th, at 256 (holding that a screenplay was subject to termination despite a so-called "Employment Agreement" saying the author was employed by the film production company to write the screenplay). A court cannot avoid looking at the relevant facts when determining whether or not a work is indeed a work made for hire exempt from termination. As Judge Owen of the Southern District of New York previously explained:

> This statutory prohibition is intended to be broadly applied to invalidate such unlawful contracts and liberally protect termination rights. Indeed, copyright termination abrogates freedom of contract in two ways: it allows for the invalidation of the original contractual transfer, and it abrogates subsequent attempts to contract around the termination right it creates.

*Steinbeck v. McIntosh & Otis, Inc.*, 433 F. Supp. 2d 395, 399 n.10 (S.D.N.Y. 2006) *rev'd*, 537 F.3d 193 (2d Cir. 2008).

This Circuit Court has clarified previously why statutory protection of termination rights is so crucial. In *Simon*, the Court reasoned:

> If an agreement between an author and publisher that a work was created for hire [was] outside the purview of § 304(c)(5), the termination provision would be rendered a nullity; litigation-savvy publishers would be able to utilize their superior bargaining position to compel authors to agree that a work was created for hire in order to get their works published. . . . We conclude that Congress included the

"notwithstanding any agreement to the contrary" language in the termination provision precisely to avoid such a result.

310 F.3d at 290-91. The same concern was explained by the Supreme Court, recounting the legislative history of how "commissioned works" eligible for the "work for hire" exception was initially proposed to cover all types of works: "Those representing authors objected that the added provision would allow publishers to use their superior bargaining position to force authors to sign work for hire agreements, thereby relinquishing all copyright rights as a condition of getting their books published." *Reid*, 490 U.S. at 745-46 (citing H. Comm. of the Judiciary, 89th Cong., Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law 67 (Comm. Print 1965) [hereinafter Supplementary Report]).

That is exactly why the district court error was egregious: It allowed "agreements to the contrary" to obstruct authors' termination rights, making it trivially easy for distributors to nullify termination rights by executing subsequent agreements with third parties purporting to allocate ownership. The district court stated that "the 1986 agreements do not indicate that Plaintiffs ever owned the copyrights to the sound recordings or that they granted a transfer of those rights to anyone else. It was only Azor and NITA that granted a transfer of rights in 1986 to Next Plateau Records." App. at A-218. But these are precisely the kinds of "agreement[s] to the contrary" that the statute commands courts to set aside when

10

determining whether authors may exercise their termination rights. 17 U.S.C. § 203(a)(5).

**II.    Section 101 Requires Courts to Apply the Common Law of Agency and Engage in Fact-Specific Investigation When Determining Whether a Work Qualifies as a "Work Made for Hire" Exempt from Termination; Copyright Registrations Are Not Dispositive on "Work Made for Hire" Questions.**

Copyright "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). The author is generally "the party who actually creates the work." *Reid*, 490 US at 737. "Work made for hire" is an exception to this general rule. *Id.*

To qualify as a "work made for hire," either the plaintiffs were employees, or the songs fit within one of the categories of works that can be works for hire with a written agreement that expressly states the songs are works for hire. 17 U.S.C. § 101.

Sound recordings likely do not qualify as one of the categories of commissioned works eligible to be considered work made for hire made by independent contractors. *See generally*, Mary LaFrance, *Authorship and Termination Rights in Sound Recordings*, 75 S. Cal. L. Rev. 375, 378-90 (2002) (recounting the legislative and judicial background and finding sound recordings likely do not fall into the specially commissioned categories). But this Court need not even decide that issue in the present appeal. Because there is no written agreement in the record stating the sound recordings at issue constitute "works for hire," App. at A-222 to -23, the sound recordings cannot qualify as "commissioned

works" that are "work for hire." The district court has to hold the plaintiffs were employees in order to lawfully deny their assertion of termination rights. 17 U.S.C. § 203(a).

The district court erred in not examining the actual relationship of the plaintiffs and their purported employer. Zero attention was given to the common law of agency, as is required when determining if a work is indeed "work made for hire." *Reid*, 490 U.S. at 750-52; *see also Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 115 (2d Cir. 2000) (stating that a determination to whether a worker is an employee or an independent contractor necessitates an analysis using common law of agency). Instead, the district court simply asserts that plaintiffs contractually "acknowledg[ed] that NITA would be the sole copyright owner of any master recordings created pursuant to their agreement." App. at A-218. Such contractual language is contrary to Section 203 and thus cannot be the basis of denying termination. To conclude NITA was the employer of plaintiffs, the district court must instead examine whether the plaintiffs received royalties and advances or paychecks from NITA, and whether plaintiffs received health insurance, retirement benefits, or administrative support from NITA for example—applying the thirteen *Reid* factors.

The only evidence the district court points to in order to support this finding (besides "any agreement to the contrary" that cannot be considered, as discussed in

12

the section above) are the copyright certificates designating the plaintiffs' sound recordings as "works made for hire." *Id.* at A-218 to -19. The district court fundamentally misapplied the law by treating the copyright registration's "work made for hire" designation as dispositive, wholly evading the required factual inquiry into whether an employment relationship actually existed.

Under Section 410(c) of the Copyright Act, a copyright registration made within five years of publication is prima facie evidence of the validity of the copyright and the facts stated in the certificate of registration. 17 U.S.C. § 410(c). However, that presumption is rebuttable. *See Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 111 (2d Cir. 1998), *amended*, 169 F.3d 782 (2d Cir. 1998). In *Horror v. Miller,* this Circuit Court refused to classify a work as "work for hire" under Section 101, despite a copyright certificate designating the company as the employer for the "work for hire," as well as a previous labor dispute designating the creator as employee. 15 F.4th at 243. As the Court explained:

> [S]ection 101 of the Copyright Act uses a more restrictive definition of employment, one aimed at limiting the contours of the work-for-hire determination and protecting authors—the individual creators of works whose foundational value the Constitution itself recognizes and Congress has expounded upon.

*Id.* at 244.

Besides the policy reasons this Court has amply explained in previous cases, it is important to note that the U.S. Copyright Office does not meaningfully examine

13

whether a claimed "work for hire" relationship in fact satisfies the statutory requirements. Rather, the Office accepts authorship and "work for hire" designations as asserted, leaving factual questions over "work for hire" to the courts. 17 U.S.C. § 410(a); U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 506.2 (3d ed. 2021) (emphasizing that an "applicant—not the U.S. Copyright Office" determines whether to register the work as for hire and references the Court's command to apply *Reid*). The Office explained that, in the context of termination, "the act of recordation by the Office and the refusal of recordation by the Office do not carry equal weight under the law. The latter may permanently invalidate a notice of termination that is otherwise legally sound." U.S. Copyright Office, Analysis of Gap Grants under the Termination Provisions of Title 17 at ii, n.3 (2010) [hereinafter Analysis of Gap Grants]. Simply recording a copyright registration does not carry the dispositive weight the district court ascribed to it. App. at A-219.

Furthermore, the music industry has a well-documented history—and current practice—of leveraging market power to give authorship credit where it is not due, as well as insisting in form contracts that termination right does not exist. *Merchant v. Lymon*, 828 F.Supp. 1048, 1066 (S.D.N.Y. 1993), *rev'd on other grounds*, 92 F.3d 51 (2d Cir. 1996) (finding a producer's repeated practice of claiming authorship on registration forms over works he had not created rebutted presumption of authorship); Kristelia García, *The Emperor's New Copyright*, 103 B.U. L. Rev. 837,

14

870 (2023) (documenting the prevalent industry mantra "change a word, get a third," exploiting how even a slight contribution could lead to authorship credit); Ryan A. Rafoth, *Limitations of the 1999 Work-For-Hire Amendment: Courts Should Not Consider Sound Recordings to Be Works-For-Hire When Artists' Termination Rights Begin Vesting in Year 2013*, 53 Vand. L. Rev. 1021, 1050 (2000) ("After the 1976 Copyright Act, clauses attempting to contractually circumvent the right of termination became common, essentially boilerplate in most record contracts, but these efforts were in vain."). A functional termination right provides authors with a legal mechanism to protect themselves from rampant abusive industry practices.

Finally, as this Court held in *Wilson v. Dynatone Publishing Co.*, "mere registration of a copyright without more" is insufficient to "trigger the accrual of an ownership claim." 892 F.3d 112, 119 (2d Cir. 2018). Therefore, contrary to what UMG suggests, plaintiffs are not time-barred from asserting their termination rights because of mistaken designations of authorship in previous copyright registrations. The first time UMG expressly repudiated the plaintiffs' authorial rights was on June 27, 2022, in its Response to Plaintiffs' Notices of Termination; that is when the statute of limitation for bringing an action to enforce termination rights began to run. App. at A-23. Because plaintiffs filed their lawsuit on May 19, 2025, *id.* at A-9, their termination claims are not time-barred.

**III.** **Legislative History Makes It Amply Clear that Section 203 Was Enacted to "Safeguard[] Authors Against Unremunerative Transfers;" the Same Concern Remains Today.**

Congress intended Section 203 to be "a provision safeguarding authors against unremunerative transfers." H.R. Rep No. 94-1476, at 124. Authors often assigned their rights for inadequate compensation, especially when early in their careers and under unequal bargaining positions. Both the House and Senate Reports state that termination right was necessary because "of the unequal bargaining position of authors, resulting in part from the impossibility of determining a work's value until it has been exploited," a disadvantage that undermines an authors' other rights. H.R. Rep No. 94-1476, at 124; S. Rep. No. 94-473, at 108 (1975) (using identical language). *See also* Supplementary Report, at 53 ("[A]uthors are often in a relatively poor bargaining position, however, we believe that some other provision should be made to permit them to renegotiate their transfers that do not give them a reasonable share of the economic returns from their works.").

Authors routinely agree to unremunerative transfers early in their career. Termination is necessary because of the "impossibility of determining a work's value until it has been exploited." H.R. Rep No. 94-1476, at 124. This economic reality has not changed. For example, Bob Dylan's first music publishing deal with Leeds Music Publishing in 1962 provided him a mere $100 advance. Years later, in 2020, he transferred his songwriting catalog for an estimated $300 million in

16

publishing and an additional low-to-mid nine figures' sum for his masters—far beyond anyone's contemplation in 1962. *See* Ben Sisario, *Bob Dylan Sells His Songwriting Catalog in Blockbuster Deal*, N.Y. Times (Dec. 7, 2020), https://www.nytimes.com/2020/12/07/arts/music/bob-dylan-universal-music.html. When Bruce Springsteen signed management contracts with Mike Appel in 1972 that transferred complete ownership of his song catalog and granted Springsteen only a three percent royalty rate (terms he later had to sue to escape), neither he nor anyone else could have known those same rights would sell to Sony for an estimated $500 million in 2021. *See* Debra Filcman, *How Bruce Springsteen Settled A Lawsuit With His Original Manager*, Townsquare Media Inc. (May 29, 2017), https://ultimateclassicrock.com/bruce-springsteen-mike-appel-settle-lawsuit. When Deborah Gregory sold Disney the dramatic rights to her *Cheetah Girls* novels for four percent of net profits, neither she nor Disney could have known those books would anchor a franchise spanning multiple hit films, concert tours across more than eighty cities, and millions in merchandise sales. Eriq Gardner, *Cheetah Girls Creator Latest Alleged Victim of Hollywood Accounting*, The Hollywood Reporter (Feb. 15, 2008, at 1:02 ET), https://www.hollywoodreporter.com/business/business-news/cheetah-girls-creator-latest-alleged-62309. The $2,500 advance Stephen King received for *Carrie* was seen as a typical deal for an unknown debut novel: at the moment of signing, it was simply impossible to know that the paperback rights alone

17

would sell for $400,000, a 160-fold increase, without accounting for the films, remakes, and more. Jane Pauley, *Stephen King Used Paperback Advance From First Novel to Make Sure his Mother Never Had to Work Again*, CBS News (June 14, 2021, at 7:04 ET), https://www.cbsnews.com/news/stephen-king-carrie-paperback-advance-mother-work. Section 203 provides authors a meaningful opportunity to renegotiate new terms after the value of their works becomes clear.

Termination also allows authors to pursue different distribution strategies, such as nonexclusive licensing or self-distribution, that ultimately expand dissemination to the public. *See, e.g., Robert Darnton and Authors Alliance: A Rights Reversion Success Story*, Authors Alliance (Sept. 11, 2015), http://www.authorsalliance.org/2015/09/11/robert-darnton-and-authors-alliance-rights-reversion-success-story ("I am making the first two books I published available online and free of charge through the Authors Alliance, because I hope in at least a small way to promote the diffusion of knowledge."); *From Trad-Pub to Self-Pub—Tips and Observations*, Elizabeth Spann Craig (June 10, 2016), https://elizabethspanncraig.com/uncategorized/from-trad-pub-to-self-pub-observations (after regaining the rights to her literary characters from a traditional publisher, the author moved her series to self-publishing; she gained full control over production and promotion, lowered the e-book price, and saw particularly strong e-book sales—a benefit she was unable to realize under her original agreement.)

18

Ultimately, a robust termination right results in not only more authorial incentive to create but also more public access to creative works in the market. *See* Ann Bartow, *Using the Lessons of Copyright's Excess to Analyze the Political Economy of Section 203 Termination Rights*, 6 Tex. A&M J. Prop. L. 23 (2020) ("If authors can predictably and efficiently reclaim their copyrights using Section 203 termination rights, this almost certainly would lead to the broader dissemination of existing works. . . . Authors can leverage their control of the copyrights in commercially successful works to obtain support for less economically flourishing works"). Empirical evidence demonstrates that reverting rights to authors increases availability. Paul J. Heald, *Copyright Reversion to Authors (and the Rosetta Effect): An Empirical Study of Reappearing Books* 5 (December 8, 2017) (finding that the availability of books increases as much as twenty-five to thirty percent after termination). Protecting and promoting the author's termination rights effectuates the ultimate goals of copyright. U.S. Const. art. I, § 8, cl. 8 ("To promote the Progress of Science [] by securing for limited Times to Authors [] the exclusive Right to their respective Writings [].").

Termination rights' role in protecting the interests of authors and the general public is nothing new; rather, it reflects a principle Congress has recognized for centuries. Congress has included reversion provisions for authors since the Copyright Act of 1790. Under the 1790 Act, rights conveyed during the initial term

19

would revert to the author in the renewal term. Act of May 31, 1790, ch. 15, § 1, 1 Stat. 124. Courts interpreted the renewal right as creating a "new estate," reinforcing that the renewal term vests in the author independent of prior transfers. *See, e.g.*, *Pierpont v. Fowle*, 19 F. Cas. 652, 660 (C.C.D. Mass. 1846) ("[T]he taking out of the second term in each copyright . . . is rather like a new interest obtained by one after the original interest had expired.").

Congress preserved these protections in each of its subsequent revisions of the copyright laws to ensure that authors retain a "second chance" to reap the benefits of their creative works. 1909 Copyright Act, 17 U.S.C. § 24; *see, e.g.*, *Stewart v. Abend*, 495 U.S. 207, 220 (1990) ("[T]he renewal provisions were intended to give the author a second chance to obtain fair remuneration for his creative efforts and to provide the author's family a "new estate" if the author died before the renewal period arrived."); Barbara Ringer, *Study No. 31: Renewal of Copyright*, *reprinted in* Library of Congress Copyright Office, *Copyright Law Revision: Studies Prepared for the Subcommittee on Patents, Trademarks, and Copyrights of the Committee on the Judiciary, United States Senate, Eighty-sixth Congress, First [-Second] Session*, at 125 (1961) (describing Congress' two goals of (1) giving living authors the ability to renegotiate agreements made when "the author (regardless of his business ability) is necessarily in a poor bargaining position" and (2) to ensure that the relatives of deceased authors would benefit from renewal).

20

Before the enactment of the 1976 Act, however, authors often "assigned the contingent rights in the renewal term well before his or her rights vested." U.S. Copyright Office, General Guide to the Copyright Act of 1976, at 6:1 (1977). Contrary to Congress's original intent to protect authors, the Supreme Court's decision in *Fred Fisher Music Co. v. M. Witmark & Sons* enabled publishers to secure control over the renewal terms. 318 U.S. 643 (1943). *Fisher* made it trivially easy for authors to be denied a "second chance." *See Copyright: Assignment of Author's Renewal Interest*, 18 Ind. L.J. 318, 319 (1943) ("[T]he [*Fisher*] court erred in its interpretation of the legislative intent. . . . The ruling in the instant case will result only in the addition of a few words to copyright assignments, and the renewal interest created for the author's benefit will be lost to him."); *see also* Richard Arnold & Jane C. Ginsburg, *Foreign Contracts & U.S. Copyright Termination Rights*, 43 Colum. J.L. & Arts 437, 439 (2020) ("Because most book and music publishing contracts routinely—since at least the 1870s—systematically and explicitly conveyed both the first and the renewal terms, generally with no separate consideration for the latter, [*Fisher*] validated industry practice, but arguably at the cost of the raison d'être of the reversion right.").

Congress recognized the failures of *Fisher* to uphold the reversion provision's aim of protecting authors. To prevent publishers from securing a single, uninterrupted term through perpetual assignments, Congress rejected the reversion

provision in favor of termination rights that clearly guarantee authors a nonwaivable opportunity to reclaim their copyrights. H.R. Rep. No. 2222, at 92 (1961) ("[W]e have recommended that this reversion of the renewal right be eliminated, because it has *largely failed to accomplish the purpose of protecting authors* and their heirs against improvident transfers, and has been the source of much confusion and litigation." (emphasis added)).

If this Court were to affirm the district court's holding to allow "any agreement to the contrary" to abrogate termination rights, it will recreate the very problem Congress set out to eliminate when enacting Section 203.

## IV. As an Indispensable Safeguard to Preserving Authors' Statutory Termination Rights, Section 203 Allows Termination Against Grantee's Successors in Title.

Disregarding the plain language of the statutory text as well as the legislative history, the district court made termination rights entirely illusory. The district court held that subsequent grants made by a grantee are not subject to termination: "Plaintiffs can only terminate copyright transfers that they executed. They cannot terminate a copyright grant executed by [the producers]." App. at A-221. This ill-conceived rule makes it trivially easy for publishers or distributors to evade termination: By transferring rights to a new entity and ensuring an author is neither a party to nor an executor of the new grant, publishers and distributors can entirely insulate themselves from an author's enforcement of statutory termination rights.

22

Accepting such a rule would render decades of negotiation and eventual compromise between authors and distributors—as codified in the 1976 Act—entirely meaningless, nullifying the hard-won protections the 1976 Copyright Act affords authors.

Properly understood, the phrase "executed by the author" ensures that the termination clock is triggered by the original transfer executed by the author, instead of allowing each subsequent downstream transfer to reset the termination clock. This prevents later assignments between third parties from indefinitely delaying termination. Without "executed by author" as safeguard, a grantee could assign the rights to another party years later, who could then reassign them again, effectively restarting the clock with each transfer. For example, B could transfer to C ten years after the original grant executed by the author, and C could transfer back to B another ten years later, resulting in a cycle that could postpone termination with each new transfer.

Comparing Section 203 with its counterpart Section 304 can further clarify the meaning of the phrase "executed by author." Section 304 extends termination rights to both grants executed by authors and their heirs. 17 U.S.C. §§ 203, 304; *see also* H.R. Rep. No. 94-1476, at 140 ("There is good reason for this difference. . . . Under section 203, [termination] rights apply only to grants by the author, and any effort by a widow, widower, or child to transfer contingent future interests under a

23

termination would be ineffective."). Congress allowed transfers executed by the author as well as the author's heirs to be terminated under Section 304, but not under Section 203, because Section 304 governs copyrights under the old renewal system, and an author's surviving spouse and children could have already assigned the authors' copyrights and would have been unfairly disadvantaged by the 1976 Act absent a corresponding termination right. Put simply, Section 203(a)'s "executed by author" language functions to prevent heirs from transferring a copyright only to later exercise a termination right that they do not hold under the statute.

Indeed, Section 203 places no limitation on who may be affected by authors' exercise of their termination rights; those rights are not only valid against parties to the agreements personally signed by authors. To the contrary, Section 203 expressly provides that termination may be effectuated against "the grantee or the grantee's successors in title." "A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination." 17 U.S.C. § 203(b)(4). Here, any grant originating from Azor or NITA disposing of the plaintiffs' sound recordings would constitute precisely such "a further grant" under Section 203(b)(4) and becomes invalid once the author exercises the statutory right of termination. NITA was dissolved in 1997. *Noise In The Attic Prods., Inc. v. London Recs.*, 10 A.D.3d 303, 305 (2004). It would be absurd to deprive authors of their termination rights merely because the original

24

grantee no longer exists to notify downstream assignees or licensees of termination. As a matter of sound policy, courts should encourage authors to diligently provide notice to sub-assignees and sublicensees to ensure clarity for all affected by termination; in fact the statute precisely requires that notice be served "upon the grantee or the grantee's successor in title." 17 U.S.C. § 203(a)(4). The district court's conclusion that plaintiffs' notice to UMG is ineffectual turns the statute on its head.

Fundamentally, contrary to what the district court concluded, the meaning of the phrase "executed by the author" as included under "condition for termination" does not mean an author has to be a party to an agreement or to sign that agreement. One only has to refer to the comments received in answer to the Gap in Termination Provisions Inquiry to see the consensus of copyright scholars and practitioners that "executed" can never refer to an agreement disposing of a work not yet created. Analysis of Gap Grants, at 1 (summarizing different comments explaining that before a work is actually created there is no "author" or "copyright," and therefore no possible execution of a grant). The NPR agreement that, according to the district court the plaintiffs did not "execute" was dated 1986, whereas the sound recordings to be terminated were created in the years after. App. at A-17 to -18. The 1986 grants cannot be said to have been executed without the authors actually *having created* the works to be granted; therefore the district court fundamentally erred in holding that

25

the plaintiffs did not execute the NITA as well as NPR grants they now seek to terminate.

## CONCLUSION

Upholding the district court's interpretation would render the Section 203 termination right illusory for all authors when "any agreements to the contrary" are signed. For the reasons set forth herein, this Court should hold that Section 203 is effective against grantees as well as subgrantees, regardless of agreements or copyright certificates to the contrary. *Amici* respectfully requests this Court reverse the decision of the district court.

Respectfully submitted,

Dated: April 7, 2026

/s/ Jason M. Schultz
JASON M. SCHULTZ
NYU TECHNOLOGY LAW & POLICY CLINIC
*Counsel for Amici Curiae*
  *Authors Alliance, Music Artists*
  *Coalition and Public Knowledge*[2]
245 Sullivan Street, 5th Floor
New York, New York 10012
(212) 998-6430

---

[2] *Amicus Curiae* Authors Alliance thanks Spring 2026 NYU Technology Law and Policy Clinic students Lilit Arakelyan and Frances Schwentker, and Authors Alliance's student intern Kalani Gaviola, for their valuable contributions to this brief.

26

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations set forth in Local Rules 29.1(c) and 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 6,190 words.

I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in a 14-point Times New Roman font.

Dated: April 7, 2026                    /s/ Jason M. Schultz

                                       Jason M. Schultz

                                       *Counsel for Amici Curiae*