**No. 26-253**

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

Cheryl James and Sandra Denton, p/k/a Salt-N-Pepa
*Plaintiffs – Appellants*

versus

UMG Recordings, Inc.
*Defendant – Appellee*

On Appeal from the United States District Court
for the Southern District of New York
No. 25-cv-4182 (DLC)

## BRIEF OF NATIONAL SOCIETY OF ENTERTAINMENT & ARTS LAWYERS AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLANTS CHERYL JAMES AND SANDRA DENTON, P/K/A SALT-N-PEPA

Timothy R.W. Kappel, *Counsel of Record*
**WELLS & KAPPEL LLP**
1615 Poydras Street, Suite 900
New Orleans, Louisiana 70112
(504) 905-2012
tkappel@wellskappel.com

Scott Alan Burroughs
**DONIGER / BURROUGHS**
247 Water Street, First Floor
New York, New York 10038
(310) 590-1820
scott@donigerlawfirm.com

Steven T. Lowe
**LOWE & ASSOCIATES**
8383 Wilshire Boulevard, Suite 1038
Los Angeles, California 90211
(310) 477-5811
steven@lowelaw.com

*Counsel for Amicus Curiae National Society of Entertainment & Arts Lawyers*

## TABLE OF CONTENTS

*TABLE OF CONTENTS* ............................................................................*i*

*TABLE OF AUTHORITIES*.........................................................................*ii*

*STATEMENT OF INTEREST*.......................................................................*1*

*INTRODUCTION*.......................................................................................*3*

*ARGUMENT*............................................................................................*6*

  I.  **The Subject Recordings were almost certainly not employee "works made for hire" under established copyright law. ..............9**

  II. **The Subject Recordings cannot be specially ordered or commissioned "works made for hire" under established copyright law. ................11**

     A.   The Legislative History Is Decidedly Against UMG's Position..........12

     B.   Interpretation of the 1976 Act and the Industry's Response ..........19

     C.   Previous Judicial Rejection of UMG's Position ...............................22

*CONCLUSION*........................................................................................*27*

*CERTIFICATE OF COMPLIANCE*..............................................................*28*

*CERTIFICATE OF SERVICE*......................................................................*29*

## TABLE OF AUTHORITIES

### *Cases*

*Aldon Accessories Ltd. v. Spiegel, Inc.*, 738 F.2d 548 (2d Cir. 1984) .......19, 20

*Aymes v. Bonelli*, 980 F.2d 857 (2d Cir. 1992) ...……………………………… 20

*Ballas v. Tedesco*, 41 F. Supp. 2d 531 (D.N.J. 1999)...........................23, 24

*Bucciarelli-Tieger v. Victory Records, Inc.*, 488 F. Supp. 2d 702 (N.D. Ill. 2007) ...............................................................................................24, 25

*Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53 (1884) .......................7

*Carol Barnhart Inc. v. Econ. Cover Corp.*, 773 F.2d 411 (2d Cir. 1985)........11

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) ......passim

*Eni US Operating Co., Inc. v. Transocean Offshore Deepwater Drilling, Inc.*, 919 F.3d 931 (5th Cir. 2019).................................................................................8

*Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061 (7th Cir. 1994).....................7

*Fleurimond v. New York University*, 722 F.Supp.2d 352 (E.D.N.Y. 2010) ......8

*Forward v. Thorogood*, 985 F.2d 604 (1st Cir. 1993)...................................7

*Grant v. Trump*, 749 F. Supp. 3d 423 (S.D.N.Y. 2024)...............................26

*Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d Cir. 2021) ......................6, 7, 11

*Johnson v. Arista Holding, Inc.*, 2006 WL 3511894 (S.D.N.Y. Dec. 5, 2006)..8

*Kelley v. Everglades Drainage District*, 319 U.S. 415 (1943)..........................8

*Lulirama Ltd., Inc. v. Axcess Broadcast Services, Inc.*, 128 F.3d 872 (5th Cir. 1997) .........................................................................................................22

*Pavlica v. Behr*, 397 F. Supp. 2d 519 (S.D.N.Y. 2005) ..................................8

*Playboy Enters. v. Dumas*, 53 F.3d 549 (2d Cir. 1995) ...............................11

*Staggers v. Real Authentic Sound*, 77 F. Supp. 2d 57 (D.D.C. 1999) ............24

*Stillwater Ltd. v. Basilotta*, 2020 WL 4355306 (C.D. Cal. Feb. 5, 2020) ........7

*Ulloa v. Univ.l Music & Video Distr. Corp.*, 303 F. Supp. 2d 409 (S.D.N.Y. 2004) .........................................................................................................11

*Waite v. UMG Recordings, Inc.*, 450 F. Supp. 3d 430 (S.D.N.Y. 2020) .........25

### *Statutes*

17 U.S.C. § 101 ..................................................................passim

17 U.S.C. § 201 ..........................................................................6

17 U.S.C. § 26 (1909) .............................................................13

17 U.S.C. § 203 ...............................................................3, 4, 6

7 U.S.C. § 304(c) ....................................................................3, 4

Intellectual Property and Communications Omnibus Reform Act of 1999 ..21

Work Made For Hire and Copyright Corrections Act of 2000......................21

### *Other Authorities*

Bill Holland, *RIAA's Involvement Goes Back 10 Years*, Billboard, July 29, 2000 ........................................................................................21

Catherine L. Fisk, *Authors at Work: The Origins of the Work-for-Hire Doctrine*, 15 Yale J.L. & Human. 1 (2003) ................................13

*Copyright Law Revision Part 6, Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill*, 89th Cong., 1st Sess........................................................17

*Copyright Law Revision, Part 3: Preliminary Draft for Revised U.S. Copyright Law and Discussion and Comments, Transcript of Meeting on Preliminary Draft for Revised U.S. Copyright Law*, June 11, 1963 ..............................17

*Copyright Law Revision*: Hearings on S. 597 Before the Subcomm. on Patents, Trademarks, & Copyrights of the S. Comm. on the Judiciary, 90th Cong., March 21, 1967 ........................................................15

Corey Field, *Their Master's Voice? Recording Artists, Bright Lines, and Bowie Bonds: The Debate Over Sound Recordings as Works Made for Hire*, 48 J. Copr. Soc'y 145 (2000)......................................................22

*Definition of Work Made for Hire in the Copyright Act of 1976*: Hearing on S. 2044 Before the Committee on the Judiciary, 97th Cong., 2d Sess. (1982) ........................................................................................19

Donald Passman, ALL YOU NEED TO KNOW ABOUT THE MUSIC BUSINESS (1991) ........................................................................................15

H.R. Rep. No. 92-487 (1971) ....................................................6, 14

H.R. Rep. No. 94-1476 (1976) ..........................................3, 4, 15, 18

Jessica Litman, *Copyright, Compromise, and Legislative History*, 72 Cornell L. Rev. 857, 865 (1987) ......................................................................4

Jon Parles, *Musicians Take Copyright Issue to Congress*, The New York Times, May 25, 2000 ..............................................................................21

Marci A. Hamilton, *Commissioned Works As Works Made for Hire Under the 1976 Copyright Act: Misinterpretation and Injustice*, 135 U. Pa. L. Rev. 1281 (1987) ................................................................................14

Merriam-Webster Dictionary ....................................................................19

*Moral Rights in Our Copyright Laws*: Hearings on S. 1198 and S. 1253 Before the Subcomm. on Patents, Copyrights & Trademarks of the S. Comm. on the Judiciary, 101st Cong. (1989) .........................................21

Randy S. Frisch & Matthew J. Fortnow, *Termination of Copyrights in Sound Recordings: Is There A Leak in the Record Company Vaults?*, 17 Colum.-VLA J.L. & Arts 211 (1993) ...........................................................................5

Recording Industry Association of America, U.S. Music Revenue Database 18

Richard Osborne, OWNING THE MASTERS: A HISTORY OF SOUND RECORDING COPYRIGHT (2023) ......................................................................20

Ringer, *Renewal of Copyright*, Copyright Office Study No. 31, Copyright Law Revision, Studies Prepared for the Subcommittee on Patents, Trademarks, and Copyrights of the Committee of the Judiciary, U.S. Senate, 86th Cong., 1st Sess. ..............................................................................13, 16

Sidney Shemel & M. William Krasilovsky, THIS BUSINESS OF MUSIC (4th ed. 1979) ......................................................................................20

Sidney Shemel & M. William Krasilovsky, THIS BUSINESS OF MUSIC (6th ed. 1990) ......................................................................................20

*Sound Recordings as Works Made for Hire*: Hearings before the Subcommittee on Courts and Intellectual Property Committee on the Judiciary United States House of Representatives 106th Congress, 2nd Session, May 25, 2000 ..................................................................10, 21

Varmer, *Works Made for Hire and on Commission*, Study No. 13, Copyright Law Revision, Studies Prepared for the Subcommittee on Patents, Trademarks, and Copyrights of the Committee of the Judiciary, U.S. Senate, 86th Cong., 1st Sess. (1960) .................................................................13

William Patry, 2 Patry on Copyright § 3:19 (2026).....................................14

## STATEMENT OF INTEREST

National Society of Entertainment & Arts Lawyers ("NSEAL") is a non-profit 501(c)(3) organization that was founded in 2013.[1] This national organization advocates for artists' and entertainers' rights and is comprised of attorneys across the United States who represent authors, screenwriters, songwriters, musicians, and other creative professionals in the entertainment and arts industries. Its members have litigated thousands of entertainment and art cases in trial and appellate courts throughout the country, including many of the most important recent copyright, art, and entertainment cases, and have advised scores of creative professionals on litigation, licensing, and intellectual property strategy. Its members have also argued for and obtained crucial decisions at the appellate court level in cases involving artists' rights and entertainment law. The organization has submitted amicus briefs in support of the prevailing party in four Supreme Court cases, *viz.*, *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014), *Unicolors, Inc. v. H&M*

---

[1] NSEAL was previously known as California Society of Entertainment Lawyers. Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, NSEAL represents that there is no parent corporation or any publicly held corporation that owns 10% or more of its stock. All parties to the present appeal have consented to the submission of this brief pursuant to Rule 29(a)(2) of the Federal Rules of Appellate Procedure. No counsel for any such party authored this brief in whole or in part, and no person or entity besides NSEAL and its counsel funded this brief's preparation or submission.

1

*Hennes & Mauritz, L. P.,* 142 S. Ct. 941 (2022), *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith,* 598 U.S. 508 (2023), and *Nealy v. Warner Chappell Music, Inc.,* 601 U.S. 366 (2024), all of which involved important issues of copyright law, and all of which reached conclusions consistent with the reasoning in NSEAL's briefs. Most recently, NSEAL's amicus curiae brief in *Vetter v. Resnik* was cited by the Fifth Circuit in a landmark copyright termination rights opinion. 163 F.4th 951, 963 (5th Cir. 2026).

* * *

2

## **INTRODUCTION**

Congress has long viewed "the author [as] the fundamental beneficiary of copyright under the Constitution."[2] At the same time, Congress has been clear-eyed in its recognition that economic realities routinely force authors to transfer away the benefits afforded by copyright to industry intermediaries. Moreover, in many cases, such deals between authors and industry are imbalanced, both financially and otherwise, in favor of intermediaries. To remedy this inversion of constitutional benefits, Congress has always ensured that authors receive a second chance to control and benefit from the fruits of their labor. Under the Copyright Act of 1976 (the "1976 Act"), that second chance is guaranteed through so-called "termination rights," which provide authors and their heirs an ***inalienable*** right to reclaim any copyright previously transferred or licensed away by the original author.[3]

Powerful as it is, termination rights are not without limitations. These limitations are the byproduct of years of negotiation and legislative

---

[2] H.R. Rep. No. 94-1476, at 124 (1976) available at 1976 WL 14045 (hereafter, "1976 House Report").

[3] 17 U.S.C. §§ 203. Both Sections 203 and 304(c) make the termination right exercisable "notwithstanding any agreement to the contrary."

maneuvering in the decades preceding the 1976 Act.[4] Relevant here, "works made for hire" are expressly excluded from the termination regime.[5] This exception was, by far, the most controversial,[6] and, as a result, the legislative history surrounding the compromise Congress eventually endorsed is comparatively extensive. In the end, that compromise recognized only two categories of "works made for hire," the first being works made by employees within the scope of their employment, and the second being a very narrow set of specially commissioned works made by independent contractors.[7]

For whatever truce existed between authors and industry on the "work made for hire" exception following the enactment of the 1976 Act, it did not last long. In 1989, the Supreme Court's decision in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989), abruptly upended long-standing industry assumptions as to the meaning of the term "employee" as used in the 1976 Act. Specifically, it rejected the notion that an independent contractor would be deemed an "employee" for purposes of the "work made for hire"

---

[4] *See* Jessica Litman, *Copyright, Compromise, and Legislative History*, 72 Cornell L. Rev. 857, 865, 888 (1987).

[5] 17 U.S.C. §§ 203, 304(c).

[6] *See* 1976 House Report *supra* note 2, at 121, 125.

[7] *See* 17 U.S.C. § 101.

provisions of the 1976 Act merely because the "employer" had some control (actual or ostensible) over the creation of the work. The decision left certain industry intermediaries—in particular, record companies—searching for a way to squeeze into the second category of independent contractor "works made for hire" so as to avoid the loss of valuable assets.[8] With those efforts, the controversy around the "work made for hire" language in the 1976 Act was reignited.

The district court's Opinion and Order[9] in favor of UMG purports to side-step the "work made for hire" issue. But to do so, the court ignored a fundamental tenet of copyright law that, absent a legitimate "work made for hire" relationship, the creator is the author and initial owner of a copyrighted work from the moment it is fixed in a tangible medium of expression.[10] Stated differently, unless the Salt-N-Pepa sound recordings at issue (the "Subject Recordings") were "works made for hire," any rights obtained by third-party

---

[8] Randy S. Frisch & Matthew J. Fortnow, T*ermination of Copyrights in Sound Recordings: Is There A Leak in the Record Company Vaults?*, 17 Colum.-VLA J.L. & Arts 211, 229-35 (1993) (describing steps record labels can take to limit termination rights after *Reid*).

[9] A-206-23 (hereafter, the "Opinion"). All capitalized terms herein not otherwise defined have the meanings ascribed to them by the district court in the Opinion.

[10] 17 U.S.C. §§ 102, 201; *Reid*, 490 U.S. at 737. The district court failed to appreciate that a creator can be vested with **author** status upon fixation and nevertheless agree that another party will be the **owner** of the copyright from "inception." There is nothing nonsensical about an agreement to immediately transfer future copyrights upon creation.

record companies necessarily required a "transfer of copyright ownership,"[11] and any such transfer is subject to termination.[12] Accordingly, inherent in the district court's conclusion that there was no "transfer of copyright ownership" by Denton and James, is a determination that the Subject Recordings were "works made for hire." Respectfully, making that determination without any factual development or legal explanation was reversable error, and the case should be remanded.

## **ARGUMENT**

Like all copyrightable works, copyright ownership in sound recordings "vests initially in the author or authors of the work."[13] As a general rule, the author is the party who actually creates the work.[14] In context, the most likely authors of a sound recording are the performers and, possibly, the producers who take an active role in shaping the sonic landscape by contributing meaningful creative expression to the recording.[15] Conversely, given the

---

[11] 17 U.S.C. § 101.

[12] 17 U.S.C. § 203.

[13] 17 U.S.C. § 201.

[14] *Reid*, 490 U.S. at 737; *see also Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d Cir. 2021).

[15] H.R. Rep. No. 92-487 (1971), 1971 U.S.C.C.A.N. 1566, 1570, *available at* 1971 WL 11367 (hereafter, the "1971 House Report").

purely logistical and financial role of record companies in the recording process, the label will rarely, if ever, be considered an author of an artist's sound recording.[16] The only exception to the general "creator-as-author" rule (and thus, generally the only time a record company may be considered an author of copyright) is if the sound recording is a "work made for hire," which renders creative contributions to a work irrelevant to authorship thereof.[17]

The district court acknowledged that Denton and James created the Subject Recordings.[18] Accordingly, black-letter copyright law instructs that Denton and James were the presumptive authors and initial owners thereof.[19] In order for UMG's predecessors in interest to have a claim to copyright ownership in the Subject Recordings, the agreements between Salt-N-Pepa and those companies must reflect a transfer of Denton and James'

---

[16] *See e.g., Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061 (7th Cir. 1994) (regarding ideas, refinements, and directions), *Forward v. Thorogood*, 985 F.2d 604, 607 (1st Cir. 1993) (regarding logistical and financial contributions), *Stillwater Ltd. v. Basilotta*, 2020 WL 4355306, at *6 (C.D. Cal. Feb. 5, 2020) (same).

[17] *See Horror Inc.*, 15 F.4th at 241.

[18] A-210 ("Plaintiffs then recorded many popular and critically acclaimed albums, singles, and remixes pursuant to the terms of the 1986 agreements").

[19] *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 57–58 (1884) ("An author in [the constitutional] sense is he to whom anything owes its origin; originator; maker; one who completes a work of science or literature.").

initial ownership. That is, of course, unless the Subject Recordings were "works made for hire," in which case UMG's predecessors in interest would be considered the authors thereof. The district court concluded that there were no transfers of copyright made by Salt-N-Pepa in these agreements, but then purported "not [to] reach the issue" of whether the Subject Recordings were "works made for hire."[20] However, the Opinion can only bear logical weight if the district court's allusions to "work made for hire" status were actually an implicit factual finding, and that finding served as the basis for the court's ultimate ownership determination.

Resting on an implicit factual premise is, of itself, reversible error because, "there must be findings, stated either in the court's opinion or separately, which are sufficient to indicate the factual basis for the ultimate conclusion."[21] What is especially problematic here, is that the district court's implicit determination is not one that can reasonably be made at the motion

---

[20] A-218-19.

[21] *Kelley v. Everglades Drainage District*, 319 U.S. 415, 421–22 (1943); *see also Eni US Operating Co., Inc. v. Transocean Offshore Deepwater Drilling, Inc.*, 919 F.3d 931, 936 (5th Cir. 2019) (it is not the job of an appellate court to "supply[] the subsidiary facts necessary to support the general holding," but to "review[] the district court's factual reasoning.").

to dismiss stage when, as here, facts are in dispute.[22] Consequently, whether the district court's Opinion should be reversed seems beyond debate. What remains an open issue, however, is the applicability of the "work made for hire" doctrine as it relates to sound recordings. To that end, NSEAL respectfully requests the Court make clear that, on remand, the district court cannot simply rely on the language of the parties' agreements to declare the Subject Recordings "works made for hire." Instead, that inquiry requires factual development and any legal determination on the issue should be made consistent with the text, history, and purpose of the "work made for hire" provisions of the 1976 Act.

## I. The Subject Recordings were almost certainly not employee "works made for hire" under established copyright law.

The first category of "works made for hire" is "a work prepared by an employee within the scope of his or her employment."[23] To determine whether someone should be treated as an employee for purposes of copyright law, the Supreme Court has instructed lower courts to use a multi-factor test

---

[22] *See, e.g., Johnson v. Arista Holding, Inc.,* No. 05 CIV. 9645 (LBS), 2006 WL 3511894, at *6 (S.D.N.Y. Dec. 5, 2006); *Pavlica v. Behr,* 397 F. Supp. 2d 519, 525 (S.D.N.Y. 2005), *Fleurimond v. New York University,* 722 F.Supp.2d 352 (E.D.N.Y. 2010).

[23] 17 U.S.C. § 101.

derived from the law of agency, which considers *inter alia* the skill required to create the work, the method of payment to the creator, the provision of employee benefits to the creator, and the tax treatment of the creator.[24] In this case, there are few (if any) facts stated in the parties' briefings that would suggest a legitimate employment relationship with respect to Denton and James. That said, pursuant to *Reid,* employee status is necessarily a factual inquiry and, therefore, would not be appropriate to decide on this appeal. But it would be appropriate to caution the district court not to simply rest a "work made for hire" determination on the language of the agreements between the parties or the copyright registrations for the Subject Recordings.[25] Instead, the district court must permit fact discovery on the issue of whether Denton and James were employees of UMG's predecessors in interest, and whether the Subject Recordings were created within the scope of their employment. Importantly, the district court must place the burden to establish the "work

---

[24] *Reid*, 490 U.S. at 751–52.

[25] *Sound Recordings as Works Made for Hire*: Hearings before the Subcommittee on Courts and Intellectual Property Committee on the Judiciary United States House of Representatives 106th Congress, 2nd Session, May 25, 2000 ("[T]he fact that work-for-hire agreements and copyright registrations as works for hire have been made does not lead to the legal conclusion that the sound recordings that are the subjects of those agreements and registrations are indeed works made for hire.") (Statement of Marybeth Peters, Register of Copyrights).

10

made for hire" exception to termination rights on UMG.[26] Any fact dispute should be submitted to a jury.[27]

**II.  The Subject Recordings cannot be specially ordered or commissioned "works made for hire" under established copyright law.**

The second category of "works made for hire" is referred to as "specially ordered" or "specially commissioned" works.[28] There are two requisite elements for works in this category. First, the parties must "expressly agree in a written instrument signed by them that the work shall be considered a work made for hire."[29] Second, the work created must fit within a narrow band of "eligible" works identified in the 1976 Act. Those works eligible for specially ordered or commissioned "work made for hire" status are:

---

[26] *Horror Inc.*, 15 F.4th at 242 (stating that the party asserting "work made for hire" status bears burden to establish it); *see also Carol Barnhart Inc. v. Econ. Cover Corp.*, 773 F.2d 411, 414 (2d Cir. 1985) (observing that the presumption based on a copyright registration "merely orders the burdens of proof," and does not relieve the party bearing the ultimate burden of proof).

[27] *Ulloa v. Universal Music & Video Distribution Corp.*, 303 F. Supp. 2d 409, 414 (S.D.N.Y. 2004) ("Questions of historical fact relevant to applying each of the *Reid–Aymes* factors are for the finder of fact.").

[28] 17 U.S.C. § 101.

[29] *Id.* This Court has also determined that "the 1976 Act requires that the parties agree before the creation of the work that it will be a work made for hire, but the actual writing memorializing the agreement need not be executed before the creation of the work." *Playboy Enters. v. Dumas*, 53 F.3d 549, 559 (2d Cir. 1995) (cleaned up). Given that a number of the Subject Recordings were created before the 1986 NITA Recording Agreement was executed, UMG's position may be challenged on that basis alone.

11

contributions to a collective work, parts of a motion picture or other audiovisual work, translations, supplementary works, compilations, instructional texts, tests (or answer material for a test), and atlases.[30] Thus, even if parties purport to agree otherwise, if the work does not fit within one of those eligible categories, it **cannot** be considered a specially ordered or commissioned "work made for hire."[31] UMG acknowledges that sound recordings are not an eligible category, but insists that "they fall comfortably within the 'contribution to a collective work' category where, as here, the works are for inclusion on albums."[32] That confidence notwithstanding, neither the text and history of the 1976 Act's "work made for hire" provisions, nor the judicial interpretation of those provisions, support UMG's position.

## A.    The Legislative History Is Decidedly Against UMG's Position

What is now understood as the "work made for hire" doctrine in the 1976 Act first developed in the United States through judicial decisions in the

---

[30] 17 U.S.C. § 101.

[31] *Reid*, 490 U.S. 730, 746-48. This list was a compromise of sorts, made following highly controversial negotiations leading up to the passage of the 1976 Act. This legislative history was described by the Supreme Court in *Reid* as "significant" to the interpretation of the compromise "works made for hire" terms.

[32] A-210.

19th century.[33] Initially, courts were reluctant to recognize an inherent right of an employer to own the copyright in the works created by its employees.[34] However, towards the latter part of the 19th century, courts became more comfortable with the notion and adopted a presumption in favor of the employer.[35] This presumption carried forward into the Copyright Act of 1909 (the "1909 Act"), which was the first instance of Congress legislating the right of an employer to claim authorship in the works of its employees.[36]

The 1909 Act provided that "the word 'author' shall include an employer in the case of works made for hire."[37] At first, courts interpreting the 1909 Act strictly policed the employment relationship, requiring the creator to be in a formal salaried position in order to invoke the presumption in favor of employer ownership.[38] However, starting with this Court's 1966

---

[33] *See generally* Catherine L. Fisk, *Authors at Work: The Origins of the Work-for-Hire Doctrine*, 15 Yale J.L. & Human. 1 (2003).

[34] Ringer, *Renewal of Copyright*, Copyright Office Study No. 31, Copyright Law Revision, Studies Prepared for the Subcommittee on Patents, Trademarks, and Copyrights of the Committee of the Judiciary, U.S. Senate, 86th Cong., 1st Sess. 128 (1960).

[35] Fisk, *supra* note 31, at 46.

[36] Varmer, *Works Made for Hire and on Commission*, Study No. 13, Copyright Law Revision, Studies Prepared for the Subcommittee on Patents, Trademarks, and Copyrights of the Committee of the Judiciary, U.S. Senate, 86th Cong., 1st Sess. 128 (1960).

[37] 17 U.S.C. § 26 (1909)

[38] *See* Varmer, *supra* note 34, at 128-29.

13

opinion in *Brattleboro Publishing Co. v. Winmill Publishing Corp.*, 369 F.2d 565 (2d Cir. 1966), the scope of the term "employee" in the 1909 Act broadened significantly to include independent contractors who created a work at the "instance and expense" of his or her "employer." Other Circuits followed, such that by the time the 1976 Act was passed, employer ownership was the general rule for both salaried employees and commissioned works.[39]

### i. The legislative history of the 1976 Act reveals that the recording industry harbored obvious assumptions of an employment relationship with recording artists.

It has been observed that "compromises [made on the "work made for hire" provisions] were based upon the publishers' and artists' conjectures about the operation of the provisions."[40] In the case of record companies, it is plainly obvious that their representatives—perhaps reasonably—assumed throughout the entire legislative process that the then-contemporary concept of "employment" for purposes of copyright ownership would carry forward into the structure and application of the 1976 Act.[41] For example, in March

---

[39] William Patry, 2 Patry on Copyright § 3:19 (2026).

[40] Marci A. Hamilton, *Commissioned Works As Works Made for Hire Under the 1976 Copyright Act: Misinterpretation and Injustice,* 135 U. Pa. L. Rev. 1281, 1282 (1987).

[41] For its part, it appears Congress operated under similar assumptions. "The bill does not fix the authorship, or the resulting ownership, of sound recordings, but leaves these

of 1967, Sidney Diamond appeared before the Subcommittee on Patents, Trademarks, and Copyrights on behalf of the Recording Industry Association of America, Inc. (the "RIAA") and told members of Congress, unequivocally, that "because of the *employment relationship* between the performers and the recording company[, o]wnership of the sound recording copyright would vest automatically in the recording company under the 'works made for hire' provision in section 201(b)."[42]

Because of this assumed employment relationship, there was no real participation by recording companies in the discussions around the specially ordered or commissioned "work made for hire" category.[43] In fact, the legislative history shows that the participating record companies did not help develop (and were never intended beneficiaries of) the "carefully worked out compromise" on the independent contractor "work made for hire" issue.[44] To

---

matters to the *employment relationship* and bargaining among the interests involved." 1971 House Report, *supra* note 14, at 1570 (emphasis added).

[42] *Copyright Law Revision*: Hearings on S. 597 Before the Subcomm. on Patents, Trademarks, & Copyrights of the S. Comm. on the Judiciary, 90th Cong., March 21, 1967, at 506 (statement of Sidney Diamond) (emphasis added); *see also id*. at 535–36 (statement of Ernest S. Meyers) ("[T]he relationship between performers and recording companies is that of employees and employers.").

[43] Donald Passman, ALL YOU NEED TO KNOW ABOUT THE MUSIC BUSINESS, 242 (1991) ("Great job by the motion picture lobbyists; where were the record [industry] lobbyists?")

[44] 1976 House Report *supra* note 2, at 114.

15

the contrary, the "collective work" argument raised by UMG in briefings to the district court below represents an evidently *post hoc* rationalization pushed only after the *Reid* decision called the employment relationship between artists and labels into serious doubt. Indeed, an examination of what Congress intended as a "contribution to a collective work" in the "work made for hire" provisions makes clear that the Subject Recordings do not fit the mold, "comfortably" or otherwise.

> ### ii. The legislative history of the 1976 Act reveals that the definition of "collective works" was never intended to include routine combinations of recordings on single-artist albums.

Under the 1909 Act, the common understanding of "collective works" involved multi-author works. For example, in Study No. 31 on the Renewal of Copyright, written by Barbara Ringer in 1960, she defined "collective works" as "works lacking over-all elements of compilation or editing, but containing separate contributions **by two or more authors which were written without collaboration**."[45] It is no great surprise, then, that in the 1963 preliminary draft, the Copyright Office proposed defining a "collective

---

[45] Ringer, *supra* note 32, at 176 (emphasis added).

16

work" as "a work, such as a periodical issue or encyclopedia, combining the separate contributions of ***various authors*** into a collective whole."[46]

During roundtable discussions on the preliminary draft, a participant representing literary publishers remarked that "[s]ome very good collections are collections of the works of a single author, and I would like that gone into."[47] In context, it is clear that the participant was referring to anthologies—that is, a collected group of disparate writings or pieces created by an author over a career or other span of time and published together as a retrospective. In response to that request, the next draft released by the Copyright Office removed reference to "various authors" and replaced it with reference to "a number of contributions, constituting separate and independent works in themselves."[48] Tellingly, whereas the preliminary draft only provided "periodical issue" and "encyclopedia" (i.e., multi-author works) as examples of collective works, "anthology" was added to the list in the

---

[46] *Copyright Law Revision Part 6, Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1965 Revision Bill*, 89th Cong., 1st Sess. 66, at 169 (Comm. Print 1965) (emphasis added) (hereafter, "1965 Supplementary Report").

[47] *Copyright Law Revision, Part 3: Preliminary Draft for Revised U.S. Copyright Law and Discussion and Comments, Transcript of Meeting on Preliminary Draft for Revised U.S. Copyright Law*, June 11, 1963, at 265 (Comm. Print 1964) (Statement of Theodore Jackson).

[48] 1965 Supplementary Report *supra* note 45, at 168.

revised draft in a clear attempt to signal and limit the scope of single author works encompassed by the definition.

Under this light, although true that works from a single author *may* constitute a collective work, contrary to UMG's suggestion, the mere assemblage of two or more works does not render them contributions to a collective work for purposes of the "work made for hire" provisions of the 1976 Act. To be sure, multi-recording formats like the "45," "EP," and "LP" were widely sold to consumers during this period.[49] If there was any intent by Congress to include such single-artist sound recordings as a collective work, surely it would have been mentioned in the 1976 House Report accompanying the final draft of the legislation. But there was no such mention. The only examples given in the 1976 House Report were "periodical issues, *anthologies*, symposia, and *collections of the discrete writings of the same authors*."[50] Thus, the legislative history significantly undercuts UMG's claim that the Subject Recordings are "contributions to a collective work" as understood in the "work made for hire" provisions of the 1976 Act, because

---

[49] Recording Industry Association of America, U.S. Music Revenue Database, www.riaa.com/u-s-sales-database (last visited April 1, 2026).

[50] 1976 House Report *supra* note 2, at 122 (emphasis added).

18

they are not "discrete,"[51] but rather, connected and interdependent works, no different than chapters in a novel or acts in a play.[52]

B.   Interpretation of the 1976 Act and the Industry's Response

For a time after the passage of the 1976 Act, the industry's assumptions regarding the employment relationship of recording artists held together. The majority view, including in this Circuit by way of *Aldon Accessories Ltd. v. Spiegel, Inc.*, 738 F.2d 548 (2d Cir. 1984), was that a work was considered prepared by an "employee" so long as the hiring party exercised some element of control over the creation of a particular work. That approach fit nicely with recording artist contracts of that era, because record labels were contractually entitled to control many aspects of the recording process, including the selection of a producer, which compositions to record, the dates and places

---

[51] Discrete, Merriam-Webster Dictionary, www.merriam-webster.com/dictionary/discrete ("consisting of distinct or unconnected elements") (last visited April 1, 2026).

[52] To the extent that there is any doubt as to whether single-artist album recordings were intended to be covered as "contributions to collective works," Congressional activity shortly after the passage of the 1976 Act further undercuts UMG's arguments. In 1982, a bill was introduced in the Senate to eliminate "contributions to collective works" from the list of eligible specially ordered or commissioned "works made for hire." Based on UMG's position today, one might legitimately expect the RIAA or other recording industry groups to have strongly opposed and testified against the bill. And, yet, the recording industry was again nowhere to be found in the legislative process. *See Definition of Work Made for Hire in the Copyright Act of 1976*: Hearing on S. 2044 Before the Committee on the Judiciary, 97th Cong., 2d Sess. (1982).

19

of the recording process, and the budget for the recording.[53] Consequently, an employment relationship and "work made for hire" ownership were simply presumed.[54] But the *Reid* decision's rejection of the *Aldon Accessories* approach in favor of agency factors was "fraught with uncertainty and complexity" for record companies.[55]

Following the *Reid* decision, the "contribution to a collective work" argument took on outsized importance as record companies scrambled to find a home in the specially ordered or commissioned category of "works made for hire." But the argument has always been tenuous. Even before the ink on the *Reid* decision was dry, then-Register of Copyrights, Ralph Oman, told Congress in no uncertain terms that "sound recordings [were] ***not included***

---

[53] Richard Osborne, OWNING THE MASTERS: A HISTORY OF SOUND RECORDING COPYRIGHT, 102 (2023) (noting the record label dominance in setting contractual terms); *but see* Statement of Marybeth Peters, Register of Copyrights, *supra* note 24 ("By hiring or acting as producers, by retaining back-up singers, musicians and engineers, and by recording in their own studios or at independent studios, featured artists have increasingly come to control the creative elements of a sound recording, making it considerably more difficult now for record companies to characterize artists as employees producing works within the scope of their employment.").

[54] *See* Sidney Shemel & M. William Krasilovsky, THIS BUSINESS OF MUSIC, 10 (4th ed. 1979) ("A recording agreement is an employment contract.").

[55] Sidney Shemel & M. William Krasilovsky, THIS BUSINESS OF MUSIC, 190-95 (6th ed. 1990). This became all the more so following this Court's opinion in *Aymes v. Bonelli*, 980 F.2d 857 (2d Cir. 1992), which applied *Reid* retroactively and characterized certain *Reid* factors as most relevant.

*in the work made for hire compromise*."[56] In response, the RIAA started a decade long lobbying campaign to get sound recordings added to the list of eligible specially ordered or commissioned works—an amendment the RIAA characterized as merely a "clarification" of existing law.[57] These lobbying efforts were not well received until, in 1999, the RIAA and others quietly succeeded in amending the "work made for hire" definition to include sound recordings as a standalone category of eligible works.[58] When the "technical" amendment went into effect in 2000 and became more widely known, the backlash from the artist community was immediate.[59] In response, Congress held hearings to allow an airing of grievances.[60] Following those hearings, Congress repealed the amendment retroactively.[61]

---

[56] *Moral Rights in Our Copyright Laws*: Hearings on S. 1198 and S. 1253 Before the Subcomm. on Patents, Copyrights & Trademarks of the S. Comm. on the Judiciary, 101st Cong. (1989) (cleaned up) (emphasis added). Although Mr. Oman speculated that the exclusion was because sound recordings were not protected until 1972, this explanation is too generous to the recording industry. Sound recordings were included as protected subject matter in the first draft of the revision in 1961. The industry groups had a seat at the table through the entire revision process.

[57] Bill Holland, *RIAA's Involvement Goes Back 10 Years*, Billboard, Page 1, July 29, 2000.

[58] *See* Intellectual Property and Communications Omnibus Reform Act of 1999.

[59] Jon Parles, *Musicians Take Copyright Issue to Congress*, The New York Times, Section E, Page 1, May 25, 2000.

[60] *See Sound Recordings as Works Made for Hire supra* note 25.

[61] Work Made For Hire and Copyright Corrections Act of 2000. Notably, the record industry successfully lobbied for judicial "blinders" to be placed over the whole ordeal. The definition of "work made for hire" in the 1976 Act now includes instructions which

21

## C. Previous Judicial Rejection of UMG's Position

Judicial decisions both before and after the "millennium flip flop,"[62] have held that sound recordings were not eligible works. For example, in *Lulirama Ltd., Inc. v. Axcess Broadcast Services, Inc.*, 128 F.3d 872 (5th Cir. 1997), at issue was a collection of advertising jingles that had been recorded and delivered pursuant to an agreement that contained "work made for hire" language. The defendant argued that, because the jingles were intended (at least in part) for television advertisements, that the recordings were "contributions to an audiovisual work."[63] But the Fifth Circuit observed the narrowness of the categories delineated in the specially ordered or commissioned part of the "work made for hire" definition and the Congressional compromise reflected therein.[64] The court took seriously the Supreme Court's admonishment that "[s]trict adherence to the language and structure of [the compromise reflected in] the Act is particularly

---

ostensibly forbid the judiciary from considering or otherwise giving any legal significance to the amendment or the subsequent deletion. *See* 17 U.S.C. § 101.

[62] Corey Field, *Their Master's Voice? Recording Artists, Bright Lines, and Bowie Bonds: The Debate Over Sound Recordings as Works Made for Hire*, 48 J. Copr. Soc'y 145, 162 (2000).

[63] *Lulirama Ltd., Inc.*, 128 F.3d at 875.

[64] *Id.* at 877.

appropriate."[65] Accordingly, because there was no evidence that the jingles were uniformly intended for television advertisements, and because the definition of "audiovisual works" could not be stretched to encompass "purely audio works," the Fifth Circuit reversed the lower court's ruling that the "work made for hire" language of the contract was enforceable.[66]

In *Ballas v. Tedesco,* 41 F. Supp. 2d 531 (D.N.J. 1999), the plaintiff commissioned the defendant to create an album of dance music recordings. Following delivery of the recordings, the parties' contractual negotiations fell apart.[67] The defendant then decided to release the recordings on an album of his own, to which the plaintiff objected.[68] The plaintiff filed suit asking the court to declare "plaintiff the true and correct owner of the copyright of the music product produced at the request of plaintiff."[69] There was no question that these recordings were to be released in album format. Yet, the court rejected the plaintiff's claim that the recordings were owned as specially ordered or commissioned "works made for hire." "[T]he sound recordings are

---

[65] *Id*. (citing *Reid,* 490 U.S. at 748 n.14).

[66] *Id.* at 878.

[67] *Ballas*, 41 F. Supp. 2d at 534.

[68] *Id.*

[69] *Id.* at 537.

23

not a work for hire under the second part of the statute because ***they do not fit within any of the nine enumerated categories***, and because there was no signed written agreement between the parties."[70]

That same year, the District Court for the District of Columbia dealt with a similar issue in *Staggers v. Real Authentic Sound*, 77 F. Supp. 2d 57 (D.D.C. 1999). There, the plaintiff was a musician and performer on multiple recordings featured on an album released by the record label defendant. A dispute developed about the proper disbursement of royalties between the performer and the label, which led to litigation.[71] The label alleged ownership of the recordings as "works made for hire," but as the court observed: "Because a sound recording does not fit within any of the nine categories of 'specially ordered or commissioned' works, whether it was made for hire depends on whether Staggers was [the label's] employee and prepared the sound recording within the scope of that employment."[72]

In *Bucciarelli-Tieger v. Victory Records, Inc.*, 488 F. Supp. 2d 702 (N.D. Ill. 2007), the band Hawthorn Heights signed a recording agreement with

---

[70] *Id.* at 541.

[71] *Staggers*, 77 F. Supp. 2d at 60.

[72] *Id.* at 64.

Victory Records.[73] A dispute developed between the label and the group, following which the group sought a declaratory judgment that it owned the sound recording copyrights in the albums recorded for the label. In response to the label's argument that it owned the recordings as "works made for hire," the district court flatly stated: "Sound recordings are notably exempt from the list of works that can be specially commissioned as works-for-hire. Therefore, the only way this can be a work-for-hire is if plaintiffs are employees of defendants."[74] The court then noted the "fact-intensive" nature of the issue and declined to dismiss the group's complaint in response to a Rule 12(b)(6) motion by the label.[75]

Most recently, in *Waite v. UMG Recordings, Inc.*, 450 F. Supp. 3d 430 (S.D.N.Y. 2020), the district court found "unpersuasive" UMG's "suggest[ion] that sound recordings comprising an album constitute either a 'compilation' or 'contributions to a collective work.'"[76] Notably, UMG's argument to the district court in this case was even more threadbare than in *Waite*. UMG relied below entirely on Copyright Office "Circulars" which provide instructions and

---

[73] *Bucciarelli-Tieger*, 488 F. Supp. 2d at 705.

[74] *Id.* at 709.

[75] *Id.*

[76] 450 F. Supp. 3d 430, 435 n.23 (Kaplan, J.).

internal procedures for copyright registration.[77] Even putting aside UMG's selective quoting of the Circulars and lack of analysis on the issue, the Copyright Office's policy-based preferences for the registration process are not the law.[78] Simply because a group of sound recordings may qualify as a technical "collective work" for purposes of obtaining a copyright registration, it does not follow that the carefully crafted compromise endorsed by Congress on "works made for hire" can be ignored.

* * *

At bottom, it is clear from the legislative history that single-artist albums like the ones at issue in this case were never intended by Congress as a category of works eligible to be specially commissioned "works made for hire." Every court that has examined the issue to date has reached a result consistent with that congressional intent. Here, because the district court provided no explanation on its "work made for hire" determination (and, indeed, purported not to even reach the issue), it is not necessary for this Court to decide the issue on appeal. Nevertheless, it may be desirable to

---

[77] Rec. Doc. 41 at 8.

[78] *Grant v. Trump*, 749 F. Supp. 3d 423, 433 (S.D.N.Y. 2024) (Koeltl, J.).

26

remand to the district court with instructions to discard UMG's specially commissioned "work made for hire" arguments as legally untenable.

CONCLUSION

As the creators of the Subject Recordings, Denton and James are presumed under copyright law to be the authors thereof. What the district court in this case missed, is that simply labeling something in a record contract as a "work made for hire" or that it will be owned by the recording company "from inception" does not make it so. Nor does designating oneself as the "employer for hire" on a copyright registration. If it were that easy, every industry intermediary would be free with the stroke of a pen to avoid the carefully crafted compromise in the 1976 Act recognized in *Reid*. That is exactly what the district court's Opinion permits. It should be reversed.

Respectfully submitted,

/s/ Timothy R.W. Kappel
Timothy R.W. Kappel, *Counsel of Record*
**WELLS & KAPPEL LLP**
1615 Poydras Street, Suite 900
New Orleans, Louisiana 70112
(504) 905-2012
tkappel@wellskappel.com

Scott Alan Burroughs
**DONIGER / BURROUGHS**
247 Water Street, First Floor
New York, New York 10038

27

(310) 590-1820
scott@donigerlawfirm.com

Steven T. Lowe
**LOWE & ASSOCIATES**
8383 Wilshire Boulevard, Suite 1038
Los Angeles, California 90211
(310) 477-5811
steven@lowelaw.com

*Counsel for Amicus Curiae National*
*Society of Entertainment & Arts Lawyers*

## CERTIFICATE OF COMPLIANCE

I hereby certify that that the Appellees' principal brief complies with the type-volume limitations in Rule 29(a)(5) of the Federal Rules of Appellate Procedure because, excluding the parts of the document exempted by Rule 32(a)(7), and Second Circuit Rule 29.1(c), this brief contains 6078 words.

I hereby further certify that this brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type-style requirements of Rule 32(a)(6), because this brief uses proportionally spaced 14-point Charter typeface prepared in Microsoft Word.

/s/ Timothy R.W. Kappel

28

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 8, 2026, a copy of the foregoing was re-filed electronically with the Clerk of Court using the ACMS system. Notice of this filing will be served upon all counsel of record by operation of the Court's electronic filing system.

/s/ Timothy R.W. Kappel

29