# 26-253-cv

## United States Court of Appeals

*for the*

## Second Circuit

CHERYL JAMES, PKA Salt-N-Pepa, SANDRA DENTON, PKA Salt-N-Pepa,

*Plaintiffs-Appellants,*

– v. –

UMG RECORDINGS, INC., DBA Universal Music Group,
a Delaware corporation,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

RICHARD S. MANDEL
THOMAS KJELLBERG
COWAN, LIEBOWITZ & LATMAN, P.C.
*Attorneys for Defendant-Appellee*
 *UMG Recordings, Inc.*
114 West 47th Street, 21st Floor
New York, New York 10036
(212) 790-9200

CP COUNSEL PRESS    (800) 4-APPEAL • (392717)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Appellee UMG Recordings, Inc. ("UMG") states that UMG's parent companies include Universal Music Group Holdings, Inc., a Delaware corporation, and Universal Music Group, Inc., a Delaware corporation. UMG's ultimate parent is Universal Music Group N.V., a Netherlands public limited company. No other publicly held company owns 10% or more of UMG's stock.

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................iv

STATEMENT OF ISSUES ...........................................................................1

STATEMENT OF THE CASE.........................................................................1

    I.    Plaintiffs' Claims..............................................................................1

    II.    The Relevant Agreements ...............................................................3

        A.    The Next Plateau Agreement ......................................4

        B.    The NITA Agreement .................................................6

        C.    The 1992 Agreements .................................................8

    III.    The District Court's Decision ..........................................................9

SUMMARY OF THE ARGUMENT .................................................................10

ARGUMENT ...............................................................................................12

THE DISTRICT COURT CORRECTLY GRANTED UMG'S MOTION
TO DISMISS BECAUSE THERE WAS NO GRANT OF COPYRIGHT
FROM PLAINTIFFS SUBJECT TO POSSIBLE TERMINATION .....................12

    I.    The Relevant Legal Background Concerning Termination
        of Transfers of Copyright Rights Under 17 U.S.C. § 203 .................12

    II.    Under the Plain Language of the 1986 Agreements, There
        Was No Grant of Copyright Rights Executed by Plaintiffs...............15

        A.    Determination of Whether a Copyright Grant Exists
            is Analyzed by Applying Basic Principles of State
            Contract Law................................................................16

        B.    Reading the Contemporaneous 1986 Agreements
            Together as a Whole Compels the Conclusion
            That They Did Not Contain a Grant of Copyright...................18

        C.    Plaintiffs' and Their Amici's Focus on Policy
            Arguments and Issues Extraneous to the Court's
            Holding Cannot Change the Result .........................................26

III.    Plaintiffs' Erroneous Work Made For Hire Analysis Fails to Establish the Existence of a Terminable Grant ........................29

IV.    Dismissal of the Declaratory Judgment Claim is Also Appropriate as to the Remixes Because They Constitute Derivative Works that UMG May Continue to Utilize Notwithstanding any Alleged Termination of its Rights ....................36

CONCLUSION .............................................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*ABS Entm't v. CBS Corp.*,
 908 F.3d 405 (9th Cir. 2018)....................................................................38

*Acuti v. Authentic Brands Grp. LLC*,
 33 F.4th 131 (2d Cir. 2022)........................................................ 10, 27, 29

*Affymetrix, Inc. v. Illumina, Inc.*,
 446 F. Supp. 2d 292 (D. Del. 2006)..........................................................20

*Akazawa v. Link New Tech. Int'l, Inc.*,
 520 F.3d 1354 (Fed. Cir. 2008)..................................................................20

*Apollo Global Mgmt., LLC v. Bokf, NA (In re MPM Silicones, LLC)*,
 874 F.3d 787 (2d Cir. 2017).......................................................................17

*Armento v. Laser Image, Inc.*,
 950 F. Supp. 719 (W.D.N.C. 1996) .........................................................35

*Ass'n of Am Med. Colls. v. Carey*,
 728 F. Supp. 873 (N.D.N.Y. 1990) ..........................................................20

*Bartsch v. Metro-Goldwyn-Mayer, Inc.*,
 391 F.2d 150 (2d Cir. 1968).......................................................................16

*Brad H. v. City of N.Y.*,
 17 N.Y.3d 180 (2011) ................................................................................18

*Bragdon v. Abbott*,
 524 U.S. 624 (1998) ...................................................................................34

*Broder v. Cablevision Sys. Corp.*,
 418 F.3d 187 (2d Cir. 2005).......................................................................27

*Bryant v. Media Right Prods.*,
 603 F.3d 135 (2d Cir. 2010)........................................................ 12, 31, 32

*BTE v. Bonnecaze*,
 43 F. Supp. 2d 619 (E.D. La. 1999)...........................................................37

*Caffey v. Cook*,
 409 F. Supp. 2d 484 (S.D.N.Y. 2006).......................................................21

iv

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) ...................................................................34

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002).........................................................27

*Citizens United v. Schneiderman*,
  882 F.3d 374 (2d Cir. 2018).........................................................39

*Close-Up Int'l, Inc. v. Berov*,
  382 F. App'x 113 (2d Cir. 2010)...................................................16

*Cmty. for Creative Non-Violence v. Reid*,
  490 U.S. 730 (1989) ...................................................................15

*Connecticut Nat'l Bank v. Germain*,
  503 U.S. 249 (1992) ...................................................................15

*Crook v. Rindskopf*,
  105 N.Y. 476 (1887) ...................................................................17

*Dep't of Housing & Urban Dev. v. Rucker*,
  535 U.S. 125 (2002) ...................................................................33

*Deutsche Bank Natl. Trust Co. v. Romano*,
  147 A.D.3d 1021, 48 N.Y.S.2d 237 (2d Dep't 2017) .........................19

*DiFolco v. MSNBC Cable L.L.C.*,
  622 F.3d 104 (2d Cir. 2010).........................................................26

*Estate Examinations Co. v. ECG Enters.*,
  2006 U.S. Dist. LEXIS 81478 (E.D.N.Y. Nov. 7, 2006).....................16

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*,
  2002 U.S. Dist. LEXIS 4219 (S.D.N.Y. Mar. 15, 2002) .....................36

*Fifty-Six Hope Rd. Music Ltd. v. UMG Recordings, Inc.*,
  2010 U.S. Dist. LEXIS 94500 (S.D.N.Y. Sept. 10, 2010).....................36

*Fonar Corp. v. Domenick,*
  105 F.3d 99 (2d Cir. 1997)...........................................................39

*Food Mktg. Inst. v. Argus Leader Media*,
  588 U.S. 427 (2019) ...................................................................33

*Gordon v. Vincent Youmans, Inc.*,
  358 F.2d 261 (2d Cir. 1958).........................................................18

v

*Greenfield v. Philles Records*,
98 N.Y.2d 562 (2002) ...............................................................17

*Griffin v. J-Records*,
398 F. Supp. 2d 1137 (E.D. Wash. 2005) ..................................37

*In re Nortel Networks Corp. Sec. Lit.*,
539 F.3d 129 (2d Cir. 2008)......................................................22

*Kass v. Kass*,
91 N.Y.2d 554 (1998) ...............................................................18

*Kelso Enters. v. A.P. Moller-Maersk A/*S,
375 F. App'x 48 (2d Cir. 2010)..................................................18

*Litecubes, LLC v. N. Lights Prods.*,
523 F.3d 1353 (Fed. Cir. 2008)..................................................20

*Logicom Inclusive, Inc. v. W.P. Stewart & Co.*,
2004 U.S. Dist. LEXIS 15668 (S.D.N.Y. Aug. 9, 2004) ........35

*Lulirama Ltd., Inc. v. Axcess Broadcast Servs.*,
128 F.3d 872 (5th Cir. 1997)....................................................23

*Maljack Productions v. UAV Corp.*,
964 F. Supp. 1416 (C.D. Cal. 1997*)*,
 *aff'd sub nom. Batjac Prods. Inc. v. Good Times Home Video Corp.*,
160 F.3d 1223 (9th Cir. 1998)..................................................38

*Mazer v. Stein*,
347 U.S. 201 (1954) .................................................................15

*Mellon Bank, N.A. v. United Bank Corp. of New York*,
31 F.3d 113 (2d Cir. 1994)........................................................18

*MGM Pictures, Inc. v. Mark Brown, Beauty Shop, LLC*,
2004 U.S. Dist. LEXIS 29562 (C.D. Cal. Feb. 11, 2004) .............21-22

*Morning Crew Music v. UMG Recordings, Inc.*,
2026 WL 1104768 (C.D. Cal. Apr. 17, 2026)........................32

*Nau v. Vulcan Rail & Constr. Co.*,
286 N.Y. 188 (1941) .................................................................19

*Niss v. Columbia Pictures*,
2000 U.S. Dist. LEXIS 18328 (S.D.N.Y. Dec. 20, 2000) ................22

vi

*Omni MedSci, Inc. v. Apple Inc.*,
  7 F.4th 1148 (Fed. Cir. 2021)..................................................................20

*PDK Labs, Inc. v. United States DEA*,
  362 F.3d 786 (D.C. Cir. 2004) ...............................................................28

*Penguin Group (USA) Inc. v. Steinbeck*,
  537 F.3d 193 (2d Cir. 2008).......................................................... 12, 13

*Pettaway v. Nat'l Recovery Sols., LLC*,
  955 F.3d 299 (2d Cir. 2020)...................................................................31

*Playboy Enters., Inc. v. Dumas*,
  53 F.3d 549, 562 (2d Cir. 1995).............................................................36

*Playboy Enters. v. Dumas*,
  831 F. Supp. 295 (S.D.N.Y. 1993), *aff'd in relevant part
  and reversed in part on other grounds*, 53 F.3d 549 (2d Cir. 1995) .............. 20-21

*Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*,
  13 N.Y.3d 398 (2009) .............................................................................25

*Sanborn Libr. LLC v. Eris Info. Inc.*,
  2024 U.S. Dist. LEXIS 76134 (S.D.N.Y. Mar. 25, 2024) ............................. 16, 17

*Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*,
  7 F.3d 1091 (2d Cir. 1993)......................................................................25

*Shiro v. Drew*,
  174 F. Supp. 495 (D. Me. 1959) ............................................................21

*Silvers v. Sony Pictures Entm't, Inc.*,
  402 F.3d 881 (9th Cir. 2005)...................................................................20

*Silvester v. Time Warner, Inc.*,
  1 Misc.3d 250 (Sup. Ct. N.Y. County 2003),
  *aff'd*, 14 A.D.3d 430, 787 N.Y.S.2d 870 (1st Dep't 2005)................................21

*Sony Corp. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984) ................................................................................20

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*,
  580 U.S. 405 (2017) .......................................................................... 15, 27

*Steward v. West*,
  2014 U.S. Dist. LEXIS 186012 (C.D. Cal. Aug. 14, 2014) ...............................37

*Sullivan v. Stroop*,
  496 U.S. 478 (1990) ...................................................................................32

*T.B. Harms Co v. Jem Records, Inc.*,
  655 F. Supp. 1575 (D.N.J. 1987) ...............................................................37

*This Is Me v. Taylor*,
  157 F.3d 139 (2d Cir. 1998) .......................................................................18

*United States v. Gonzales*,
  520 U.S. 1 (1997) .......................................................................................33

*Vassilkioti v. CCS Int'l, Ltd.*,
  2000 U.S. Dist. LEXIS 17776 (S.D.N.Y. Dec. 7, 2000) ............................20

*Waite v. UMG Recordings, Inc.*,
  450 F. Supp. 3d 430 (S.D.N.Y. 2020) ............................................. 13, 16, 26, 28

*Warren v. Fox Family Worldwide, Inc.*,
  328 F.3d 1136 (9th Cir. 2003) ....................................................................34

*Woods v. Bourne Co.*,
  60 F.3d 978 (2d Cir. 1995) .........................................................................37


**Statutes & Other Authorities:**

17 U.S.C. § 101 ............................................................................... 14, 23, 31

17 U.S.C. § 101(1) ....................................................................................36

17 U.S.C. § 101(2) ................................................................... 30, 31, 32, 35

17 U.S.C. § 102(a) .....................................................................................37

17 U.S.C. § 102(a)(6) ................................................................................23

17 U.S.C. § 102(a)(7) ................................................................................23

17 U.S.C. § 114(b) ............................................................................... 38, 40

17 U.S.C. § 203 ...................................................................................... *passim*

17 U.S.C. § 203(a) ............................................................................ 13, 14, 15

17 U.S.C. § 203(b)(1) ........................................................................... 14, 40

17 U.S.C. § 204(a) ............................................................................... 16, 20

17 U.S.C. § 301(c) ..............................................................................21

17 U.S.C. § 304(c) ..............................................................................13

17 U.S.C. § 410(c) ..............................................................................39

17 U.S.C. § 504(c)(1)..........................................................................32

17 U.S.C. § 1011(d) ............................................................................30

1 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 1.18[A][1] (2025) ..............17

1 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 2.10[A][2] (2025) ..............37

1 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 5.03 (2025) ........................35

3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 10.03[A][2] (2025) ............17

3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 10.08[A] (2025)................17

9 Corbin on Contracts § 47:7 ...............................................................19

Paul Goldstein, Goldstein on Copyright § 2.16.1 (2026) ........................................31

U.S. Copyright Office Circular 34 .........................................................32

U.S. Copyright Office Circular 56 ................................................................. 32, 38

**STATEMENT OF ISSUES**

Did the District Court correctly dismiss plaintiffs-appellants' claim for declaratory relief as to the validity of their purported copyright termination notice where the plain language of the relevant agreements annexed to the complaint did not contain a terminable grant of copyright executed by plaintiffs-appellants?

**STATEMENT OF THE CASE**

**I.      Plaintiffs' Claims**

Plaintiffs-Appellants Cheryl James and Sandra Denton ("Plaintiffs") are musical performers who were two-thirds of the rap group professionally known as "Salt-N-Pepa" that recorded albums released by Next Plateau Records, Inc. ("Next Plateau") and London Records, Inc. ("London"), predecessors of UMG, in the 1980s and 1990s. *See* A-45 – A-53.  On May 13, 2022, a copyright termination notice (the "Notice") was served on UMG on Plaintiffs' behalf.  A-152 – A-170.  Referencing a grant allegedly made by Plaintiffs to UMG's predecessors "on or about May 15, 1986," the Notice purported to terminate that grant as to various sound recordings named therein.  *Id*.

UMG served a counter-notice on Plaintiffs on June 27, 2022 disputing the validity of the Notice.  A-171 – A-177.  As to four of the albums identified in the Notice (*Hot, Cool & Vicious*, *A Salt With A Deadly Pepa*, *Black's Magic* and *Very Necessary*), the counter-notice explained, among other things, that the agreements

1

referenced in the Notice did not contain a grant executed by Plaintiffs that could be subject to possible termination.[1] *Id*. The counter-notice also indicated that any remixed sound recordings listed in the Notice, including but not limited to those on the album *A Blitz of Salt-N-Pepa Hits: The Hits Remixed*, were derivative works and thus not subject to termination for an additional reason. *Id*.

On September 12, 2024, Plaintiffs responded to UMG's counter-notice (A-182 – A-198), contending that UMG's counter-notice "was based on incomplete information concerning" the sound recordings contained on the first group of four albums addressed in the counter-notice.[2] A-57 – A-58. Plaintiffs did not address the derivative work status of the remixed sound recordings in their response letter. A-182 – A-198.

---

[1]The counter-notice further explained that Plaintiffs' attempt to terminate with respect to sound recordings on an additional album referenced in the Notice (*Brand New*) was invalid because that album was governed by a separate 1995 agreement with Plaintiffs' furnishing company that also did not contain a grant of copyright. A-174 – A-175. Plaintiffs evidently concede that point, as the First Amended Complaint states explicitly that the *Brand New* album is "not at issue in this case." A-53 at n. 5.

[2]UMG further responded to the September 12, 2024 letter, but Plaintiffs did not attach such letter to their pleading. Regardless, UMG's arguments from its response were fully addressed below and accepted by the District Court. *See* pp. 16-21 *infra*.

2

Although the parties attempted to resolve their dispute concerning the validity of the Notice, they were unable to do so.  A-57 at ¶ 95, A-59 at ¶ 104. Plaintiffs brought suit seeking declaratory relief as to the validity of the Notice and also asserting a claim for conversion.  A-37 – A-71.

## II.     The Relevant Agreements

Plaintiffs' contributions to the albums *Hot, Cool & Vicious*, *A Salt With A Deadly Pepa*, *Black's Magic*, and *Very Necessary*, and the sound recordings "Let's Talk About AIDS," "Emphatically No" and "Start Me Up" (collectively, the "Sound Recordings") were created pursuant to two interrelated agreements entered into simultaneously as of May 15, 1986 (collectively, the "1986 Agreements").[3]  A-46 – A-51, A-72 – A-113.  As discussed below, neither agreement contains a grant of copyright, or of rights under a copyright, executed by Plaintiffs.

---

[3]Other individuals, including but not limited to Diedra Roper p/k/a Spinderella (the third member of Salt-N-Pepa) and Herb Azor p/k/a Hurby "Love Bug" Azor (Salt-N-Pepa's initial producer), contributed protectible authorship to the Sound Recordings.  UMG's ownership of those contributions is not at issue in this case.

### A.     The Next Plateau Agreement

In the May 15, 1986 distribution agreement between Next Plateau and Herb Azor and Hugh Azor ("Producer")[4] (the "Next Plateau Agreement"), Next Plateau "engages Producer to produce and deliver to [Next Plateau] Sides embodying the performances of Artist [defined as "Salt and Pepa"], and Producer hereby accepts such engagement and agrees to deliver Sides embodying the performances of Artist exclusively to [Next Plateau]." A-86 at ¶ 2. The Next Plateau Agreement defines a "Side" as a "single-sided recording embodying the recorded performances of the Artist and intended for use in the manufacture and sale of phonograph records." A-222 at n. 3 (quoting Next Plateau Agreement ¶ 1(a); *see* A-85). The Next Plateau Agreement gave Next Plateau the right and option to require Producer to furnish Sides sufficient to constitute one "LP" during each contract period of the term of the agreement, with an "LP" embodying not less than 7 and not more than 10 Sides. A-86 – A-87 at ¶ 3; A-85 at ¶ 1(d).

Plaintiffs are not parties to or signatories of the Next Plateau Agreement, in which Producer represents and warrants to Next Plateau that "[t]here is in existence between the Producer and [Plaintiffs] a valid and enforceable agreement

---

[4] "Herb Azor and Hugh Azor assigned all of their rights and obligations under the [Next Plateau Agreement] to [Noise In The Attic Productions, Inc.]." A-51 at ¶ 64; A-114 at ¶ 1(a)(iii).

4

under the terms of which [Plaintiffs] shall perform exclusively for Producer as a recording artist during the Term of this agreement as extended."  A-96 at ¶ 13(g).

The Next Plateau Agreement contains a straightforward transfer of copyright rights in the already-existing LPs *Hot, Cool & Vicious* and *A Salt With A Deadly Pepa* from Producer – not Plaintiffs – to Next Plateau.[5]  A-87 at ¶ 3(c) ("Producer hereby sells, transfers and assigns to [Next Plateau], for the world, all of the aforesaid right, title and interest in and to such Sides including without limitation the sound recording copyright and the performances embodied thereon…..").  In that same provision, Producer warrants and represents that Producer "is the sole and exclusive owner" of the recordings and "all right, title and interest therein." *Id*.

As to future Sound Recordings, Producer undertakes that:

> All Sides recorded during the Term shall be recorded by Producer on [Next Plateau]'s behalf and all records made therefrom, together with the performances embodied therein, shall, <u>from the inception of their creation</u>, be entirely the property of [Next Plateau] in perpetuity, throughout the Territory, <u>free of any claim whatsoever by Producer, Artist or by any persons deriving any rights or interests from Producer or Artist</u> and [Next Plateau] shall have the right to secure the

---

[5]The preexisting sound recordings are purportedly listed on a missing Schedule A to the Next Plateau Agreement, but there is no dispute that the sound recordings comprising the *Hot, Cool & Vicious* and *A Salt With A Deadly Pepa* albums were covered by such transfer from Producer.  *See* A-73 at ¶ C; A-87 at ¶ 3(c).

5

> sound recording (P) copyright in and to the Sides in [Next Plateau]'s name <u>as the owner and author</u> thereof and to secure any and all renewals of such copyright.

A-88 at ¶ 5 (emphasis added).

Plaintiffs signed a customary inducement letter annexed to the Next Plateau Agreement (the "Inducement Letter"). *See* A-107 – A-109. The Inducement Letter does not contain or refer to any grant of copyright rights. Instead, Plaintiffs in their individual capacities made and guaranteed all of Producer's warranties, representations and covenants in the Next Plateau Agreement, which would necessarily include Producer's warranty and representation that Plaintiffs were employed by Producer under a valid and enforceable agreement (A-96 at ¶ 13(g)), and that Next Plateau would be the legal "owner and author" of all Sound Recordings created pursuant to the Next Plateau Agreement "from the inception of their creation," free of any claims whatsoever by Plaintiffs or Producer (A-88 at ¶ 5). *See* A-107 at ¶ 1.

## B. The NITA Agreement

Plaintiffs and Noise In The Attic Productions, Inc. ("NITA") entered into a personal services-production agreement dated as of May 15, 1986 (the "NITA Agreement") "with respect to [NITA] providing [Plaintiffs] with production services as well as with respect to [Plaintiffs] rendering [Plaintiffs'] exclusive personal services to [NITA] as a recording artist, as well as granting [NITA]

certain exclusive rights with respect to [Plaintiffs] pertaining to audio-visual exploitation." A-72. The NITA Agreement is coterminous with the Next Plateau Agreement, which was entered into "simultaneously herewith." S*ee* A-48 at ¶ 54; A-72 (preamble); A-73 at ¶ B.

The relevant provision in the NITA Agreement concerning copyright ownership contains no reference to any grant or transfer of copyright rights in sound recordings (or any other works):

> As between [NITA] and [Plaintiffs], [NITA] shall be the sole and exclusive owner of any and all rights, title and/or interest in and to master recordings recorded hereunder, including but not limited to the worldwide sound copyrights therein and the renewal rights thereto.

A-75 at ¶ H. Significantly, the NITA Agreement used express rights transfer language elsewhere when the parties so intended with reference to rights <u>other than copyright</u>. For example, the preamble specifies Plaintiffs' grant to NITA of "certain exclusive rights with respect to Artist pertaining to audio-visual exploitation," A-72, A-75 at ¶ H, which as explained below referenced NITA's rights to the exclusive services of Plaintiffs as audio-visual recording artists. See pp. 22-23 *infra*. The NITA Agreement also contains express present grants by Plaintiffs to NITA of "the worldwide right in perpetuity to use Artist's name and, subject to Artist's prior approval, Artist's likeness, biography and other identification (all of the foregoing referred to as 'Artist's Identification')," A-77 at

7

¶ K; and of "the sole and exclusive worldwide right to use Artist's Identification for general trade purposes" and merchandising. A-78 at ¶ K. Had the parties intended to effectuate a transfer of exclusive copyright rights in sound recordings from Plaintiffs to NITA, they could certainly have used similar grant language. But they did not do so.

## C.  The 1992 Agreements

By virtue of two agreements entered into in 1992 (the "1992 Agreements"), London stepped into the shoes of Next Plateau. A-51 – A-52; A-114 – A-151. However, those agreements have no impact on the applicable termination analysis, as they simply carried forward the terms of the 1986 Agreements (except with respect to financial terms not at issue here). *See* A-114 at ¶¶ 1(a)(iv), 1(b) (acknowledging that all of Next Plateau's rights and obligations under the Next Plateau Agreement, excluding any music publishing rights, have been assigned from Next Plateau to London, with Producer and Plaintiffs approving and ratifying the assignment and agreeing to be bound to London under the Next Plateau Agreement); A-143 at ¶ 1 (acknowledging that two albums remain to be recorded under the NITA Agreement). The 1992 Agreements do not address copyright ownership at all because the 1986 Next Plateau Agreement continued to govern as to that issue. *See* A-114 at ¶ 1(b) (ratifying and confirming terms of Next Plateau Agreement). UMG is the successor-in-interest to London. A-43 at ¶ 28.

8

### III. The District Court's Decision

On January 8, 2026, the District Court granted UMG's motion to dismiss the First Amended Complaint filed by Plaintiffs. A-203 – A-223. Judge Cote held that Plaintiffs' declaratory judgment claim as to the validity of the Notice failed to state a cause of action because even viewed in the light most favorable to Plaintiffs, the 1986 Agreements did not effect a transfer of copyright executed by Plaintiffs. A-218. While the District Court explained that the Sound Recordings were "likely works made for hire, which are excluded from § 203's termination mechanism," it properly found it unnecessary to reach that issue given the absence of any copyright grant by Plaintiffs in the 1986 Agreements. A-218 – A-219. The District Court also found it unnecessary to reach UMG's alternative argument that Plaintiffs could not effect termination of UMG's rights with respect to any remixed Sound Recordings under the derivative work exception to termination, because it found no right of termination with respect to any of the Sound Recordings. A-216.

The District Court also dismissed Plaintiffs' second claim for conversion of the physical master tapes embodying the Sound Recordings because Plaintiffs failed to plausibly plead their ownership of the tapes. A-221 – A-223. Plaintiffs do not appeal that aspect of Judge Cote's ruling.

9

## SUMMARY OF THE ARGUMENT

The District Court properly granted UMG's motion to dismiss Plaintiffs' declaratory judgment claim because the relevant agreements referenced in the Notice contained no grant of copyright rights executed by Plaintiffs, a fundamental requirement of the Copyright Act's termination provisions. Plaintiffs and their amici seek to sidestep that foundational deficiency with a single-minded focus on the termination provision's general intent to benefit authors. However, as this Court has made clear, such broad policy arguments cannot override clear statutory language requiring a contrary result. *See Acuti v. Authentic Brands Grp. LLC*, 33 F.4th 131, 142 (2d Cir. 2022).

Similarly, because determination of whether an agreement transfers copyright ownership is ultimately an issue of state contract law, Plaintiffs also cannot avoid the unambiguous language of their agreements, which constitutes the best evidence of the parties' intent. The relevant agreements here are devoid of any language manifesting an intention to make a present transfer of copyright rights, and instead consistently indicate that Next Plateau, UMG's predecessor, was to own the Sound Recordings in its own name from "inception" as the "author" thereof. Plaintiffs guaranteed and themselves joined in the representations, warranties and covenants effecting such an arrangement. They

10

cannot now insist on a contrary interpretation in an effort to create a termination right that the Copyright Act does not provide them.

While Plaintiffs search in vain for something to pass off as a terminable grant, they ultimately fail to come up with anything remotely plausible. Their newfound reliance on language supposedly granting exclusive rights in "audiovisual" works is completely puzzling inasmuch as there were no audiovisual works referenced in their Notice or at issue in this case that could even be the subject of such a supposed grant. In the end, Plaintiffs are left with the same dispositive language which the District Court correctly found was clear on its face and did not constitute a grant of copyright. Try as Plaintiffs might, they cannot twist this unambiguous language into something it is not.

Nor can Plaintiffs somehow create reversible error by claiming the District Court erroneously found the Sound Recordings to be works made for hire. The District Court's opinion makes clear that it did not need to reach the issue of whether the Sound Recordings constituted works made for hire because Plaintiffs had failed to plausibly plead the existence of a terminable grant in the first instance. For the same reason, this Court need not reach the work for hire question in order to affirm Judge Cote's ruling granting UMG's motion to dismiss.

But even were this Court to indulge Plaintiffs' attempt to disprove the existence of works made for hire, Plaintiffs' argument is fatally flawed. Plaintiffs

11

argue that the Sound Recordings cannot be works made for hire because Congress removed a specific "sound recording" category from the specially commissioned work prong of the work made for hire definition. Such an argument ignores that the statute itself expressly says such removal may not be considered by courts, and it also ignores that the albums containing the Sound Recordings are collective works/compilations, as this Court held in *Bryant v. Media Right Prods.*, 603 F.3d 135, 140 (2d Cir. 2010). Because the Sound Recordings fall squarely within the existing categories for work made for hire treatment of specially commissioned works, Plaintiffs' attempt to interject an extraneous issue cannot rescue its deficient claim.

## ARGUMENT

### THE DISTRICT COURT CORRECTLY GRANTED UMG'S MOTION TO DISMISS BECAUSE THERE WAS NO GRANT OF COPYRIGHT FROM PLAINTIFFS SUBJECT TO POSSIBLE TERMINATION

**I. The Relevant Legal Background Concerning Termination of Transfers of Copyright Rights Under 17 U.S.C. § 203**

Under the Copyright Act of 1909, "authors were entitled to a copyright in their works for an initial twenty-eight year period," and "[a]fter this period expired, the author had the right to renew the copyright for a second twenty-eight year term." *Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 197 (2d Cir. 2008). "The 1976 amendments to the Copyright Act, which took effect in 1978,

12

abandoned this framework," and "replaced the two consecutive twenty-eight year terms with a single copyright term of increased duration, and it created for authors … [a] right to terminate the grant of a transfer or license." *Id.* at 197-98 (citation omitted).

Congress established two separate termination regimes, one as to grants executed by authors on or after January 1, 1978, and the other as to certain grants executed before that date. *See* 17 U.S.C. §§ 203, 304(c). Section 203, at issue here, provides:

> In the case of any work other than a work made for hire, the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, otherwise than by will, is subject to termination [under certain specified conditions].

17 U.S.C. § 203(a).

In developing the termination structure, Congress struck a careful balance that included several important limitations on the termination right. First, the right only applies where there was (a) a grant and (b) such grant was executed by the author (*i.e.*, not any grant of copyright). *See* 17 U.S.C. § 203(a) (only creating termination right as to grants "executed by the author"); *see also Waite v. UMG Recordings, Inc.*, 450 F. Supp. 3d 430, 441 (S.D.N.Y. 2020) ("[T]hird parties to a contract and loan-out companies, which 'loan' out an artist's services to

13

employers, and enter into contracts on behalf of the artist do not have a termination right under the statute.").

Second, the statute excludes from the scope of the termination right "work[s] made for hire." 17 U.S.C. § 203(a) ("In the case of any work <u>other than a work made for hire</u>, …") (emphasis added). The Copyright Act defines a "work made for hire" as:

> (1) a work prepared by an employee within the scope of his or her employment; or

> (2) a work specially ordered or commissioned for use as a contribution to a collective work, as part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101.

Finally, the Copyright Act provides a derivative work exception to the termination right permitting the continued use of derivative works following termination of a grant:

> A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

17 U.S.C. § 203(b)(1).

While Plaintiffs and their amici emphasize the congressional policy to give

authors a second chance to capture the value of their creative works through a termination right, they ignore the extent to which the entire termination provision is itself a carefully balanced scheme that also places important limitations on when and how the right may be exercised.  As set forth below, Judge Cote correctly found that the present case falls clearly outside the scope of any termination right created by Congress.

**II.    Under the Plain Language of the 1986 Agreements, There Was No Grant of Copyright Rights Executed by Plaintiffs**

As the Supreme Court has explained, a court's task in a copyright case "is not a free-ranging search for the best copyright policy, but rather 'depends solely on statutory interpretation.'" *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 413 (2017) (quoting *Mazer v. Stein*, 347 U.S. 201, 214 (1954)). The "starting point" for a court's "interpretation of a statute is always its language." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989).  "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

Section 203 of the Copyright Act expressly limits the termination right to grants "executed by the author," 17 U.S.C. § 203(a), and only an author who executed the grant, or the statutorily designated heirs of a deceased author-grantor,

15

may terminate a grant. *See Waite*, 450 F. Supp. 3d at 441. Judge Cote correctly dismissed Plaintiffs' claim for declaratory relief as to the validity of the Notice for failure to state a claim because "[e]ven viewed in the light most favorable to Plaintiffs, the 1986 agreements do not indicate that Plaintiffs ever owned the copyrights to the sound recordings or that they granted a transfer of those rights to anyone else." A-218.

### A. Determination of Whether a Copyright Grant Exists is Analyzed by Applying Basic Principles of State Contract Law

Section 204(a) of the Copyright Act sets forth certain basic requirements for a transfer of copyright ownership. *See* 17 U.S.C. § 204(a) (requiring transfer to be "in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent"). However, "[w]hether a contract transfers copyright ownership is a question of contract law." *Sanborn Libr. LLC v. Eris Info. Inc.*, 2024 U.S. Dist. LEXIS 76134, at *21 (S.D.N.Y. Mar. 25, 2024); *see also Close-Up Int'l, Inc. v. Berov*, 382 F. App'x 113, 115 (2d Cir. 2010) (alleged transfer of copyright is governed by state contract law in addition to copyright law's requirements); *Bartsch v. Metro-Goldwyn-Mayer, Inc.*, 391 F.2d 150, 153 (2d Cir. 1968) (applying state law to a contract dispute involving the assignment of rights under federal copyright law); *Estate Examinations Co. v. ECG Enters.*, 2006 U.S. Dist. LEXIS 81478, at *11 (E.D.N.Y. Nov. 7, 2006) ("Where disputes arise under an

16

agreement between parties, resolution depends on state contract law, not the Copyright Act."); 1 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 1.18[A][1] (2025) (hereinafter "Nimmer") ("[T]he vast bulk of copyright contractual-issues must be resolved under state law….").

Both the NITA Agreement and the Next Plateau Agreement are governed by New York law.  A-79 at ¶ M; A-100 at ¶ 25.  Under New York law, courts construe purported assignments using the "same rules which obtain in the interpretation of other contracts."  *Crook v. Rindskopf*, 105 N.Y. 476, 485 (1887); *see also* 3 Nimmer § 10.08[A] ("Principles of contract law generally apply to construction of copyright assignments, licenses and other transfers of rights…."). "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002); *see also Sanborn Libr.*, 2024 U.S. Dist. LEXIS 76134, at *21 ("As with any contractual provision, courts must interpret purported copyright transfer agreements to give effect to the intention of the parties.") (citing *Apollo Global Mgmt., LLC v. Bokf, NA (In re MPM Silicones, LLC)*, 874 F.3d 787, 795 (2d Cir. 2017)); 3 Nimmer § 10.03[A][2] ("As with all matters of contract law, the essence of the inquiry here is to effectuate the intent of the parties.").

"The best evidence of what parties to a written agreement intend is what they say in their writing." *Greenfield*, 98 N.Y.2d at 569. Resort to extrinsic

17

evidence is permitted only if ambiguity exists within the four corners of the agreement. *See Brad H. v. City of N.Y.*, 17 N.Y.3d 180, 186 (2011). Absent ambiguity, a court should construe the agreement to "carry out the plain purpose and object" of the written contract. *Kass v. Kass*, 91 N.Y.2d 554, 567 (1998).

"Whether a contractual provision is clear or ambiguous is a question of law" for the Court to decide. *Mellon Bank, N.A. v. United Bank Corp. of New York*, 31 F.3d 113, 115 (2d Cir. 1994). As detailed below, Judge Cote properly resolved that legal question by applying basic principles of contract interpretation to find that the unambiguous language of the 1986 Agreements did not include a grant of copyright executed by Plaintiffs. A217 – A218. Accordingly, the District Court's decision dismissing Plaintiffs' declaratory judgment claim should be affirmed.

**B.** **Reading the Contemporaneous 1986 Agreements Together as a Whole Compels the Conclusion That They Did Not Contain a Grant of Copyright**

"Under New York law, all writings forming part of the same transaction are to be read together." *This Is Me v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998); *see also Kelso Enters. v. A.P. Moller-Maersk A/*S, 375 F. App'x 48, 49 (2d Cir. 2010) ("Generally, when interpreting a contract or multiple contracts in a transaction, we strive to give effect to all of the terms of the relevant documents, reading them together."); *Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261, 263 (2d Cir. 1958) ("[I]t is both good sense and good law that these closely integrated and nearly

18

contemporaneous documents be construed together") (quotations omitted); *Nau v. Vulcan Rail & Constr. Co.*, 286 N.Y. 188, 197 (1941) (agreements "executed at substantially the same time, related to the same subject-matter, were contemporaneous writings and must be read together as one").  Because the NITA Agreement and the Next Plateau Agreement, including the Inducement Letter attached thereto, were entered into "simultaneously" as of May 15, 1986 as part of a single transaction (*see* A-72 - preamble), they must be read together in ascertaining the parties' intent.[6]  A-217.

Plaintiffs do not and cannot dispute the venerable tenet of contract law that in order to establish the existence of an "assignment," a purported assignor must have, "in some fashion, manifested an intention to make a present transfer of his rights to the assignee."  9 Corbin on Contracts § 47:7; *see*, *e.g.*, *Deutsche Bank Natl. Trust Co. v. Romano*, 147 A.D.3d 1021, 48 N.Y.S.2d 237, 240 (2d Dep't 2017).  The 1986 Agreements are devoid of any language signaling such an

---

[6]In a confusing and ultimately irrelevant detour, Plaintiffs seek to show that the NITA Agreement was entered into before the Next Plateau Agreement.  *See* Appellant Brief at 38-41.  However, the language Plaintiffs quote in the NITA Agreement as supposedly contemplating a <u>subsequent</u> distribution agreement actually reflects such agreement as being entered into <u>simultaneously</u> with the NITA Agreement.  A-72 (preamble).  Thus, even assuming that treating the 1986 Agreements as sequential would somehow help establish the existence of a grant – and Plaintiffs fail to explain why it would – the plain language of the 1986 Agreements makes clear that they must be read and understood together as one.

intention.  That absence is fatal to Plaintiffs' claim of a grant: "in the cases in which the agreement at issue was found to be a present assignment of a future interest, the agreement contained express language of present conveyance." *Affymetrix, Inc. v. Illumina, Inc.*, 446 F. Supp. 2d 292, 296 (D. Del. 2006).  *See, e.g.*, *Omni MedSci, Inc. v. Apple Inc.*, 7 F.4th 1148, 1150-56 (Fed. Cir. 2021) (finding language "shall be the property of" constituted "statement of an intended outcome rather than a present assignment" and deeming absence of present tense executing verb indication that assignment was not intended);[7] *Vassilkioti v. CCS Int'l, Ltd.*, 2000 U.S. Dist. LEXIS 17776, at *7 (S.D.N.Y. Dec. 7, 2000) ("the Release on its face … does not contain language which can be read as a present transfer of Ross' copyright interest."); *Playboy Enters. v. Dumas*, 831 F. Supp. 295, 309 (S.D.N.Y. 1993) (in finding a check legend insufficient to meet the requirements of 17 U.S.C. § 204(a), "[t]he court also notes that there is no language of present transfer in Legend A."), *aff'd in relevant part and reversed in*

---

[7]While *Omni MedSci* is a patent case, "[i]t is 'appropriate to refer' to patent cases when conducting an analysis under the Copyright Act due to 'the historic kinship between patent law and copyright law.'" *Ass'n of Am Med. Colls. v. Carey*, 728 F. Supp. 873, 880 n. 6 (N.D.N.Y. 1990) (quoting *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 (1984)); *see, e.g.*, *Litecubes, LLC v. N. Lights Prods.*, 523 F.3d 1353, 1371 (Fed. Cir. 2008); *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 888 (9th Cir. 2005).  Moreover, like copyright ownership transfer issues, patent ownership issues are typically governed by state law, not federal law. *See Akazawa v. Link New Tech. Int'l, Inc.*, 520 F.3d 1354, 1357 (Fed. Cir. 2008).

*part on other grounds*, 53 F.3d 549 (2d Cir. 1995); *Shiro v. Drew*, 174 F. Supp. 495, 498 (D. Me. 1959) ("There is nothing in its terms indicative of that manifestation of present surrender of control essential to an assignment. Language of present transfer is wholly lacking.").[8]

The language of the NITA Agreement – "As between [NITA] and Artist, [NITA] shall be the sole and exclusive owner of any and all rights, title and/or interest in and to the master recordings recorded hereunder, including but not limited to the worldwide sound copyrights therein" (A-75) – is similarly lacking a present tense executing verb, or any active verbal expression of present execution or language of present transfer.[9]

---

[8]Plaintiffs rely on *Silvester v. Time Warner, Inc.*, 1 Misc.3d 250 (Sup. Ct. N.Y. County 2003), *aff'd*, 14 A.D.3d 430, 787 N.Y.S.2d 870 (1st Dep't 2005) as supposedly contrary authority. But the sole dispute in *Silvester* was as to the scope of rights owned and whether they extended to digital media. There was thus no analysis of whether the excerpted, illustrative language quoted by the court constituted a grant (which would not even have concerned federal copyright with respect to the sound recordings at issue from the 1950's and 1960's predating federal protection of such works). *See* 17 U.S.C. § 301(c).

[9] Indeed, while the District Court did not need to resolve the issue of whether the Sound Recordings were works made for hire (*see* pp. 27-28 *infra*), the language "shall be the sole and exclusive owner" and language of similar import is almost invariably found where the parties' intent is to create a work made for hire. *See, e.g.*, *Caffey v. Cook*, 409 F. Supp. 2d 484, 490 (S.D.N.Y. 2006) (defendants have no rights to their creative contributions where agreement provides "Producer shall be the sole and exclusive owner of all results and proceeds of Artist's performance services hereunder … as a work-made-for-hire"); *MGM Pictures, Inc. v. Mark Brown, Beauty Shop, LLC*, 2004 U.S. Dist. LEXIS 29562, at *3-4 (C.D. Cal. Feb.

21

In a desperate attempt to find some manifestation of an intention to effect a present transfer of copyright, Plaintiffs point for the first time on appeal to language in the preamble to the NITA Agreement describing the contract as "granting [NITA] certain exclusive rights with respect to Artist pertaining to audio-visual exploitation." *See* Appellant Brief at 32 ("This is the magic present tense grant that the District Court was looking for…."); 36 ("[T]here is at least a grant of 'exclusive rights with respect to Artist Pertaining (sic) to audio-visual exploitation'" to NITA, which is terminable under Section 203."). Putting aside the impropriety of raising this argument for the first time on appeal,[10] the relevant language plainly does not refer to a grant of copyright, let alone a grant of copyright in the audio-only Sound Recordings at issue here.

The rights pertaining to audio-visual exploitation referenced in the preamble are, as more fully described in paragraph H of the NITA Agreement, NITA's rights to the exclusive services of Artist as an "audio-visual recording artist." A-75.

---

11, 2004) ("the Agreement acknowledges that MGM is and shall be the sole and exclusive owner of all rights of every kind and nature in and to and with respect to the Barbershop screenplay and motion picture."); *Niss v. Columbia Pictures*, 2000 U.S. Dist. LEXIS 18328, at *9 (S.D.N.Y. Dec. 20, 2000) ("The ownership of work clause provided, among other things, that MGM, 'as employer of the writer, shall be the sole and exclusive owner of the work'").

[10]*See, e.g.*, *In re Nortel Networks Corp. Sec. Lit.*, 539 F.3d 129, 132 (2d Cir. 2008) ("[I]t is a well established general rule that an appellate court will not consider an issue raised for the first time on appeal.") (quotations omitted).

Neither the preamble nor the language of paragraph H identifies any audiovisual works or references ownership of the copyrights in any such works as opposed to the Sound Recordings at issue here. Under the Copyright Act, sound recordings and audiovisual works constitute separate and distinct categories of works. 17 U.S.C. § 102(a)(6), (7). "[A]n audiovisual work must have a visual component," and is thus distinguished from purely audio works, which constitute the distinct category of sound recordings. *See Lulirama Ltd., Inc. v. Axcess Broadcast Servs.*, 128 F.3d 872, 878 (5th Cir. 1997); 17 U.S.C. § 101 (definitions of "audiovisual works" and "sound recordings").

Perhaps even more tellingly, the Notice does not purport to terminate any grants relating to audio-visual works. A-152 – A-161. Thus, if the reference to audio-visual exploitation is supposed to supply the "magic" missing terminable grant, as Plaintiffs now assert, why did they never seek termination of any such alleged grant of copyright rights in audio-visual works, naming the audiovisual works they claim were the subject of such a grant? The answer, of course, is because there is no such grant and no claim was ever alleged concerning any such works in this case. Far from proving a terminable grant, the relevant language as well as other grant language in paragraph K of the NITA Agreement concerning the Artist's name and likeness (A-77 – A-78) only serves to demonstrate that when the parties intended to make a grant with respect to rights other than copyright

23

rights in the Sound Recordings, they used clear language reflecting such an intent.

Nor did Plaintiffs somehow make a grant of copyright through the Next Plateau Agreement, to which they were not even a party. Plaintiffs' original complaint did not even attempt such a feat. A-9 – A-34. But perhaps recognizing the futility of finding a grant in the NITA Agreement, Plaintiffs alleged in their amended complaint that "[t]hrough the 1986 Inducement Letter [attached to the Next Plateau Agreement], [Plaintiffs] personally and individually granted to Next Plateau the sound recording copyrights at issue." A-47 at ¶ 52. The District Court properly rejected such attempt because reading the warranties and representations made in the Inducement Letter in the context of the full Next Plateau Agreement precluded Plaintiffs' interpretation and with it any plausible claim for declaratory relief. A-220 – A-221.

In the very provision of the Inducement Letter that Plaintiffs claim granted Next Plateau copyright rights, Plaintiffs "specifically guarantee[d] the performance by Producer of all the warranties and representations and covenants made in [the Next Plateau Agreement]." A-107 at ¶ 1. Among such covenants guaranteed by Plaintiffs was that Next Plateau would own the Sound Recordings created under the Next Plateau Agreement "from the <u>inception</u> of their creation … as the owner <u>and author</u> thereof." A-88 at ¶ 5 (emphasis added). And contrary to Plaintiffs' attempt to explain away their representations as only relating to already created

24

recordings that had supposedly previously been transferred to NITA by virtue of the NITA Agreement (Appellant Brief at 41-44), Plaintiffs guaranteed <u>all</u> of Producer's covenants, including those relating to Next Plateau's ownership as "author" of the yet-to-be created Sound Recordings.

Plaintiffs thus allege a paradox: that they agreed that Next Plateau was the author and initial copyright owner of the Sound Recordings, and that they simultaneously, in the same instrument (indeed same provision), made a copyright grant to Next Plateau as the authors of the same Sound Recordings. Plaintiffs' interpretation is untenable, because it would render superfluous and negate the rest of the paragraph from which the supposed "grant" language is plucked, as well as much of the Next Plateau Agreement itself. *See*, *e.g.*, *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (courts must examine entire contract "to safeguard against adopting an interpretation that would render any individual provision superfluous"); *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (2009) ("The entire contract must be reviewed and particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.").

The relevant contractual language in both the NITA Agreement and the Next Plateau Agreement provides conclusive evidence that there was never an intention

25

to effectuate a copyright transfer from Plaintiffs to NITA or Next Plateau. As the District Court explained, the only transfer to be found is made by Producer, as the copyright owner of the Sound Recordings on the pre-existing *Hot, Cool & Vicious* and *A Salt With A Deadly Pepa* albums, to Next Plateau. A-220 – A-221; *see* A-87 at ¶ 3(c) ("Producer hereby sells, transfers and assigns to [Next Plateau], for the world, all of the aforesaid right, title and interest in and to such Sides including without limitation the sound recording copyright…."). Because that is not a grant executed by Plaintiffs, it is not subject to termination. Accordingly, Plaintiffs failed to "plausibly allege a claim for declaratory relief." A-221; *see*, *e.g.*, *Waite*, 450 F. Supp. 3d at 441-42.

**C.** **Plaintiffs' and Their Amici's Focus on Policy Arguments and Issues Extraneous to the Court's Holding Cannot Change the Result**

Plaintiffs and their amici devote significant effort to advancing broad policy points and addressing arguments that were not relevant to the District Court's decision and in some instances are not even disputed. The District Court based its decision on the clear statutory language of the Copyright Act and the unambiguous contractual language of the relevant agreements, which were annexed to Plaintiffs' pleading and thus properly considered on UMG's motion. *See*, *e.g.*, *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (courts may properly consider on pleading motion "the complaint, documents attached to the complaint

26

as exhibits, and documents incorporated by reference in the complaint");

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (noting that

recording contracts are integral to a copyright claim and thus were properly

incorporated by reference on motion to dismiss).

Accordingly, there was no reason for the District Court to embark on a

"free-ranging search for the best copyright policy." *See Star Athletica*, 580 U.S. at

413 (court's task in copyright case "depends solely on statutory interpretation")

(quotations omitted); *Acuti*, 33 F.4th at 142 (fact that termination provision is

intended to benefit authors and their heirs does not require interpreting every

provision in whatever way would best favor their interests where clear statutory

language to the contrary exists). And there was likewise no need for the District

Court to accept Plaintiffs' factual allegations that were contradicted by the

agreements themselves. *See*, *e.g.*, *Broder v. Cablevision Sys. Corp.*, 418 F. 3d 187,

196 (2d Cir. 2005) (courts need not accept complaint's description of agreement

but may look to agreement itself).

Most notably, Plaintiffs and their amici fault the District Court for allegedly

reaching (and erroneously deciding)[11] the issue of whether the Sound Recordings

were works made for hire. However, Plaintiffs' attempt to divert this Court's

---

[11]As discussed below, Plaintiffs' arguments as to why the Sound Recordings
were not works made for hire are flatly wrong. *See* Point III infra.

attention to an issue the District Court did not need to reach cannot rescue its deficient claim. While the District Court noted based on the relevant contractual language and the information in the applicable copyright registrations that the Sound Recordings were "likely works made for hire," it expressly found it unnecessary to reach that issue to decide UMG's motion. A-218 – A-219.

It was Plaintiffs' burden to plead a plausible basis for finding a terminable grant to support their declaratory judgment claim, and that poses a separate issue from whether the Sound Recordings fall within the statutory work made for hire exception to the termination right. *See*, *e.g.*, *Waite*, 450 F. Supp. 3d at 435 (finding it unnecessary to resolve work for hire status of recordings while granting motion to dismiss declaratory judgment claim based on absence of grant executed by author). It is a "cardinal principle of judicial restraint" that "if it is not necessary to decide more, it is necessary not to decide more." *PDK Labs, Inc. v. United States DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in judgment). Accordingly, Judge Cote correctly resolved the motion to dismiss based on the narrow ground presented by the absence of a terminable grant in the relevant agreements without deciding the discrete work for hire issue.

Plaintiffs also criticize the District Court for purportedly creating a new standard requiring an express contractual assertion of Plaintiffs' alleged copyright ownership interest. Appellant Brief at 27-29. However, properly understood in the

28

context of the entire opinion, the District Court's analysis of the 1986 Agreements reflects nothing more than the modest and obviously necessary requirement that a grant of copyright be made by the actual owner of the rights. *See Acuti*, 33 F.4th at 138 ("a grantor cannot validly convey more than he owns") (quotations omitted). Because the entire structure of the parties' agreements, including Plaintiffs' own representations and warranties, was inconsistent with the existence of a grant executed by Plaintiffs as authors, the District Court correctly concluded that Plaintiffs had not set forth a plausible claim of a termination right.

Finally, Plaintiffs and their amici also waste ink on showing that the right of termination is binding on successors-in-interest to grantees. *See* Appellant Brief at 37-38; Authors Alliance Brief at 22-26. However, UMG never claimed otherwise and the District Court did not make any contrary finding. The critical point is that the 1986 Agreements reflect no grant from an author in the first instance (*see* Point II, B *supra*), and accordingly there are no successor grantees in the chain against whom a termination right can be exercised.

## III. Plaintiffs' Erroneous Work Made For Hire Analysis Fails to Establish the Existence of a Terminable Grant

Plaintiffs seek somehow to back into the conclusion of a terminable grant by insisting that the District Court erroneously treated the Sound Recordings as works made for hire. However, as discussed above, the District Court did not need to

29

reach the work for hire issue because the plain language of the relevant agreements precluded finding a terminable grant of copyright rights executed by Plaintiffs. *See* pp. 27-28 *supra*. It is thus likewise unnecessary for this Court to reach the work made for hire issue in order to conclude that there is no terminable grant.

Nevertheless, because Plaintiffs' work for hire argument is itself so fundamentally flawed and fails to provide any rationale for rejecting Judge Cote's decision, UMG is compelled to address it. Plaintiffs claim that the removal of "sound recordings" as an express section 101(2) category of specially commissioned works in a 2000 amendment of the Copyright Act is a direct indication of congressional intent to exclude such works from work made for hire treatment. Appellant Brief at 52. The obvious problem with that argument is that Congress said the exact opposite in the very amendment Plaintiffs cite:

> In determining whether any work is eligible to be considered a work made for hire under paragraph (2), neither the amendment contained in section 1011(d) of the Intellectual Property and Communications Omnibus Reform Act of 1999, as enacted by section 1000(a)(9) of Public Law 106-113, nor the deletion of the words added by that amendment –
>
> (A) shall be considered or otherwise given any legal significance; or
>
> (B) shall be interpreted to indicate congressional approval or disapproval of, or acquiescence in, any judicial determination, by the courts or the Copyright Office.

17 U.S.C. § 101 (definition of work made for hire) (emphasis added). Congress further instructed courts making work made for hire determinations under section 101(2) to interpret the statute as if both the addition of the sound recording category and its subsequent deletion "were never enacted." *Id*.

Ignoring that actual, explicit indication regarding congressional intent, Plaintiffs' analysis of the section 101(2) work made for hire issue focuses entirely on the removal of the sound recordings category from the statute rather than any evaluation of the remaining categories themselves.[12] Had Plaintiffs bothered to do what Congress required, they would have been forced to confront the reality that the "LP" record albums to be delivered pursuant to the Next Plateau Agreement (A-86 – A-87 at ¶ 3(a), A-85 at ¶ 1(d)) are quintessential "collective works," one kind of a "compilation."[13] *See Bryant*, 603 F.3d at 140 ("An album falls within the

---

[12]Accordingly, Plaintiffs have waived any argument that the Sound Recordings do not fall within any of the existing section 101(2) categories and may not raise such arguments for the first time in reply. *See, e.g.*, *Pettaway v. Nat'l Recovery Sols., LLC*, 955 F.3d 299, 305 n. 2 (2d Cir. 2020).

[13]"The term 'compilation' includes collective works," 17 U.S.C. § 101 (definition of compilation), with a collective work defined as a "work … in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." *Id*. (definition of collective work). "Compilations other than collective works almost always take the form of 'fact' works such as directories, databases and case reports." Goldstein on Copyright § 2.16.1.1 (2026).

31

Act's expansive definition of compilation. An album is a collection of preexisting materials – songs – that are selected and arranged by the author in a way that results in an original work of authorship – the album.");[14] *Morning Crew Music v. UMG Recordings, Inc.*, 2026 WL 1104768, at *4-5 (C.D. Cal. Apr. 17, 2026) (finding albums to be specially commissioned works made for hire on motion to dismiss based on clear language of parties' agreements); *see also* U.S. Copyright Office Circular 34 (Multiple Works) at 2 (listing album containing multiple sound recordings as example of collective work); U.S. Copyright Office Circular 56 (Copyright Registration for Sound Recordings) at 5 (multiple sound recordings may be registered "as a 'collective work' if they have been assembled together into a collective whole, such as a digital album or compact disc.").

---

[14]While *Bryant* involved the issue of statutory damages, not work for hire, the statutory damage provision does not contain a separate definition of what constitutes a compilation, merely prescribing that where a compilation exists, all its parts constitute a single work for damage calculation purposes. *See* 17 U.S.C. § 504(c)(1). Since the term "compilation" has the same meaning when used in different parts of the same statute, this Court's conclusion that a "compilation" in section 504(c)(1) includes record albums means that it also includes record albums for purposes of the section 101(2) work made for hire definition. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (noting "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning") (quotations omitted).

Amicus National Society of Entertainment & Arts Lawyers ("NSEAL")

argues based on a selective and inventive reading of legislative history[15] that

"single-artist albums like the ones at issue in this case were never intended by

Congress as a category of works eligible to be specially commissioned 'works

made for hire.'" NSEAL Brief at 26. However, "reference to legislative history is

inappropriate when the text of the statute is unambiguous." *Dep't of Housing &*

*Urban Dev. v. Rucker*, 535 U.S. 125, 132 (2002); *see also Food Mktg. Inst. v.*

*Argus Leader Media*, 588 U.S. 427, 436 (2019) (legislative history may never be

used to "muddy the meaning of clear statutory language") (quotations omitted);

*United States v. Gonzales*, 520 U.S. 1, 6 (1997) ("Given the straightforward

statutory command, there is no reason to resort to legislative history.").

---

[15]NSEAL's detour through legislative history is rife with misrepresentations and unwarranted inferences, such as "obvious assumptions" the recording industry must have "harbored" (NSEAL Brief at 14-16), the inclusion and deletion of "various authors" from the collective work definition (*id*. at 16-17), the inclusion of "anthology" in the definition (which NSEAL mysteriously construes as "a clear attempt to signal and limit the scope of single author works encompassed by the definition") (*id*. at 17-18) and Congress's failure to "mention" LP record albums in the 1976 House Report (*id*. at 18). NSEAL's final definitional contention that multiple sound recordings compiled into an album "are not 'discrete,' but rather, connected and interdependent works no different than chapters in a novel or acts in a play" (*id*. at 18-19), is *ipse dixit* and wrong on its face. *See* https://copyright.gov/eco/help-collective-work.html ("representative examples of collective works include … An album containing multiple sound recordings that embody multiple musical works …. A collective work is not … A single unified work that contains separate parts or elements, such as a novel consisting of multiple chapters ….") (emphasis added).

33

NSEAL's contentions may thus be ignored. The Copyright Act's clear language does not distinguish between single-artist and multi-artist collections in defining collective works. Nor may the scope of collective works somehow be limited to the illustrative examples of periodicals, encyclopedias or anthologies included in the collective work definition. *See*, *e.g.*, *Bragdon v. Abbott*, 524 U.S. 624, 639 (1998) ("As the use of the term 'such as' confirms, the list is illustrative, not exhaustive."); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-78 (1994) ("The text [of Copyright Act § 107] employs the terms 'including' and 'such as' in the preamble paragraph to indicate the 'illustrative and not limitative' function of the examples given…."). Accordingly, NSEAL's suggestion that a group of sound recordings may somehow "qualify as a technical 'collective work' for purposes of obtaining a copyright registration," but not when interpreting the same statutory language in the work made for hire provision, *see* NSEAL Brief at 26, is baseless.

Plaintiffs' claim that there is no express agreement that the Sound Recordings be considered works for hire (Appellant Brief at 51) because the 1986 Agreements do not use that phrase is equally flawed. The Copyright Act does not require the inclusion of any "magic words," including the words "work made for hire," in a valid work-for-hire agreement. *See Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1141 (9th Cir. 2003) ("That the agreements did not use the

34

talismanic words 'specially ordered or commissioned' matters not, for there is no requirement, either in the Act or the caselaw, that work-for-hire contracts include any specific wording."); *Logicom Inclusive, Inc. v. W.P. Stewart & Co.*, 2004 U.S. Dist. LEXIS 15668, at *31 (S.D.N.Y. Aug. 9, 2004) ("To hold that § 101(2) demands the presence of the phrase 'works for hire' in all would-be work for hire agreements would … certainly be a parsimonious reading of the statute.") (internal quotation marks omitted); *Armento v. Laser Image, Inc.*, 950 F. Supp. 719, 731-32 (W.D.N.C. 1996) ("rotely invalidating the ownership effect of a work for hire contract because it fails to include the words 'for hire' leads to unjust results and undermines the purposes of the Copyright Act.… Indeed, ignoring the import of the commissioning contracts because they fail to include the phrase 'work for hire' would undermine Congress's paramount goal ... of enhancing predictability and certainty of copyright ownership.") (internal quotation marks omitted). "After all, the statute itself requires the parties to agree that the 'work shall be considered a work made for hire,' not that the 'work shall be considered and labeled a work made for hire.'" 1 Nimmer, § 5.03.

The parties' express agreement in the Next Plateau Agreement that the Sound Recordings would be owned by Next Plateau "from the inception of their creation" with the right to secure the copyright "as the owner <u>and author</u> thereof" necessarily evinced an intent to, and did establish, a work made for hire

arrangement making Next Plateau the corporate author. *See* A-88 at ¶ 5 (emphasis added).[16] Accordingly, even if this Court were to engage in the unnecessary exercise invited by Plaintiffs of considering the work made for hire status of the Sound Recordings, this would not change the result the District Court reached dismissing Plaintiffs' declaratory judgment claim.[17]

## IV. Dismissal of the Declaratory Judgment Claim is Also Appropriate as to the Remixes Because They Constitute Derivative Works that UMG May Continue to Utilize Notwithstanding any Alleged Termination of its Rights

As Plaintiffs indicate (Appellant Brief at 56-57), the District Court did not need to reach UMG's alternative argument seeking to deny Plaintiffs' request for declaratory relief as to derivative work remixes because it determined there was no

---

[16]Plaintiffs' brief does not dispute that the Sound Recordings were "specially ordered or commissioned" by Next Plateau. Courts have interpreted "specially ordered or commissioned" as having the same meaning as the "instance and expense" test under the Copyright Act of 1909, *see Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 562 (2d Cir. 1995), and the Sound Recordings here were clearly created at the instance and expense of Next Plateau. *Id*. at 561-62; *Fifty-Six Hope Rd. Music Ltd. v. UMG Recordings, Inc.*, 2010 U.S. Dist. LEXIS 94500, at *26-27 (S.D.N.Y. Sept. 10, 2010); *Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 2002 U.S. Dist. LEXIS 4219, at *58 (S.D.N.Y. Mar. 15, 2002).

[17]The Sound Recordings also satisfy the section 101(1) work for hire definition because Plaintiffs' contributions were made within the scope of their employment by Producer, pursuant to a valid personal services agreement. A-96 at ¶ 13(g). However, UMG does not address this issue further for present purposes given that the Sound Recordings clearly constitute works made for hire under the specially commissioned work prong of the statutory definition.

right of termination as to *any* of the Sound Recordings. A-216. However, because Plaintiffs have once again erroneously analyzed this issue, UMG briefly addresses it here to correct Plaintiffs' claim that the derivative work issue may not be appropriately resolved at the pleading stage.

Relying on *Woods v. Bourne Co.*, 60 F.3d 978 (2d Cir. 1995), Plaintiffs contend that determining if "a remix constitutes a derivative work is a fact-intensive inquiry" requiring the listener to hear more than "basically the original tune." Appellant Brief at 57-58 (citing *Woods*, 60 F.3d at 991). However, the *Woods* case involved analysis of derivative works of musical compositions, not sound recordings. Because the sound recording copyright protects only the actual sounds, not the underlying musical work,[18] the originality issue is far simpler. *See Griffin v. J-Records*, 398 F. Supp. 2d 1137, 1143 (E.D. Wash. 2005) (because "each 'independent fixation' is itself copyrightable, regardless of how similar it sounds to its predecessor fixations, … there are no reported decisions in which the

---

[18]"Sound recordings and their underlying musical compositions are separate works with their own distinct copyrights." *Griffin v. J-Records*, 398 F. Supp. 2d 1137, 1142 (E.D. Wash. 2005); *see also* 17 U.S.C. § 102(a). The rights in the sound recording do not extend to the song itself, and accordingly the originality analysis for the two types of works differs. See *Steward v. West*, 2014 U.S. Dist. LEXIS 186012, at *21 & n. 7 (C.D. Cal. Aug. 14, 2014); *BTE v. Bonnecaze*, 43 F. Supp. 2d 619, 627 (E.D. La. 1999); *T.B. Harms Co v. Jem Records, Inc.*, 655 F. Supp. 1575, 1576 n. 1 (D.N.J. 1987); 1 Nimmer § 2.10[A][2].

copyrightability of a registered sound recording has been challenged on grounds of lack of originality.").

In the case of a derivative work sound recording, the only relevant issue is whether the preexisting recorded sounds "have been rearranged, remixed, or otherwise altered in sequence or character." 17 U.S.C. § 114(b). "The Copyright Office accepts alterations such as remixing … as sufficiently original to constitute derivative works." *Maljack Productions v. UAV Corp.*, 964 F. Supp. 1416, 1428 (C.D. Cal. 1997), *aff'd sub nom. Batjac Prods. Inc. v. Good Times Home Video Corp.*, 160 F.3d 1223 (9th Cir. 1998); *see* U.S. Copyright Office Circular 56 ("Examples of derivative work sound recordings that can generally be registered include … a remix from multitrack sources."). The Ninth Circuit adopted the reasoning of the Copyright Office in distinguishing between uncopyrightable remastered recordings, which do not alter sounds, and copyrightable remixed recordings, which do. *ABS Entm't v. CBS Corp.*, 908 F.3d 405, 417-18 (9th Cir. 2018).

There is no dispute that a significant number of the Sound Recordings are remixes. A-50 at ¶ 62(d). Neither the First Amended Complaint nor Plaintiffs' appeal brief asserts that such remixes did not alter the sounds of the original recordings (nor could Plaintiffs have made that assertion in good faith). Instead, Plaintiffs clumsily attempt to evade the effect of the derivative work exception by

38

hiding behind "information and belief" boilerplate allegations as to an alleged lack of originality.  A-48 – A-49 at ¶ 58, A-50 at ¶ 62(d) n. 3.

Leaving aside the incongruity of Plaintiffs' apparent claim that the registered copyrights in some of the most valuable Sound Recordings it seeks to own are invalid, Plaintiffs' "information and belief" allegations, unsupported by any plausible facts, are not sufficient to overcome the presumption of copyright validity afforded by the U.S. copyright registrations for the Sound Recordings.[19] *See* 17 U.S.C. § 410(c) ("In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute *prima facie* evidence of the validity of the copyright."); *Fonar Corp. v. Domenick,* 105 F.3d 99, 104 (2d Cir. 1997) (registration certificate "creates a rebuttable presumption that the work in question is copyrightable").

"A litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory." *Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018).  But that is precisely what Plaintiffs did in using formulaic labels and conclusions to plead that the remixes "are not original, independently copyrightable works" and "do not contain

---

[19]The registrations are all listed in the Notice (A-158 – A-159), and courts may take judicial notice of them as public records.  A-219 at n.2 (citing authorities).

39

substantive, copyrightable variations." A-48 – A-49 at ¶ 58, A-50 at ¶ 62(d) n. 3. Notably, they fail to allege that the remixes do not alter the sounds of the original recordings, which is all that is necessary to create a copyrightable derivative work under 17 U.S.C. §114(b).

Plaintiffs' omission (as well as their reliance on "information and belief" pleading) is particularly telling, because the relevant information is clearly within their own knowledge. Plaintiffs obviously know whether and how the hit version of their most successful and iconic recording, "Push It," which became a "global phenomenon" and "their first platinum single" (A-49 at ¶ 60), is a remix that differs from the original version. Their reliance on "information and belief" allegations tracking the relevant legal language without any actual supporting facts fails to plead a plausible basis for finding that the remixes are not derivative works. Accordingly, UMG retains the right to continue to utilize the remixed Sound Recordings under 17 U.S.C. § 203(b)(1), and Plaintiffs' claim for a declaration as to termination of UMG's rights with respect to such recordings is properly subject to dismissal.

## **CONCLUSION**

For the foregoing reasons, the District Court's decision dismissing the First

Amended Complaint in this action should be affirmed.

Dated: May 5, 2026          Respectfully submitted,

         COWAN, LIEBOWITZ & LATMAN, P.C.
         Attorneys for Appellee UMG Recordings, Inc.

         By:/s/Richard S. Mandel
            Richard S. Mandel
            Thomas Kjellberg
         114 West 47th Street
         New York, New York 10036
         Telephone: (212) 790-9200
         Facsimile: (212) 575-0671

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(5) of the Federal Rules of Appellate Procedure, the foregoing brief is in 14-Point Times New Roman proportional font and contains 9,866 words and thus is in compliance with the word limitation set forth in Local Rule 32.1(a)(4)(A) of the Court of Appeals for the Second Circuit.

Dated: May 5, 2026                COWAN, LIEBOWITZ & LATMAN, P.C.

By: /s/Richard S. Mandel
       Richard S. Mandel
       Thomas Kjellberg
114 West 47th Street
New York, New York 10036
(212) 790-9200