# 26-0253

# United States Court of Appeals
*for the*
## Second Circuit

———— · ————

CHERYL JAMES, PKA SALT-N-PEPA AND SANDRA DENTON, PKA SALT-N-PEPA,

*Plaintiffs –Appellants,*

- v. -

UMG RECORDINGS, INC.

*Defendant – Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**REPLY BRIEF FOR PLAINTIFFS – APPELLANTS
CHERYL JAMES AND SANDRA DENTON, P/K/A SALT-N-PEPA**

RICHARD S. BUSCH
ANDREW H. "DREW" DAVIS
*Attorneys for Plaintiffs-Appellants*
KING & BALLOW LAW OFFICES
26 Century Boulevard, Suite NT 700
Nashville, Tennessee 37214
Phone: (615) 259-3456
*rbusch@kingballow.com*
*ddavis@kingballow.com*

TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION .......................................................................................... 1

ARGUMENT .................................................................................................. 8

    I.   The 1986 Agreements Constitute a Grant of Copyrights. .............................. 8

        A.  While State Law Governs, Interpretation of a Grant of Copyright Must Also Apply Federal Copyright Law. .......................................................... 8

        B.  The District Court's Invented Requirement that Salt-N-Pepa Must "Assert" Ownership Within the 1986 Agreements Pervades Its Analysis and Requires Reversal. ................................................................... 11

        C.  That the 1986 Agreements Constitute "One Transaction" Does Not Impact Salt-N-Pepa's Interpretation. ................................................... 14

        D.  UMG's Arguments that the NITA Agreement Does Not Contain a Grant from Salt-N-Pepa to NITA Are Unconvincing. ........................................ 16

            1.  "Shall Be" as used in the NITA Agreement Connotes a Present Transfer. ................................................................................. 16

            2.  The Preamble to the NITA Agreement Grants Exclusive "Audio-Visual" Exploitation to NITA. .............................................. 19

               a)  Salt-N-Pepa Did not Waive this Argument. ................................ 19

               b)  The NITA Agreement Defines "Audio-Visual" to Mean "Audio" or "Audio-Visual," and the Preamble Expressly Grants NITA Exclusive Audio-Visual Exploitation Rights. ......................................... 19

        E.  UMG's Arguments Regarding the NPR Agreement Are At Best a Premature Assertion that the Sound Recordings are Made-For-Hire. ........ 21

            1.  As explained by Amicus, the Authors Alliance, UMG's Interpretation of the NPR Agreement Runs Afoul of Section 203(a)(5). ......................... 21

2. UMG's Interpretation of the NPR Agreement is Simply Arguing that the Sound Recordings are Works-Made-For-Hire. ..........................................23

F. UMG Does Not Meaningfully Respond to Salt-N-Pepa's Argument-in-the-Alternative that the 1986 Agreements are Ambiguous. .......................25

II. The Policy Arguments Are Relevant and Persuasive. ....................................26

III. Resolution of Whether the Sound Recordings are Works-Made-for-Hire at the Pleadings Stage is Inappropriate, and the District Court's Implicit Finding Thereof Must Be Reversed. ...........................................................26

A. An Employment Relationship Has Not Been Established. ........................27

B. UMG Has Not Established that the Works were "Specially Commissioned." ...................................................................................27

IV. Whether Remixes Are Derivative Works Cannot Be Determined at the Pleadings Stage. .........................................................................................29

CONCLUSION ...............................................................................................30

## TABLE OF AUTHORITIES

### The Supreme Court of the United States

*Cmty. for Creative Non-Violence v. Reid*,
490 U.S. 730 (1989) ............................................................................5

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) ............................................................................7

*Massachusetts v. Morash*,
490 U.S. 107 (1989) ..........................................................................26

*United States v. Gonzales*,
520 U.S. 1 (1997) ..............................................................................21

### Cases

*Acuti v. Authentic Brands Grp. LLC*,
33 F.4th 131 (2d Cir. 2022) .......................................................... 4, 12

*Affymetrix, Inc. v. Illumina, Inc.*,
446 F. Supp. 2d 292 (D. Del. 2006) ...................................................16

*Arachnid, Inc. v. Merit Industries, Inc.*,
939 F.2d 1574 (Fed. Cir. 1991) .........................................................17

*Aymes v. Bonelli*,
980 F.2d 857 (2d Cir. 1992) ..............................................................27

*Bryant v. Media Right Prods.*,
603 F.3d 135 (2d Cir. 2010) ..............................................................28

*Carol Barnhart, Inc. v. Econ. Cover Corp.*,
603 F. Supp. 432 (E.D.N.Y. 1985) ....................................................11

*Childress v. Taylor*,
945 F.2d 500 (2d Cir. 1991) ..............................................................24

*Close-Up Int'l, Inc. v. Berov*,
382 F. App'x 113 (2d Cir. 2010) ..........................................................8

*Deutsche Bank Nat'l Tr. Co. v. Romano*,
   48 N.Y.S.3d 237 (N.Y. App. Div. 2017)....................................................... 9, 14

*Folkes Home Servs. Heating, Cooling, Plumbing & Elec., Ltd. Liab. Co. v. Folkes
   Bros. Home Servs. Ltd. Liab. Co.*, No. 24 CV 9844 (NSR),
   2026 U.S. Dist. LEXIS 24672 (S.D.N.Y. Feb. 5, 2026) ....................................27

*Horror Inc. v. Miller*,
   15 F.4th 232  (2d Cir. 2021) .....................................................................5

*In re Rusk*, No. 23-90006-am,
   2024 LX 263353 (2d Cir. May 7, 2024)............................................................20

*King-Devick Test Inc. v. Nyu Langone Hosps.*, No. 17-CV-9307 (JPO),
   2019 U.S. Dist. LEXIS 449 (S.D.N.Y. Jan. 2, 2019)..........................................30

*Maljack Prods. v. UAV Corp.*,
   964 F. Supp. 1416 (C.D. Cal. 1997)..................................................................29

*Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*,
   290 F.3d 98 (2d Cir. 2002) .................................................................................11

*Omni MedSci, Inc. v. Apple Inc.*,
   7 F.4th 1148 (Fed. Cir. 2021) .................................................................. 17, 18

*Penguin Grp. (USA) Inc. v. Steinbeck*,
   537 F.3d 193 (2d Cir. 2008) ..............................................................................22

*Playboy Enters. v. Dumas*,
   53 F.3d 549 (2d Cir. 1995) .......................................................... 7, 10, 12, 13

*Rescuecom Corp. v. Google, Inc.*,
   562 F.3d 123 (2d Cir. 2009) ..............................................................................7

*Revitalizing Auto Cmtys. Envtl. Response Tr. v. Nat'l Grid USA*,
   92 F.4th 415 (2d Cir. 2024) ...............................................................................19

*RJE Corp. v. Northville Indus. Corp.*,
   329 F.3d 310 (2d Cir. 2003) ..............................................................................19

*Schaffer v. City Bank Farmers' Tr. Co.*,
  239 A.D. 531 (App. Div. 3rd Dept. 1933)...........................................................3

*Schiller & Schmidt, Inc. v. Nordisco Corp.*,
  969 F.2d 410 (7th Cir. 1992) ..............................................................................7

*Silvester v. Time Warner, Inc.*,
  1 Misc. 3d 250 (Sup. Ct. N.Y. County 2003).....................................................16

*Steiner v. Lewmar, Inc.*,
  816 F.3d 26 (2d Cir. 2016) ................................................................................25

*United States v. Am. Soc'y of Composers (In re Cellco P'ship)*,
  663 F. Supp. 2d 363 (S.D.N.Y. 2009) ...............................................................13

*United States v. Restrepo*,
  986 F.2d 1462 (2d Cir. 1993) ............................................................................27

*Woods v. Bourne Co.*,
  60 F.3d 978 (2d Cir. 1995) ..................................................................................7

## Statutes

17 U.S.C. § 101 ................................................................................... 2, 5, 6, 28

17 U.S.C. § 114(b) ......................................................................................29

17 U.S.C. § 201 ................................................................................... 1, 5, 13, 24

17 U.S.C. § 203 ................................................................................... 20, 21, 23

35 U.S.C. § 261 ............................................................................................16

## Treatises and Other Authorities

3 Nimmer on Copyright § 10.03 (2026) ..................................................................10

H.R. Rep. No. 94-1476 ................................................................................. 9, 23

Report of the Register of Copyrights on the General Revision of the U.S.
  Copyright Law, 87th Cong., 1st Sess., Copyright Law Revision (H. Judiciary
  Comm. Print 1961) .......................................................................................23

United States Copyright Office, *Circular 56A: Copyright Registration of Musical Compositions and Sound Recordings* ................................................................1

## INTRODUCTION

At best, UMG's[1] Brief ("UMG Br.") relies on selective language to arrive at its desired outcome, ignoring the plain language of the Agreements, which clearly effect a transfer of copyright, and the Copyright Act's provision vesting copyrights originally in the author (17 U.S.C. § 201).[2] At worst, UMG's interpretation is nothing more than circular logic designed to prematurely argue the works were works-made-for-hire. As addressed more fully *infra*, UMG's arguments fail because they: (1) ignore federal copyright law; (2) ignore clear grant language and the controlling definition of "audio-visual" in the NITA Agreement; (3) mischaracterize the District Court's "key inquiry"; (4) apply overly-broad interpretations of the statutory definitions regarding works-made-for-hire; and (5) ignore that remixes can only be derivative works if there is sufficient copyrightable contribution.

UMG argues the phrase "shall be" as used in one of the NITA Agreement's provisions assigning rights from Salt-N-Pepa to NITA (A-75) is not an assignment because it "lack[s] a present tense executing verb" (UMG Br. at 21). However, an agreement that something previously belonging to one party "shall be" the property of another party clearly connotes a present transfer. This interpretation finds support

---

[1] Capitalized terms carry the same meaning as in Salt-N-Pepa's Opening Brief ("Op. Br.").

[2] *See* United States Copyright Office, *Circular 56A: Copyright Registration of Musical Compositions and Sound Recordings* at 4 (the performing artist is the author of a sound recording).

1

in the Copyright Act's broad definition of "transfer of copyright ownership" in 17 U.S.C. § 101 (quoted fully in Op. Br. at 22). It finds further support when read with the NITA Agreement's preamble: "…as well as [Salt-N-Pepa] granting Company certain exclusive rights with respect to Artist pertaining to audio-visual exploitation." A-72.

Because it has no response to the fact that the present participle form of "to grant" is forefront in the preamble, UMG next erects a strawman, conflating "audio-visual exploitation" with "audio-visual works". UMG Br. at 22-24. Salt-N-Pepa clearly do not seek to terminate a grant of "audio-visual works," but rather, the grant of the exclusive right of "Audio-visual exploitation" which "encompasses all four of the applicable Section 106 rights." Op. Br. at 31-33.

Arguing against its own strawman, UMG next cites another use of "audio-visual" from Paragraph H of the NITA Agreement, while disingenuously utilizing the Copyright Act's definition of "audio-visual," but ignoring the NITA Agreement's controlling definition of "audio-visual" ***from the same paragraph***. UMG Br. at 22-23 (citing 17 U.S.C. § 101).[3]

---

[3] It is well settled under New York law that the parties to a contract may agree to operate under different terms or definitions than that in a statutory scheme. *Cf. W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990) ("[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms."); *John J. Kassner & Co. v. New York*, 46 N.Y.2d 544, 550-51 (1979) (parties may agree to a shorter claim limitations period).

2

Paragraph H provides:

> [T]he term "audio and/or audio-visual recording artist" is defined to mean Artist's performances embodied on **all forms of recording and reproduction by which sound may be recorded** now known or which may hereafter become known, … **whether embodying (i) sound alone or (ii) sound synchronized with visual images, e.g. "sight and sound devices."**

A-75 (emphasis added).

The use of the "and/or" between "audio" and "audio-visual" means the two terms may be used interchangeably and the full definition applies to *both* audio only and audio synchronized with video. *Schaffer v. City Bank Farmers' Tr. Co.*, 239 A.D. 531, 533 (N.Y. App. Div. 3rd Dept. 1933) ("Both the conjunctive 'and' and the disjunctive 'or' are used and effect should be given to each of them."). Therefore, granting "exclusive rights… pertaining to audio-visual exploitation" must be read as Salt-N-Pepa granting NITA any form of exploitation of "(i) sound alone or (ii) sound synchronized with visual images". Ironically, in attempting to dismantle the strawman it erected, UMG admits the language in the NITA Agreement preamble is "clear language" used "when the parties intended to make a grant." UMG Br. at 23-24; *see* § I.D.2.b., *infra*.

Next, UMG's interpretation of the 1986 Agreements must also fail as it does not account for the two pre-existing albums: *Hot, Cool & Vicious* and *A Salt With A Deadly Pepa*. *See* UMG Br. at 5, n.5 (admitting these albums pre-existed the 1986 Agreements). UMG's interpretation of the 1986 Agreements would empower NITA

3

and NPR, by way of a contract to which Salt-N-Pepa were not direct signatories, to retroactively render these albums as works-made-for-hire.

Further, UMG's response to Salt-N-Pepa's argument that the District Court created a new requirement for copyright transfers to "assert[] their ownership of the copyrights and transferred that ownership to a predecessor of UMG" (A-216), is brazenly positing that the District Court's analysis "reflects nothing more than the modest and obviously necessary requirement that a grant of copyright be made by the actual owner of the copyright." UMG Br. at 28-29 (citing *Acuti v. Authentic Brands Grp. LLC*, 33 F.4th 131, 138 (2d Cir. 2022)). That is not what the District Court held. The District Court held the "key inquiry" was whether Salt-N-Pepa expressly asserted ownership within the 1986 Agreements. A-216. This was not merely a slapdash misstatement given the District Court repeated it twice thereafter, dismissing Salt-N-Pepa's interpretation of the 1986 Agreements because they did not "characterize Plaintiffs as the owners of the copyrights" nor "represent that the Plaintiffs owned the copyrights." A-218-19.

Neither *Acuti* nor Section 204 requires there be such an assertion within the four corners of the assignment agreement. *See generally*, 33 F.4th 131. *Acuti* stands for the mundane proposition that an assignor may not assign more than she owns. *Id.* at 138. UMG cannot point to any cogent authority supporting this newly-minted

4

requirement of "assertion of ownership" within the written assignment. Tellingly, the District Court did not even cite *Acuti* when it coined this "key inquiry". A-216.

UMG's "interpretation" of the 1986 Agreements is just a thinly-veiled argument the sound recordings were works-made-for-hire. And, while the District Court claimed not to reach the issue, it clearly did by (1) adopting UMG's interpretation which presupposes the works-made-for-hire status; and (2) citing the authorship on the copyright registrations. Such a fact-heavy inquiry cannot be made at the pleadings stage. *See* n.4, *infra*.

Salt-N-Pepa, as the recording artists, are the statutory authors and initial copyright owners under Section 201 absent some agreement to the contrary or employment relationship with NITA. 17 U.S.C. §§ 101, 201. There is no agreement that provides for a work-for-hire relationship, and UMG cannot establish that Salt-N-Pepa were employees of NITA or NPR (indeed, the first two albums pre-date the 1986 Agreements).[4] Should UMG's interpretation be allowed to stand, it will open the floodgates to record labels circumventing meritorious terminations by

---

[4] In a footnote, UMG sheepishly argues it has satisfied the establishment of an employment relationship given the sound recordings were made pursuant to a valid personal services agreement. UMG Br. at 36 n.17. First, UMG does not account for the two pre-existing Albums which pre-date the 1986 Agreements. Second, UMG ignores the Supreme Court precedent cited in the Opening Brief that the establishment of an employment relationship centers on the "general common law of agency" and a highly fact-dependent multi-factor test. *See* Op. Br. at 50 (citing *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751 (1989); *Horror Inc. v. Miller*, 15 F.4th 232, 243-44 (2d Cir. 2021)).

5

contracting with third parties or requiring recording artists agree retroactively that the works were works-made-for-hire *ab initio*, the *Reid* factors notwithstanding.

Responding to Salt-N-Pepa's arguments on works-made-for-hire, UMG advances a tortured statutory interpretation of "collective works" and "compilations" to try to shoehorn these individual sound recordings into the statutory definition of works-made-for-hire. Regardless, even assuming *arguendo* that sound recordings *could* fall within the limited categories of specially-commissioned works-made-for-hire, UMG will still need to establish (as a matter of law, with all deference to Salt-N-Pepa as the non-moving parties to a pleadings challenge) that the sound recordings were "specially commissioned" by UMG's predecessor. 17 U.S.C. § 101. Absent a developed factual record, it is impossible for UMG to establish that the sound recordings were specially commissioned, especially given, under the terms of the 1986 Agreements, Salt-N-Pepa retained the right to "mutually determine" "all creative elements" of the sound recordings. A-75.

*Amicus¸* the Recording Industry Association of America ("RIAA"), all but confirms the fact its member, UMG,[5] presupposed the works are made-for-hire, and advances the same flawed, circular logic in its Brief. The RIAA even goes so far as to apply the *Reid* factors (without benefit of a developed factual record), concluding

---

[5] While the RIAA disclosed UMG's membership, it failed to disclose that five of its Board Members are associated with UMG. *See* https://www.riaa.com/about-riaa/board-executives/ (last visited May 12, 2026).

6

there was an employment relationship rendering them works-made-for-hire to "explain why… the district court may have viewed the relevant recordings as employee works-made-for-hire." Dkt. 35.1 ("RIAA Br.") at 25; *see also id*. at 26 ("[T]he case here" is "there was a work-made-for-hire agreement"). But, this cannot be true for the pre-existing works, as an agreement cannot confer retroactive work-made-for-hire status. *Playboy Enters. v. Dumas*, 53 F.3d 549, 559 (2d Cir. 1995) (work-for-hire agreement must predate the creation of the work(s), though the writing requirement *may* be satisfied by a later agreement that "confirms a ***prior*** agreement, either explicit or implicit, made before the creation of the work") (emphasis added); *accord Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 413 (7th Cir. 1992) ("The writing must precede the creation of the property in order to serve its purpose of identifying the (noncreator) owner unequivocally."). As discussed below, the works recorded after the 1986 Agreement, UMG cannot establish an employment relationship *or* that the works were "specially commissioned" with a writing acknowledging work-for-hire status.

Finally, UMG responds to Salt-N-Pepa's arguments that a ruling on whether the remixes are derivative works would be premature, chiding Salt-N-Pepa for using the phrase "upon information and belief" in the relevant allegations in the First Amended Complaint ("FAC"). However, the FAC provides supported, nonconclusory factual allegations that the works "do not contain substantive,

7

copyrightable variations." A-48-49. These must be accepted as true. *Rescuecom Corp. v. Google, Inc.*, 562 F.3d 123, 127 (2d Cir. 2009).

The *sine qua non* of copyrightability – for original works *and* derivative works – is originality. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991); *Woods v. Bourne Co.*, 60 F.3d 978, 990 (2d Cir. 1995) ("[T]here must be at least some substantial variation from the underlying work[.]… To support a copyright, the original aspects of a derivative work must be more than trivial.") (citations omitted). UMG's argument that "all that is necessary to create copyrightable derivative works" is the altering of the sounds of the original recordings (UMG Br. at 40), runs contrary to binding precedent from the Supreme Court and this Court – the "altering" must be sufficiently original to be copyrightable. *Id*.

UMG's arguments cannot avoid the inevitable conclusion: the District Court's incorrect opinion must be reversed.

## ARGUMENT

### I.  The 1986 Agreements Constitute a Grant of Copyrights.

#### A. While State Law Governs, Interpretation of a Grant of Copyright Must Also Apply Federal Copyright Law.

Salt-N-Pepa do not dispute the role state law plays with interpreting copyright assignments. However, UMG's assertion, "Determination of Whether a Copyright Grant Exists is Analyzed by Applying Basic Principles of State Contract Law"

8

(UMG Br. at 16) is an overstatement. "An alleged transfer of copyright is subject to requirements for a valid transfer under copyright law but is also governed by state contract law." *Close-Up Int'l, Inc. v. Berov*, 382 F. App'x 113, 115 (2d Cir. 2010). Congress's express purpose behind the 1976 Copyright Act was to "promote national uniformity and to avoid the practical difficulties of determining and enforcing an author's rights under differing laws and in the separate courts of the various States." H.R. Rep. No. 94-1476 at [129]. Any analysis of whether there is a grant of copyright not informed by federal law would be incomplete.

After a passing glance to Section 204's requirements, UMG's analysis focuses primarily on state law. UMG Br. at 16-18. UMG does not even cite the Copyright Act's definition of "transfer of copyright ownership" from Section 101. This is a glaring hole in its analysis.

Likewise, the District Court did not cite Section 101's definition of "transfer of copyright ownership," despite citing Section 204 as the standard governing whether a terminable transfer was made. A-215. Instead, the District Court merely cites *Deutsche Bank Nat'l Tr. Co. v. Romano*, 48 N.Y.S.3d 237, 240 (N.Y. App. Div. 2017). A-217. This is errant for two reasons. First, *Romano* deals with a mortgage foreclosure action, not with copyright assignments. 48 N.Y.S.3d at 239. Second, the District Court truncated its quotation from *Romano*. A-217. The full quotation is:

> Indeed, **in the absence of statute or a contract provision to the contrary, there are no prescribed formalities that must be observed**

9

**to make an effective assignment**. It is sufficient if the assignor has, in some fashion, *manifested an intention to make a present transfer of his rights to the assignee*".

48 N.Y.S.3d at 240 (italic emphasis kept; bold emphasis added). Here, there *is* a statutory provision regarding the requirements – one for which "it is not necessary that the written instrument include phrases of present intent (along the lines of 'I hereby transfer')." 3 Nimmer on Copyright § 10.03 (2026).

This Court's decision in *Playboy* is an instructive framework: upon a *developed* record, the district court should first engage in an authorship and ownership analysis to determine whether the transferor has rights to transfer; *then* the district court should review the facts, circumstances, and writings to determine if a Section 204 transfer has been made. *Playboy* followed the Southern District of New York's entry of two opinions, *following a bench trial*. 52 F.3d at 551. Tellingly, *before* engaging in analysis as to whether there was a copyright transfer pursuant to Section 204, the *Playboy* Court reviewed the district court's analysis of authorship, and whether the works were works-made-for-hire. 53 F.3d at 553-64. Only then did this Court determine it did not need to address whether there was a transfer of copyright for the works-made-for-hire, and limited its Section 204 analysis to those works it determined were not works-made-for-hire. *Id.* at 563-64. For those non-works-for-hire, this Court reviewed the writings in the record to determine

10

whether they satisfied Section 204, finding no clear error in the district court's analysis of the writings *and* the accompanying circumstances. *Id.* at 564.

As discussed in the next section, the District Court did not follow this framework.

### B. The District Court's Invented Requirement that Salt-N-Pepa Must "Assert" Ownership Within the 1986 Agreements Pervades Its Analysis and Requires Reversal.

The decision on appeal follows from a pleadings challenge, without benefit of the development of the factual record. A-206-207. This alone shows the District Court's ruling is premature under *Playboy* and warrants reversal.

Further, a fundamental flaw in the District Court's reasoning, which UMG further advances here, is simply skipping the inquiry from *Playboy* – authorship of the works – and substituting that inquiry for a simpler one: do the writings which putatively effect the Section 204 transfers "assert" ownership? A-216. The District Court engaged in no separate analysis, and made no finding on the authorship or ownership of the subject recordings prior to the 1986 Agreements. A-206-223. This is because such calculus is premature at the pleadings stage. *See Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*, 290 F.3d 98, 110 (2d Cir. 2002) ("Authorship is generally a question of fact for the jury."); *Carol Barnhart, Inc. v. Econ. Cover Corp.*, 603 F. Supp. 432, 433 (E.D.N.Y. 1985) ("[A]uthorship and originality are, at least initially questions of fact…").

11

Without this foundational inquiry into initial authorship and ownership at time of execution (the actual 'key inquiry'), determination of the accompanying circumstances into whether there is an intent to effect a transfer will inevitably be incomplete and manifest error. Indeed, the *Playboy* decision makes it clear that the surrounding circumstances *must* also be considered in addition to the writing proffered to satisfy Section 204. *Playboy*¸ 53 F.3d at 564.

UMG's contention that the District Court was merely relying on this Court's decision in *Acuti*¸ (UMG Br. at 29), cannot hold. The District Court did not even cite *Acuti*, nor engage in any analysis as to ownership prior to the 1986 Agreements.

Regardless, nothing from *Playboy*, *Acuti*, nor Section 204 could earnestly be taken to mean that to effect a Section-204-complaint transfer, the writing must expressly "assert," "characterize," or even "represent" ownership; merely that the grantor must, in fact, own the rights being conveyed, and the transfer must be effected by a writing signed by the grantor.

This Court provided a roadmap in *Playboy* from which the District Court clearly strayed, and erred by avoiding analysis of authorship and ownership, electing instead to manufacture a requirement that satisfying Section 204 requires 'assertion of ownership' within the writing itself. Again, this was not a mere aside, the District Court called assertion of ownership the "key inquiry" and repeated the requirement two more times. A-216; A-218-19.

12

The District Court's error in this regard is distinctly apparent regarding the two pre-existing albums. Because these sound recordings were created prior to the 1986 Agreements, Salt-N-Pepa are the statutory authors of these albums. *See United States v. Am. Soc'y of Composers (In re Cellco P'ship)*, 663 F. Supp. 2d 363, 369 (S.D.N.Y. 2009). Because the copyrights to these pre-existing albums vested initially in Salt-N-Pepa as the authors (17 U.S.C. § 201(a)), then there must be a transfer from Salt-N-Pepa to NITA or NPR.

Nothing in either agreement memorializes a "prior agreement" as to work for hire status. A-72-109; *see Playboy*, 53 F.3d at 559. However, there is grant language from Salt-N-Pepa in the NITA Agreement's preamble and Paragraph H. A-72, A-75. If there were no possibility Salt-N-Pepa were the authors or owners initially of the copyrights, then "As between Company and Artist" (A-75)[6] would be superfluous.

UMG admits the 1986 Agreements cannot be read to render portions of it superfluous. UMG Br. at 25. Yet, UMG proffers an interpretation that renders this grant language in the preamble and Paragraph H of the NITA Agreement superfluous.

When the two 1986 Agreements are read together in their full context – which necessarily includes that two albums pre-dated the 1986 Agreement (A-73; A-87) – Salt-N-Pepa's interpretation must prevail. These Agreements, when harmonized,

---

[6] The District Court omitted the leading prepositional phrase in its analysis. A-218.

13

read as Salt-N-Pepa, the recording artists, statutory authors, and initial copyright owners, granting their rights to NITA which then granted its rights to NPR.

### C. That the 1986 Agreements Constitute "One Transaction" Does Not Impact Salt-N-Pepa's Interpretation.

Salt-N-Pepa raised the District Court's error of not considering that the NITA Agreement must be read as having been executed first. Op. Br. at 40. In a footnote, UMG argues this is a "confusing and ultimately irrelevant detour" because the 1986 Agreements must be "understood together as one." UMG Br. at 19 n.6. This is a mischaracterization of Salt-N-Pepa's argument. Salt-N-Pepa agree the two agreements must be read together. *See* Op. Br. at 40 ("Therefore, when the two 1986 Agreements are read together…"). However, the point UMG does not respond to, is that to read the two Agreements together, the sequence matters. It does not strain credulity that parties can sequence the covenants and obligations in an agreement or multiple agreements in the same transaction. Indeed, *Deutsche Bank*, relied upon by the District Court (A-217) and UMG (UMG Br. at 19), makes it clear that under New York law, "Parties are free to arrange their commercial activities in a manner that furthers their interests, so long as their agreement does not violate a statutory prohibition or public policy." 32 N.Y.3d at 161. Conditions precedent and payment on delivery obligations are two ready examples of how parties might choose to sequence rights and obligations in a contract. It is a routine matter of contract interpretation for a court to sequence the rights and obligations in a contract.

Here, understanding the order of operations is important to reading the contracts together as a whole, does not run afoul of reading the two contracts as "one transaction," and is far from "irrelevant."

The District Court noted that NITA made a representation in the NPR Agreement that it was the sole and exclusive owner, "which it confirmed before transferring those copyrights to Next Plateau Records." A-220.[7] This is a telling choice of words. First, it is an acknowledgment that there is a temporal order to the 1986 Agreements. Second, as there are no other agreements between NITA and NPR which were "before" the 1986 Agreements, the District Court is acknowledging that the NITA Agreement must be deemed to have been executed first. For the pre-existing recordings, which vested automatically in Salt-N-Pepa, the only way for NITA to have "confirmed" it was the "sole and exclusive owner" "before transferring those copyrights to [NPR]" (A-220), is the transfer language from Salt-N-Pepa to NITA in the NITA Agreement. It came first, then.

That NITA conveyed the rights it received from Salt-N-Pepa to NPR as part of the same transaction does not mean Salt-N-Pepa did not make an author grant.

---

[7] However, this does not affect Salt-N-Pepa's interpretation. Of course, NITA did (briefly) have ownership by way of the grant made by Salt-N-Pepa in the NITA Agreement. It then immediately, by way of the NPR Agreement assigned those ownership rights to NPR. Thus, Salt-N-Pepa accurately confirmed the representations and warranties in the NPR Agreement that NITA was the "sole and exclusive owner" of the sound recordings because they had transferred "sole and exclusive" ownership rights to NITA in their agreement with it.

Under the plain language of the 1986 Agreements, the *only* way to find that Salt-N-Pepa did not make an author grant terminable under Section 203 would be to make a finding that the works were works-made-for-hire, which as discussed in the Opening Brief and below would be an inappropriate decision at the pleadings stage.

### D. UMG's Arguments that the NITA Agreement Does Not Contain a Grant from Salt-N-Pepa to NITA Are Unconvincing.

#### 1. "Shall Be" as used in the NITA Agreement Connotes a Present Transfer.

UMG argues that the NITA Agreement paragraph H does not have a "present tense executing verb" and thus cannot be an assignment. UMG Br. at 21. Not so. "Be" is a present tense verb that when used with the auxiliary verb, "shall" connotes a present intent that the copyrights previously owned by Salt-N-Pepa as the authors of the sound recordings "shall be" owned by NITA. *Silvester v. Time Warner, Inc.*, 1 Misc. 3d 250, 255-56 (Sup. Ct. N.Y. County 2003), *aff'd* 14 A.D.3d 430 (1st Dep't 2005).

UMG proffers patent cases like *Affymetrix, Inc. v. Illumina, Inc.*, 446 F. Supp. 2d 292, 296 (D. Del. 2006) to support this proposition.[8] In *Affymetrix*, the district

---

[8] Even accepting that patent cases are appropriate to consider when conducting copyright analysis (UMG Br. at 20 n.7), there will be nuanced differences. Transfer of patents is governed by 35 U.S.C. § 261 which merely requires that an assignment be in writing (without a signature requirement) and that such assignment be registered with the U.S. Patent and Trademark Office. Also, *Affymetrix* dealt with a contract under California, not New York law. 446 F. Supp. 2d at 296.

court for the District of Delaware noted the Federal Circuit has held that "shall be" can connote a present transfer, but does not when clearly modified with language like "and all rights thereto will be assigned". 446 F. Supp. 2d at 296 (citing, *inter alia*, *Arachnid, Inc. v. Merit Industries, Inc.*, 939 F.2d 1574, 1576 (Fed. Cir. 1991)).

UMG's assertion that "shall be" does not have a "present tense verb of execution" comes from *Omni MedSci, Inc. v. Apple Inc.*, 7 F.4th 1148, 1154 (Fed. Cir. 2021). *See* UMG Br. at 20. However, this case is readily distinguishable. There, the Federal Circuit noted there were multiple instances of "shall be" in the contract dealing with apportionment of rights, many of which were predicated on factual circumstances around the creation of the inventions. *Omni MedSci*, 7 F.4th at 1152-53. Because whether the rights would be assigned depended on the circumstances, the Federal Circuit held that the "shall be" could not connote an automatic assignment of future rights. *Id*. Further, and more pointedly, the Federal Circuit did not set forth a brightline test that "shall be" could never connote a present transfer as UMG suggests. Rather, it expressly noted that "Contracts are 'are [sic] interpreted in the light of all the circumstances' and 'as a whole.' Although the presence or absence of present language of assignment is an important indicator of the parties' intent as explained above, ***we do not hold that this indicator is necessarily determinative in all cases***." *Id.* at 1154 n.4 (emphasis added) (internal citations omitted).

17

The NITA Agreement contains no such language modifying "shall be" that the rights "will be assigned" but rather just that NITA "[s]hall be the sole and exclusive owner." A-75. Indeed, when read in the context of the NITA Agreement's preamble, which provides that Salt-N-Pepa were "granting [NITA] exclusive rights with respect to Artist pertaining to audio-visual exploitation"[9] (A-72), clearly Paragraph H is meant to be a present assignment. Furthermore, unlike *Omni MedSci¸* where there were only rights to future inventions at stake, here there were two previously-existing albums for which the copyrights had already vested in Salt-N-Pepa and eligible for present transfer. A-73; A-84.

Further, the District Court found that the virtually identical language in the NPR Agreement, "[a]ll Sides… shall… be entirely the property of [NPR]" is a transfer of copyright. A-218 (citing A-88 ¶5).[10] But, it held that the language "Company shall be the sole and exclusive owner…" in the NITA Agreement was *not* a transfer. A-218. This, despite *Omni MedSci* (cited by UMG), which holds that identical phrases in contracts should be read identically. 7 F.4th at 1152-53.

UMG does not meaningfully respond to Salt-N-Pepa's argument that the District Court clearly gave these virtually identical contractual provisions the exact

---

[9] *See* discussion in the Introduction, *supra*, and in the following section that "audio-visual" means "audio or visual" and is not limited to "audio-visual works".
[10] Tellingly, when UMG cites paragraph 5 of the NPR Agreement in its Brief (at 24), it omits "shall… be" from its quotation.

opposite effect. UMG cannot have it both ways – "shall be" cannot connote a transfer from NITA to NPR, but not from Salt-N-Pepa to NITA.

### 2. The Preamble to the NITA Agreement Grants Exclusive "Audio-Visual" Exploitation to NITA.

#### a) Salt-N-Pepa Did not Waive this Argument.

UMG argues that the grant language in the NITA Agreement preamble was raised for the first time on appeal. UMG Br. at 22. This is a mischaracterization. Salt-N-Pepa have always argued that the 1986 Agreements must be read as a whole, and that when viewed as a whole, they manifested an intent to effect a transfer of copyrights to NITA. Both Agreements were wholly before the District Court, which even quoted the preamble in its Opinion. A-207-208. On *de novo* appeal regarding contractual interpretation, the preamble of any contract is vital to understanding the full scope of the parties' intent and properly considered by this Court. *See RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) (considering preamble as evidence of contract meaning); *Revitalizing Auto Cmtys. Envtl. Response Tr. v. Nat'l Grid USA*, 92 F.4th 415, 442 (2d Cir. 2024) ("The preamble sets the stage" and can "explain[] the reasons for the Agreement.").

#### b) The NITA Agreement Defines "Audio-Visual" to Mean "Audio" or "Audio-Visual," and the Preamble Expressly Grants NITA Exclusive Audio-Visual Exploitation Rights.

As quoted in the Introduction, the NITA Agreement defines "audio-visual" to mean either audio only *or* audio combined with video. A-75. UMG ignores this

19

definition. Instead, UMG took its own 'irrelevant detour' discussing audio-visual works. UMG Br. at 19, 22-24.

The preamble contains clear grant language, "granting [NITA]…exclusive rights… to audio-visual exploitation" (A-72). This grant is terminable under Section 203, as it involves all of the relevant Section 106 rights. 17 U.S.C. § 203. UMG has no argument to the contrary, and has waived any by electing to discuss audio-visual works instead of directly addressing the argument. *In re Rusk*, No. 23-90006-am, 2024 LX 263353, at *6 (2d Cir. May 7, 2024) ("[I]ssues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.").

And, ironically, UMG admits that this language in the preamble *is* a grant! UMG acknowledges that "**the relevant language** [in the preamble] **as well as other grant language** in Paragraph K[11] of the NITA Agreement… only serves to demonstrate when the parties intended to make a grant…, they used clear language reflecting such an intent." UMG Br. at 23-24 (emphasis added). That is, UMG admits that this language in the preamble is "clear language" that was used "when the parties intended to make a grant." *Id*.

---

[11] Paragraph K provides "Artist grants to Company the worldwide right in perpetuity to use Artist's [name and likeness subject to certain approvals]." A-77-78.

**E. UMG's Arguments Regarding the NPR Agreement Are *At Best* a Premature Assertion that the Sound Recordings are Made-For-Hire.**

UMG concedes that terminations are binding on successors. UMG Br. at 29. Therefore, because Salt-N-Pepa are the first-in-time grant, the subsequent grant from NITA to NPR cannot sever the termination rights. *See* 17 U.S.C. § 203(a)(4) ("[T]ermination shall be effected by serving an advance notice… upon the grantee or the grantee's successor in title."); *id*. at § 203(a)(5) ("Termination of the grant may be effected notwithstanding any agreement to the contrary…."). However, despite these clear statutory provisions, UMG's interpretation does just that – it attempts to sever Salt-N-Pepa's termination rights through the NPR Agreement.

**1. As explained by *Amicus*, the Authors Alliance, UMG's Interpretation of the NPR Agreement Runs Afoul of Section 203(a)(5).**

*Amicus*, Authors Alliance is correct. Dkt. 20.1 at 4. Allowing the assignees of authors to contract with third parties that the second assignee is the "author" would be an impermissible encroachment on the authors' termination rights, and one expressly foreclosed by Section 203(a)(5). This subsection provides that termination of the original grant may be effected "notwithstanding any agreement to the contrary." 17 U.S.C. § 203(a)(5). "Read naturally, the word 'any' has an expansive meaning, that is 'one or some indiscriminately of whatever kind." *United States v. Gonzales*, 520 U.S. 1, 5 (1997).

21

UMG does not discuss this argument. The RIAA's critique misses the mark by presupposing work-for-hire-status. RIAA Br. at 16-17. As properly construed, the NITA Agreement contains an original grant by the authors, Salt-N-Pepa. Thus, the NPR Agreement's language conferring authorship status to NPR would necessarily be an "agreement to the contrary" affecting Salt-N-Pepa's termination rights.

The RIAA's reliance on *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 202 (2d Cir. 2008) (RIAA Br. at 15) is misplaced. First, that case dealt with Section 304 terminations, not Section 203. *Steinbeck*¸ 537 F.3d at 202. Further, the agreements that the *Steinbeck* Court noted would not run afoul of the similar prohibition against "agreements to the contrary" are agreements like those between a majority of authors *not* to exercise their termination rights to the detriment of the other co-authors. *Id*. at 202-203.

That is not the case here. Here, NITA and NPR agreed to terms that affect Salt-N-Pepa's authorship status in an agreement to which Salt-N-Pepa are not directly parties. This is far from the kind of agreement by the co-authors amongst themselves not to exercise their rights contemplated by *Steinbeck*, and exactly the kind of abuses that Congress anticipated when it overhauled the termination procedures in the 1976 Copyright Act. Knowing that music publishers had circumvented the termination procedures under the 1909 Act by forcing advance

assignments of future renewal rights[12] and knowing that authors face disparate bargaining power,[13] Congress specifically added this safeguard against "any agreement to the contrary." 17 U.S.C. § 203(a)(5). Permitting third parties to contractually alter authorship after-the-fact (and thus vitiating termination rights) violates the express Congressional purpose and plain language of Section 203(a)(5).

### 2. UMG's Interpretation of the NPR Agreement is Simply Arguing that the Sound Recordings are Works-Made-For-Hire.

UMG argues that the NPR Agreement's provision that NPR would own the sound recordings created thereunder "from the inception of their creation … as the owner and author thereof" precludes Salt-N-Pepa's interpretation of the 1986 Agreements. UMG Br. at 24-26 (quoting A-88). Not so.

First, this language only refers to the later-recorded albums and does not speak to the ownership or authorship of the pre-existing albums, which are covered by paragraph 3(c). A-87. The Parties agree that this is clear grant language wherein NITA grants NPR ownership of these pre-existing albums. *Id*. The Parties differ in that Salt-N-Pepa maintain the NITA Agreement contains a grant from Salt-N-Pepa to NITA in the first instance, thus allowing NITA to then convey the same rights to

---

[12] Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law, 87th Cong., 1st Sess., Copyright Law Revision (H. Judiciary Comm. Print 1961) at (53-55). Full text available at https://www.copyright.gov/history/1961_registers_report.pdf
[13] H.R. Rep. No. 94-1476 at [124].

NPR. Tellingly, Paragraph 3(c) of the NPR Agreement does <u>not</u> contain similar language defining the authorship of these pre-existing albums. UMG tacitly concedes this point.

Again, UMG is clearly basing its interpretation on the assumption the sound recordings are works-made-for-hire. The problem with this assumption is two-fold. First, if, in fact, the works were made-for-hire, then that would render the grant language in the NITA Agreement entirely superfluous. UMG acknowledges that these are the same transaction and must be read together (UMG Br. at 18-19), and that superfluity must be avoided (*id*. at 25). But UMG is content to read out of the Agreement the clear grants from Salt-N-Pepa to NITA that underly NITA's grants to NPR.

Second, this Court has noted that contractual resolution of authorship typically only occurs in a work-for-hire relationship. *Childress v. Taylor*, 945 F.2d 500, 507 (2d Cir. 1991) (citing 17 U.S.C. § 201(b)). Again, UMG and *Amicus* RIAA have presupposed that these contracts create a work-for-hire relationship – and even go so far as to apply the *Reid* factors (RIAA Br. at 25-26). However, again, this is entirely inappropriate for the pleadings stage.

Furthermore, if, as UMG contends, Paragraph 5 renders the sound recordings works-made-for-hire, why would the Inducement Letter appended to the NPR Agreement have an express provision wherein Salt-N-Pepa "grant [NPR] all of the

24

rights and remedies therein granted to you"? (A-107). UMG calls this a "paradox" to argue that the Inducement Letter has a belt-and-suspenders grant Salt-N-Pepa made in the NITA Agreement. UMG Br. at 25. However, that reductive argument is based on the same flawed presupposition that there was a work-for-hire relationship. Indeed, it is UMG's position that is "untenable" (*id*.) because it would render the language in the Inducement Letter and the NITA Agreement superfluous.

### F. UMG Does Not Meaningfully Respond to Salt-N-Pepa's Argument-in-the-Alternative that the 1986 Agreements are Ambiguous.

Salt-N-Pepa proffer that the 1986 Agreements unambiguously contain clear grant language that satisfies Section 204, and thus are terminable grants. However, in the alternative, Salt-N-Pepa argue that given their proffer of a reasonable interpretation, even if this Court is inclined to find UMG's alternative interpretation reasonable, that would render the 1986 Agreements ambiguous, and thus, resolution at the pleadings stage would be inappropriate. *Steiner v. Lewmar, Inc.*, 816 F.3d 26, 32 (2d Cir. 2016). UMG does not meaningfully respond to this argument, other than to generally assert throughout its Brief that the 1986 Agreements are unambiguous. Accordingly, even giving credence to UMG's interpretation, this Court should nonetheless reverse to afford the opportunity to develop the record to resolve any ambiguity.

## II. The Policy Arguments Are Relevant and Persuasive.

"[I]n expounding a statute, we are not guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Massachusetts v. Morash*, 490 U.S. 107, 115 (1989). UMG argues Salt-N-Pepa proffer mere policy arguments in a "free-ranging search for the best copyright policy." UMG Br. at 15, 27. Not so.

Salt-N-Pepa have analyzed the statutory language, and then framed it within the Act as a whole and Congress' express intent. *See generally,* Op. Br. at 13, 49; *see Gundy v. United States*, 588 U.S. 128, 140 (2019) ("[S]tatutory interpretation [i]s a holistic endeavor which determines meaning by looking not to isolated words, but to text in context, along with purpose and history.") (quotations omitted); *W.R. Grace & Co. – Conn. v. Zotos Int'l, Inc.*, 559 F.3d 85, 88 (2d Cir. 2009).

## III. Resolution of Whether the Sound Recordings are Works-Made-for-Hire at the Pleadings Stage is Inappropriate, and the District Court's Implicit Finding Thereof Must Be Reversed.

The District Court's concocted 'key inquiry' that avoids any actual analysis of ownership and authorship – pivotal fact questions involving the circumstances surrounding any putative transfer – leads to the necessary conclusion that the District Court, while disclaiming to reach the issue, did make the implicit finding that the sound recordings were works-made-for-hire. This is clear error, as a ruling on this fact-intensive inquiry is inappropriate at the pleading stage. *Aymes v. Bonelli*, 980

26

F.2d 857, 861 (2d Cir. 1992) (noting the *Reid* factors can be "easily misapplied, since it consists merely of a list of possible considerations that may or may not be relevant in a given case" and that no one factor is "dispositive"); *Folkes Home Servs. Heating, Cooling, Plumbing & Elec., Ltd. Liab. Co. v. Folkes Bros. Home Servs. Ltd. Liab. Co.*, No. 24 CV 9844 (NSR), 2026 U.S. Dist. LEXIS 24672, at *19-20 (S.D.N.Y. Feb. 5, 2026) ("Because this inquiry is 'fact-intensive,' it is generally inappropriate for resolution at the pleading stage."). This alone warrants reversal. Nonetheless, Salt-N-Pepa briefly address UMG's contentions.

### A. An Employment Relationship Has Not Been Established.

UMG argues an employment relationship exists given the personal services agreement governing Salt-N-Pepa's recordings. UMG Br. at 36 n.17. This argument is waived. *United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993) ("We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review."). Regardless, the fact-specific agency-law inquiry cannot be determined at the pleadings stage. *Aymes*, 980 F.2d at 861.

### B. UMG Has Not Established that the Works were "Specially Commissioned."

Even though sound recordings do not appear in the limited enumerated categories in Section 101's definition of works-made-for-hire, UMG argues that sound recordings can be "collective works," which are a kind of "compilation." UMG Br. at 31.

27

This argument fails first because "compilations" must be created from pre-existing works. 17 U.S.C. § 101 (compilation means "a work formed by the collection and assembling of **preexisting materials** or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship") (emphasis added). The yet-to-be recorded works are not "pre-existing materials".

There is also no evidence that the sound recordings were "specially commissioned," and the RIAA admits that Salt-N-Pepa retained the right to "mutually" determine creative elements for the sound recordings under the NITA Agreement. RIAA Br. at 22 (citing A-75).

Further, the 1986 Agreements do not clearly meet the writing requirement where the parties must "agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101.

UMG's reliance on *Bryant v. Media Right Prods.*, 603 F.3d 135 (2d Cir. 2010) (UMG Br. at 31-32) is misplaced. Even if this case regarding statutory damages could stand for the proposition that sound recording albums can be considered compilations for work-for-hire purposes, this Court in *Bryant* held that whether a work constitutes a "compilation" is a "mixed question of law and fact." *Id*. at 140. Thus, resolution at the pleadings stage is likewise improper.

28

## IV. Whether Remixes Are Derivative Works Cannot Be Determined at the Pleadings Stage.

Finally, Salt-N-Pepa turn to UMG's arguments that all other issues notwithstanding, that under Section 203, it may continue to exploit remixes created pursuant to a terminated grant. UMG Br. at 36-40. UMG's position that mere alteration of the sound recording creates a derivative work is an oversimplification. Its citations to Section 114(b) and *Maljack Prods. v. UAV Corp.*, 964 F. Supp. 1416, 1428 (C.D. Cal. 1997) do not move the needle. UMG Br. at 38.

First, UMG mischaracterizes the quoted language from Section 114, which is actually a limitation of the right of the owner of a sound recording to create derivative works to rearranging or altering the "actual sounds fixed in the sound recording" and does not extend to "making or duplication of another sound recording that consists entirely of an independent fixation of other sounds." 17 U.S.C. § 114(b). It should also be noted that *Maljack* was decided, tellingly, at summary judgment not at the pleadings stage. 964 F. Supp. at 1418.

Regardless, generously, these authorities just set the standard of *whether* a remix *can* be a derivative work – a point Salt-N-Pepa do not oppose. Rather, Salt-N-Pepa argue that the remixes must contain sufficient originality to be derivative works. *Woods*, 60 F.3d at 990. This inquiry requires song-by-song analysis as to whether the additions or changes *to each* are sufficiently original to warrant derivative work status. That cannot be done without a factual record. *King-Devick*

29

*Test Inc. v. Nyu Langone Hosps.*, No. 17-CV-9307 (JPO), 2019 U.S. Dist. LEXIS 449, at *11-12 (S.D.N.Y. Jan. 2, 2019) ("This merits-based argument, though, is premature. Typically, when the originality of a copyrighted work is at issue, it becomes a question of fact for the jury to resolve.")

## CONCLUSION

Respectfully, this Court should reverse the District Court's decision.

May 19, 2026                    Respectfully submitted,

/s/Richard S. Busch
Richard S. Busch
Andrew H. "Drew" Davis
rbusch@kingballow.com
ddavis@kingballow.com
KING & BALLOW
26 Century Boulevard, Suite NT 700
Nashville, Tennessee 37214
(615) 726-5434

*Counsel for Plaintiffs-Appellants*

30

## Certificate of Compliance
## With Type-Volume Limitation, Typeface Requirements, and
## Type Style Requirements

1. This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) and L.R. 32.1 because this brief contains 6,994 words.

2. This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14 point Times New Roman font.

/s/Richard S. Busch
Richard S. Busch

31

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2026, I electronically filed the foregoing with the Clerk of the court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/Richard S. Busch
Richard S. Busch

32